IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **APRIL PFANNENSTIEL,** ) | |
| ) | |
| Plaintiff, ) | Case No. 2:19-cv-02096-JAR-GEB |
| ) | |
| v. ) | |
| ) | |
| **MARS WRIGLEY CONFECTIONERY** ) | **REQUEST FOR JURY TRIAL** |
| **US, LLC,** ) | |
| ) | |
| Defendant. ) | |

**AMENDED COMPLAINT FOR DAMAGES**

COMES NOW Plaintiff April Pfannenstiel by and through her attorney, and for her cause of action against Defendant Mars Wrigley Confectionary US, LLC, with the written consent of Defendant, amends her Complaint as follows:

**Parties and Jurisdiction**

1. This is an employment case based upon and arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.* ("FMLA"), and Kansas common law.

2. Plaintiff April Pfannenstiel ("Pfannenstiel") is a female citizen of the United States, domiciled in Topeka, Kansas.

3. Defendant Mars Wrigley Confectionary US, LLC (hereinafter "Mars") is a limited liability company organized under the laws of Delaware, with one or more members living outside the State of Kansas.

4. Mars conducts substantial and continuous business in the State of Kansas.

5. At all relevant times, Mars employed more than five hundred (500) employees.

6. At all relevant times, Mars employed fifty (50) or more employees within a seventy-five (75) mile radius.

7. At all relevant times, Mars was engaged in interstate commerce.

8. Mars is an employer within the meaning of Title VII.

9. Mars is an employer within the meaning of the FMLA.

10. Jurisdiction is proper in the District of Kansas pursuant to 28 U.S.C. § 1331 as some or all of Plaintiff's claims arise under the laws of the United States.

11. This Court has supplemental jurisdiction over Plaintiff's state law claim pursuant to 28 U.S.C. § 1367 because the state law claim is part of the same case or controversy as the claims that arise under federal law.

12. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this claim occurred within this judicial district.

**Administrative Procedures**

13. On or about October 20, 2018, Plaintiff timely filed a charge of discrimination, alleging harassment and retaliation, with the United States Equal Employment Opportunity Commission ("EEOC") and the Kansas Commission on Human Rights (attached as Exhibit 1 and incorporated herein by reference).

14. On or about November 27, 2018 the EEOC issued Plaintiff a Notice of Right to Sue with regard to her claims (attached as Exhibit 2 and incorporated herein by reference).

15. This lawsuit was filed within 90 days of the issuance of the EEOC's Notice of Right to Sue.

16. The aforesaid Charge of Discrimination provided the EEOC sufficient opportunity to investigate the full scope of the controversy between the parties, and accordingly, the sweep

of the judicial complaint may be and is as broad as the scope of an EEOC investigation which could reasonably be expected to have grown out of the Charges of Discrimination.

17. Plaintiff has satisfied all private administrative and judicial prerequisites and judicial prerequisites to the institution of this action.

18. This Complaint is filed within the applicable statute of limitations.

## Additional Factual Allegations

19. Plaintiff began working at Mars's Topeka, Kansas, facility in approximately April 2016 as a wrapper operator.[1]

20. Beginning around January 2017, a team lead at Mars's Topeka, Kansas, facility, ("J.G.") became Plaintiff's supervisor.

21. While Plaintiff and J.G. were in training together, he would often make "jokes" that he would use his power over Plaintiff as her supervisor and would "get his way" with Plaintiff.

22. About a month into J.G. being Plaintiff's supervisor, Plaintiff noticed that he would make "special trips" out to the floor to talk to her.

23. J.G. would give Plaintiff extra cleaning duties and would constantly make belittling comments.

24. J.G. drove past her house on several occasions without a legitimate reason to do so.

25. J.G. also sent Plaintiff several inappropriate private messages on Facebook.

26. On several occasions, J.G. informed Plaintiff that if she wanted a raise at the end of the year, that she "better get to pleasing him".

27. On one occurrence, J.G. sent a picture to Plaintiff of himself naked from the waist down.

28. Plaintiff told J.G. to never send inappropriate pictures like that again.

---

[1] On or around October 2, 2017, Mars changed its name with the Kansas Secretary of State from Mars Chocolate North America, LLC, to Mars Wrigley Confectionary US, LLC. Plaintiff's employment with Mars began under the former name but concluded under the latter.

29. J.G. also made sexual comments on Plaintiff's Facebook pictures and statuses.

30. As a result, Plaintiff was forced to block J.G. from her Facebook account.

31. Once, while Plaintiff was cleaning one of the machines with a co-worker, J.G. put his stomach in Plaintiff's face and said, "Is this why you won't date me, April, because you are afraid my belly would suffocate you while you were giving me oral pleasure?"

32. J.G. also sent several texts to Plaintiff in the evening on her personal cell phone, asking her if she was lonely and if she wanted company.

33. After several nights of receiving inappropriate text messages from J.G., on the following work day, Plaintiff confronted J.G. face-to-face, informing him that she was not interested and that he made her feel very uncomfortable.

34. J.G. response to Plaintiff's objections to his advances was to tell Plaintiff that she should "calm down and stop being so serious."

35. By this point, several of Plaintiff's coworkers began to tease Plaintiff about the amount of attention J.G. was giving her.

36. When Plaintiff asked the coworkers to stop teasing her about the amount of attention she was receiving from J.G., her coworkers told her to "quit being a bitch."

37. In early 2017, a team lead in another area of Mars's Topeka, Kansas, plant, ("T.B.") sometimes served as a team lead for the area in which Plaintiff worked as well, including once when J.G. was on vacation.

38. During one stint when T.B. was acting as a team lead on the side of the Topeka, Kansas, plant in which Plaintiff worked, Plaintiff reported to T.B. that her coworkers were telling her to "stop being a bitch."

39. T.B.'s response was to laugh and also tell Plaintiff to "stop being a bitch."

40. Plaintiff brought this to T.B.'s attention, as response, he laughed and told Plaintiff "well stop being a bitch".

41. As the harassment became an everyday occurrence, Plaintiff went to another team lead and requested to be moved to his team because of the treatment she was receiving from her coworkers.

42. Shortly thereafter, when T.B. was again covering Plaintiff's area as team lead while J.G. was on vacation, T.B. spoke to Plaintiff inappropriately when Plaintiff challenged him for his inappropriate treatment of another employee.

43. When J.G. returned from his vacation, he and T.B. called Plaintiff into the production office to give her a "final" disciplinary action for issues that were false.

44. Plaintiff took her writeup to a human resources representative to show her that the writeup was unjustified.

45. At that time, Plaintiff learned that T.B. had sought approval for the termination of Plaintiff's employment based on the allegations in the writeup but was told to only make it a final.

46. Plaintiff then also told human resources about the other harassment she had suffered from J.G., T.B., and her coworkers, and provided evidence thereof.

47. A supervisor told Plaintiff to take the rest of the day off.

48. The following day, Plaintiff received a call from a human resources representative, who informed Plaintiff that J.G.'s and T.B.'s employment had been terminated.

49. Plaintiff also learned that J.G. had threatened to blow up Plaintiff's house as he was being terminated and that as a result, she was on leave until further notified.

50. After the death threat, because she had previously seen J.G. drive past her home, Plaintiff felt unsafe in her home and was worried about her children's safety, and as a consequence, had to find another place to live.

51. Plaintiff ultimately took approved leave to receive treatment for the stress and anxiety she was suffering from as a result of the treatment she received from J.G. and T.B.

52. When, Plaintiff was finally able to return to work, Mars put her on a different team.

53. On Plaintiff's new team, she had two co-workers ("J.S." and "J.E.") who were very close to T.B. and who frequently expressed to Plaintiff how unhappy they were about T.B.'s termination with the company.

54. J.S. would also consistently, unfairly, and rudely criticize the quality of Plaintiff's work.

55. Plaintiff reported J.S.'s harassment to her new team lead ("B.A.").

56. Instead of addressing Plaintiff's concerns about the treatment she was receiving from J.S., B.A. gave Plaintiff a final written warning regarding her attendance.

57. Plaintiff explained to B.A. that her previously-approved FMLA time had not been accounted for in the attendance tracking system; B.A. responded that he would investigate it, but that the writeup would still be in force until the issue was resolved.

58. A few weeks later, Plaintiff was called in the office because J.S. and J.E. told B.A. that she was taking extra breaks.

59. Despite the fact that other coworkers disputed J.S. and J.E.'s allegations, Plaintiff was told discipline was still going to be documented in her file.

60. Plaintiff then confronted J.S. and J.E. regarding their allegations that she was taking extra breaks; they responded that they had no idea what she was talking about.

61. In October 2017, Plaintiff asked B.A. for a team meeting with J.S. and J.E. to address the treatment she had been receiving from them.

62. In the meeting, J.S. started to yell at Plaintiff, telling her that she was a "self-centered bitch" and that his friends "did not deserve to get fired over" her.

63. In the meeting, J.S. also acted as if he was going to charge at Plaintiff.

64. A supervisor came to the meeting, stating that she could hear J.S. from down the hall.

65. Although Plaintiff had to leave the meeting early because she was so upset, she learned later that J.S.'s employment was terminated at the meeting.

66. After the meeting, Plaintiff went on FMLA leave for the anxiety she was suffering as a result of her treatment by her coworkers.

67. Plaintiff's therapist suggested that when Plaintiff returned to work, she should have a modified work schedule with one or two days off per week, to which Mars agreed.

68. When Plaintiff returned to work, it was difficult and painful to move her hands.

69. Mars's onsite nurse suggested that Plaintiff go see a specialist, who diagnosed Plaintiff with carpal tunnel syndrome and suggested surgery.

70. Plaintiff had surgery on both hands and returned to work in or around February 2018.

71. Almost immediately upon Plaintiff's return to work, J.E. told Plaintiff that he was not happy to see her and that he hoped that she had been fired.

72. Plaintiff went directly to a supervisor and informed her that J.E. was starting to harass her.

73. The supervisor's solution for Plaintiff was to ignore J.E. and to think positively.

74. Shortly thereafter, B.A. performed an annual evaluation for Plaintiff in which he praised Plaintiff's work performance but noted that she had missed some job duties that would have had to have been completed while Plaintiff was on leave for her hand surgery, and that she

had been given a final written warning for attendance in November 2017, again while she was off of work for her hand surgery.

75. In Spring 2018, J.E. reported to human resources that Plaintiff was violating the attendance policy, but that was again proven to be false.

76. On or around April 21, 2018, Plaintiff suffered an on the job injury when she slipped and fell after stepping on an errant hair net.

77. Plaintiff promptly notified Mars of her on the job injury.

78. On or around May 18, 2018, J.E. filed a police report, stating that Plaintiff had talked about "wanting to kill people, being involved in drive-by shootings, and hanging out with a killer."

79. After the police came to Plaintiff's residence to question her about J.E.'s ridiculous allegations, Plaintiff called B.A. and told him that she had to go to the police station because of J.E.'s false accusations.

80. B.A. informed Plaintiff that she would remain off work until Mars was done with its investigation.

81. J.E. remained at work throughout the investigation.

82. A week later, Plaintiff received a call from Mars and learned that she was terminated because Mars had no proof that J.E. was harassing her or of the police report, and because Plaintiff was slandering the company's name.

83. J.E. remained employed by Mars and was not disciplined for filing the police report against Plaintiff.

**COUNT I**
**Violation under 42 U.S.C. §§ 2000e** *et seq.*
**Retaliation**

84. Plaintiff hereby re-alleges and incorporates by reference the allegations contained in all paragraphs above as though set out fully herein.

85. Plaintiff made multiple good faith reports of sexual harassment and retaliation during her employment.

86. By making good faith reports of sexual harassment and retaliation in the workplace, Plaintiff engaged in multiple protected activities throughout her employment.

87. Plaintiff's good faith reports of sexual harassment and retaliation in the workplace were determining factors in Mars's decision to terminate her employment.

88. At all times mentioned herein, before and after, the above described perpetrators were agents, servants, and employees of Mars, and were at all such times acting within the scope and course of their agency and employment, and/or their actions were expressly authorized by Mars, thus making Mars liable for said actions under the doctrine of *respondeat superior*.

89. Mars failed to make good faith efforts to establish and enforce policies to prevent illegal discrimination against its employees, including harassment and retaliation.

90. Mars failed to properly train or otherwise inform its supervisors and employees concerning their duties and obligations under the civil rights laws, including Title VII.

91. As shown by the foregoing, Plaintiff suffered intentional discrimination at the hands of Mars, based on her good faith reports of sexual harassment and retaliation, in violation of Title VII.

92. As a direct and proximate result of Mars's actions and/or omissions, Plaintiff has been deprived of income as well as other monetary and non-monetary benefits.

93. As a further direct and proximate result of Mars's actions and/or omissions, Plaintiff has suffered humiliation, mental anguish, pain, and a loss of self-esteem in the form of emotional distress and related compensatory damages.

94. By failing to take prompt and effective remedial action and instead of re-employing Plaintiff, Mars in effect condoned, ratified, and/or authorized discrimination against Plaintiff.

95. As shown by the foregoing, Mars's conduct was willful, wanton, and malicious, and showed complete indifference to or conscious disregard for the rights of others, including the rights of Plaintiff, thus justifying an award of punitive damages in an amount sufficient to punish Mars or to deter it and other employers from like conduct in the future.

96. Pursuant to the provisions of Title VII, Plaintiff is entitled to recover her reasonable attorney's fees from Mars.

WHEREFORE, Plaintiff requests that the Court enter judgment in her favor and against Mars for economic damages, including but not limited to back pay and the value of lost benefits; for compensatory damages, including but not limited to emotional distress; for equitable relief, including but not limited to front-pay and injunctive relief; for punitive damages; for reasonable attorney's fees and costs incurred herein; for pre- and post-judgment interest as allowed by law; and for such other and further legal and equitable relief as the Court deems just and proper.

## COUNT II
### Violation under 29 U.S.C. § 2615(a)(2)
### Retaliation

97. Plaintiff re-alleges and incorporates herein by reference, as though fully set forth herein, all the above numbered paragraphs.

98. At all relevant times, Plaintiff had serious health conditions, including anxiety and carpel tunnel.

99. At all relevant times, Plaintiff was an eligible employee pursuant to the FMLA.

100. In 2017, Plaintiff engaged in a protected activity each time she requested FMLA leave or otherwise inquired about his FMLA rights with relation to her anxiety and carpel tunnel.

101. Plaintiff engaged in a protected activity when she took FMLA leave.

102. Plaintiff suffered an adverse employment action when Mars terminated her employment in May 2018.

103. A causal connection exists between Plaintiff's exercise of her FMLA rights and the aforementioned adverse employment action taken against her.

104. At all times mentioned herein, before and after, the above described perpetrators were agents, servants, and employees of Mars, and were at all such times acting within the scope and course of their agency and employment, and/or their actions were expressly authorized or ratified by Mars, thus making Mars liable for said actions under the doctrine of *respondeat superior*.

105. As a direct and proximate result of Mars's actions and/or omissions, Plaintiff has been deprived of income, as well as other monetary and non-monetary benefits.

106. Pursuant to 29 U.S.C. § 2617(a)(3), Plaintiff is entitled to recover reasonable attorney's fees from Mars.

WHEREFORE, Plaintiff requests that the Court enter judgment in his favor and against Mars for economic damages, including but not limited to back-pay and lost benefits; for equitable relief, including but not limited to front-pay and injunctive relief; for liquidated damages; for reasonable attorneys' fees and costs incurred herein; for pre- and post-judgment interest as allowed by law; and for such other and further legal and equitable relief as the Court deems just and proper.

### COUNT III
**Violation under Kansas Common Law**
**Wrongful Termination in Violation of Public Policy**

107. Plaintiff re-alleges and incorporates herein by reference, as though fully set forth herein, all of the above numbered paragraphs.

108. Public policy clearly encourages employees to file workers' compensation claims for injuries by accident, arising out of and in the course of the employee's employment. *See* K.S.A. §§ 44-501 *et seq.*

109. Public policy also clearly discourages an employer or agent of the employer from discharging or discriminating against any employee for exercising his or her rights under the workers' compensation law. *See* K.S.A. § 44-501.

110. Plaintiff reported her injury further exercised her rights under the Kansas worker's compensation law.

111. Mars knew or anticipated that Plaintiff did or would file a workers' compensation claim before it terminated her employment.

112. By terminating Plaintiff's employment, Mars subjected Plaintiff to an adverse employment action.

113. Plaintiff's exercise of his workers' compensation rights, as encouraged by public policy, was at least a motivating factor in Mars decision to terminate Plaintiff's employment.

114. At all times mentioned herein, before and after, the above described perpetrators were agents, servants, and employees of Mars, and were at all such times acting within the scope and course of their agency and employment, and/or their actions were expressly authorized or ratified by Mars, thus making Mars liable for said actions under the doctrine of *respondeat superior*.

115. Mars failed to make good faith efforts to establish and enforce policies to prevent wrongful termination of its employees' employment, including termination in retaliation for exercising one's workers' compensation rights.

116. Mars failed to properly train or otherwise inform its supervisors and employees concerning their duties and obligations under the civil rights laws, including Kansas' common law prohibition against wrongful termination in violation of public policy.

117. As shown by the foregoing, Plaintiff suffered intentional wrongful termination based on his protected activity.

118. As a direct and proximate result of Mars's actions and/or omissions, Plaintiff has been deprived of income as well as other monetary and non-monetary benefits.

119. As a further direct and proximate result of Mars's actions and/or omissions, Plaintiff has suffered humiliation, mental anguish, pain, and a loss of self-esteem in the form of garden variety emotional distress and related compensatory damages.

120. Mars's conduct was willful, wanton, and malicious, and showed complete indifference to or conscious disregard for the rights of others, including the rights of the Plaintiff, thus justifying an award of punitive damages in an amount sufficient to punish Mars or to deter it and other employers from like conduct in the future.

WHEREFORE, Plaintiff requests that the Court enter judgment in her favor and against Mars for economic damages, including but not limited to back-pay and lost benefits; for compensatory damages, including but not limited to emotional distress; for equitable relief, including but not limited to front-pay and injunctive relief; for punitive damages; for costs incurred herein; for pre- and post-judgment interest as allowed by law; and for such other and further legal and equitable relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff requests a trial by jury, in Kansas City, Kansas, on all counts and allegations of wrongful conduct alleged in this Complaint.

Respectfully Submitted,

CORNERSTONE LAW FIRM

By: _/s/ Joshua P. Wunderlich_
Joshua P. Wunderlich          D. Kan. #78506
j.wunderlich@cornerstonefirm.com
8350 N. St. Clair Ave. Ste. 225
Kansas City, Missouri 64151
Telephone          (816) 581-4040
Facsimile           (816) 741-8889

ATTORNEY FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this   17th   day of   January  , 2020, a true and accurate copy of the foregoing, was filed with the Clerk of Court via the Court's electronic filing system, which sent notice of the same to:

J. Phillip Gragson          jpgragson@hensonlawoffice.com
Henson, Hutton, Mudrick, Gragson & Vogelsberg LLP
3649 SW Burlingame Road, Ste. 200
Topeka, KS 66111-2155

Thomas R. Davies          tdavies@h-dlaw.com
Laura Bailey Gallagher    lgallagher@h-dlaw.com
Harmon & Davies, P.C.
2306 Columbia Ave.
Lancaster, PA 17603

 /s/ Joshua P. Wunderlich
Joshua P. Wunderlich