**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| APRIL PFANNENSTIEL, | ) |
| | ) |
| Plaintiff, | ) CIVIL ACTION |
| | ) CASE NO.  2:19-CV-02096 |
| | ) |
| v. | ) |
| | ) |
| MARS WRIGLEY CONFECTIONERY, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

NOW COMES Defendant Mars Wrigley Confectionery (hereinafter "Mars" or "Defendant") and respectfully submits the following Memorandum in Support of its Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 and D. Kan. Rule 56.1.

**I.      STATEMENT OF THE NATURE OF THE CASE**

Plaintiff April Pfannenstiel, a former employee (also known as associate) of Defendant Mars Wrigley Confectionery at the Topeka, Kansas facility, brings this lawsuit alleging that she was terminated in retaliation for complaining of sexual harassment, taking FMLA leave, and filing a workers' compensation claim.  After Plaintiff reported allegations of sexual harassment, Mars Wrigley Confectionery immediately suspended the accused sexual harassers and launched an investigation into the claims.  Within two days, after verifying that the allegations were credible, Mars Wrigley Confectionery terminated the workers and provided Plaintiff with paid time off.  Throughout Plaintiff's employment with Mars Wrigley Confectionery, she was approved for FMLA leave several times and returned to work in the same position for the same rate of pay.

1

Plaintiff was injured at work in April 2018 and filed a workers' compensation claim against Mars Wrigley Confectionery.  In May 2018, Plaintiff was identified in a police report filed with the Topeka Police Department.  After law enforcement officers visited the Topeka facility looking for Plaintiff, Mars Wrigley Confectionery conducted an investigation into Plaintiff.  During the Company's investigation, Plaintiff made multiple false statements for which she was ultimately terminated.

This case is now ripe for summary judgment.  Defendant Mars Wrigley Confectionery seeks summary judgment because: (1) Plaintiff fails to establish a prima facie case for retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"); (2) Plaintiff fails to establish a prima facie case for retaliation in violation of the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.* ("FMLA"); and (3) Plaintiff fails to establish a prima facie case for wrongful termination in violation Kansas common law.  However, even if Plaintiff could establish a prima facie case for retaliation in violation of Title VII and FMLA and wrongful termination in violation of Kansas common law, Defendant Mars Wrigley Confectionery had legitimate non-discriminatory and non-retaliatory business reasons for its actions that Plaintiff cannot demonstrate were pretextual.

Pursuant to D. Kan. Rule 6.1(d)(2), Plaintiff's response to this motion for summary judgment must be filed and served within 21 days of the date this motion is filed.  Plaintiff's response to this motion for summary judgment is therefore due on or before Friday, August 21, 2020.

## II.    STATEMENT OF UNCONTROVERTED FACTS

1.      On May 2, 2016, Plaintiff April Pfannenstiel began working for Defendant Mars Wrigley Confectionery at Defendant's Topeka, Kansas facility as a Wrapper Operator. (Doc. 52, PTO, at p. 2, Stip. Fact No. 1).

2.      Mars Wrigley Confectionery is a member of the Mars, Incorporated family of companies.  (Declaration of Nichole Phillips, attached hereto as Exhibit A, at ¶3).

3.      Mars Wrigley Confectionery manufactures and distributes confectionery and snack food products, specifically M&Ms Peanut, M&Ms Caramel, Snickers, and Twix. (Deposition of Shirley Ha, attached hereto as Exhibit B, at 38:16-38:17).

4.      April Pfannenstiel worked as a Wrapper Operator for Snickers. (Deposition of Plaintiff April Pfannenstiel, Volume I, attached hereto as Exhibit C, at 22:5-6).

5.      Snickers were and are the only candy bar made by the Filled Bar Department. (Ex. B, Ha Depo., at 17:24-18:8).

6.      The Filled Bar Department was divided into three different teams, with each team working different shifts. (Deposition of Michelle Waggoner, attached hereto as Exhibit D, at 29:23-30:1, 30:11-16).

7.      Each team was divided into two lines: the packaging side and the processing side. (Deposition of Benjamin Arteaga, Sr., attached hereto as Exhibit E, at 22:11-15).

8.      April Pfannenstiel worked on the packaging side. (Ex. C, Pltf. Depo., at 24:21-25:2, 120:6-9).

9.     On March 1, 2017, Travis Bussen, a Team Lead on the processing side, delivered a written attendance warning to Plaintiff. (Doc. 52, PTO, at p. 2, Stip. Fact No. 2; Ex. C, Pltf. Depo., at 49:14-23).

10.    James Gustin, who at the time was April Pfannenstiel's Team Lead, was not at the Topeka facility when Ms. Pfannenstiel was given the written attendance warning. (Ex. C, Pltf. Depo., at 26:2-5, 42:3-8, 45:5-7).

11.    Travis Bussen was not April Pfannenstiel's Team Lead, however, when James Gustin was out, Mr. Bussen would cover the packaging side as well. (Ex. D, Waggoner Depo., at 29:17-22; Ex. C, Pltf. Depo., at 49:14-23).

12.    On March 1, 2017, after receiving the written attendance warning, April Pfannenstiel spoke to People & Organization ("P&O") Manager, Michelle Waggoner, stating that she did not agree with the written attendance warning. (Doc. 52, PTO, at p. 2, Stip. Fact No. 3).

13.    Michelle Waggoner rescinded the written attendance warning after April Pfannenstiel showed her text messages between herself and Travis Bussen that Ms. Waggoner felt Ms. Pfannenstiel could have been interpreted to mean that she had permission to be out for the full day. (Ex. D, Waggoner Depo., at 10:7-23).

**<u>March 2017 Complaint of Sexual Harassment</u>**

14.    On March 2, 2017, in response to follow-up questions from Ms. Waggoner, Ms. Pfannenstiel reported that James Gustin and Travis Bussen sexually harassed her. (Doc. 52, PTO, at p. 2, Stip. Fact No. 4).

15.    Initially, April Pfannenstiel was not forthcoming to Michelle Waggoner with some of the information regarding the alleged sexual harassment because she did not want to start an investigation.  However, after Ms. Waggoner informed Ms. Pfannenstiel that she had an obligation

to investigate it now that she had knowledge of it, Ms. Pfannenstiel began sharing additional information. (Ex. D, Waggoner Depo., at 31:14-32:5).

16.     After April Pfannenstiel reported the sexual harassment, Defendant suspended James Gustin and Travis Bussen pending a further investigation. (Doc. 52, PTO, at p. 2, Stip. Fact No. 5).

17.     The day after reporting the alleged sexual harassment, April Pfannenstiel requested some time off.  Michelle Waggoner told Ms. Pfannenstiel, who was visibly upset, to talk with Jonette Penton, the Regional Nurse Case Manager.  Mars approved Ms. Pfannenstiel's request for time off. (Ex. D, Waggoner Depo., at 36:11-17; Ex. C, Pltf. Depo., at 58:6-15; Deposition of Jonette Penton, attached hereto as Exhibit F, at 12:9-10).

18.     Michelle Waggoner conducted an investigation into the reported sexual harassment that included speaking with other associates and was able to verify April Pfannenstiel's allegations of sexual harassment were credible. (Ex. D, Waggoner Depo., at 35:14-22).

19.     On March 3, 2017, after the investigation verified April Pfannenstiel's allegations of sexual harassment were credible, Defendant terminated James Gustin's and Travis Bussen's employment. (Doc. 52, PTO, at p. 2, Stip. Fact No. 6; Ex. D, Waggoner Depo., at 35:23-36:1).

20.     Between March 14, 2017 and April 2, 2017, Plaintiff took paid medical leave which the Company had offered. (Doc. 52, PTO, at p. 2, Stip. Fact No. 7).

21.     Prior to reporting the alleged sexual harassment, April Pfannenstiel approached Harry Smith, a Team Lead on another team, and asked to be moved to his team but did not tell him why. (Ex. C, Pltf. Depo., at 56:18-57:12).

22.     In March of 2017, Benjamin Arteaga, Sr., began working for Mars Wrigley Confectionary at the Topeka, Kansas facility as a Team Lead. (Ex. E, Arteaga, Sr., Depo., at 14:25-15:5).

23.     When Benjamin Arteaga, Sr., began working as a Team Lead, April Pfannenstiel was out on leave; however, Harry Smith, another Team Lead, informed Mr. Arteaga that Ms. Pfannenstiel was going to be joining his team. (Ex. E, Arteaga, Sr., Depo., at 31:12-32:1, 55:11-15).

24.     When April Pfannenstiel returned from paid medical leave, she transferred onto Benjamin Arteaga, Sr.'s team. (Ex. C, Pltf. Depo., at 60:8-16; Ex. E, Arteaga, Sr., Depo., at 37:20-38:3).

### September 2017 Complaint Regarding Jacob Edwards and Jordan Stilley

25.     Plaintiff made at least one report to Benjamin Arteaga, Sr., that she did not feel comfortable working with Jacob Edwards and Jordan Stilley and that they were making comments at work that Plaintiff was unsafe.  (Doc. 52, PTO, at p. 3, Stip. Fact. No. 8-9).

26.     On September 13, 2017, Ms. Pfannenstiel's co-workers, Jacob Edwards and Jordan Stilley, complained to Benjamin Arteaga, Sr., that Ms. Pfannenstiel was taking extra breaks. (Doc. 52, PTO, at p. 3, Stip. Fact No. 10).

27.     On September 14, 2017, Benjamin Arteaga, Sr., had a meeting with Ms. Pfannenstiel, Jacob Edwards, Jordan Stilley, and Hailey Luxe to discuss the complaints of Ms. Pfannenstiel taking extra breaks. (Doc. 52, PTO, at p. 3, Stip. Fact No. 11).

28.     During this meeting, Jordan Stilley started yelling and cursing at Plaintiff and Mr. Stilley was sent home pending an investigation. (Doc. 52, PTO, at p. 3, Stip. Fact No. 12).

29.     At this meeting, Jordan Stilley also made comments regarding April Pfannenstiel getting James Gustin and Travis Bussen fired. (Ex. E, Arteaga, Sr., Depo., at 52:19-53:3, 53:12-20; Ex. C, Pltf. Depo., at 70:1-12).

30.     Due to his conduct during the meeting, Defendant terminated Jordan Stilley shortly thereafter. (Doc. 52, PTO, at p. 3, Stip. Fact No. 13).

### Plaintiff's FMLA Leave Requests

31.     Beginning on September 19, 2017, the Company offered Plaintiff the chance to take intermittent FMLA leave. (Doc. 52, PTO, at p. 3, Stip. Fact No. 14).

32.     Beginning September 22, 2017, Plaintiff began taking FMLA leave for exacerbation of her anxiety. (Doc. 52, PTO, at p. 3, Stip. Fact No. 15).

33.     Between September 27, 2017 and October 3, 2017, Plaintiff took FMLA medical leave due to carpal tunnel syndrome. (Doc. 52, PTO, at p. 3, Stip. Fact No. 16).

34.     On October 6, 2017, the Topeka-Capital Journal reported that Plaintiff was booked into Shawnee County Jail in connection with aggravated assault with a deadly weapon on October 5, 2017. (Doc. 52, PTO, at p. 4, Stip. Fact No. 17).

35.     Idol Rashid, Associate Relations Manager for the Mars Wrigley Confectionery facility in Topeka, was aware of the report in the Topeka-Capital Journal that Plaintiff was booked into Shawnee County Jail in connection with aggravated assault with a deadly weapon on October 5, 2017. (Declaration of Idol Rashid, attached hereto as Exhibit G, at ¶¶4, 6; Ex. C, Pltf. Depo., at 78:8-19).

36.     Mr. Rashid was an Associate Relations Manager with Mars, Incorporated, from November 10, 2014 to September 28, 2018. (Ex. G, Rashid Decl., at ¶3).

37.     Mr. Rashid was assigned to multiple facilities, including the Mars Wrigley Confectionery facility located in Topeka, Kansas. (Ex. G, Rashid Decl., at ¶4).

38.     April Pfannenstiel admitted that she had a gun charge and a criminal damage to property charge and that those charges were dropped. (Ex. C, Pltf. Depo., at 77:18-78:1, 82:17-20, 85:9-10).

39.     Between October 4, 2017 and November 22, 2017, Plaintiff only worked a total of nine shifts. (Doc. 52, PTO, at p. 4, Stip. Fact No. 18).

40.     From November 2, 2017 to November 10, 2017, Plaintiff took FMLA medical leave due to her generalized anxiety disorder. (Doc. 52, PTO, at p. 4, Stip. Fact No. 19).

41.     Between November 27, 2017 and February 12, 2018, Plaintiff took FMLA medical leave due to carpal tunnel surgery on both hands. (Doc. 52, PTO, at p. 4, Stip. Fact No. 20).

**Plaintiff's Worker's Compensation Claim**

42.     On April 21, 2018, Plaintiff sustained a work-related injury when she slipped on a hair net in the locker room and strained her back. (Doc. 52, PTO, at p. 4, Stip. Fact No. 21).

43.     Per Company policy, when an associate sustains a work-related injury and they are sent to a physician for care, the associate is required to undergo a post-accident drug test. (Ex. F, Penton Depo., at 40:8-14).

44.     Pursuant to Company policy, Plaintiff was required to undergo a post-accident drug test. (Doc. 52, PTO, at p. 4, Stip. Fact No. 22).

45.     After April Pfannenstiel's drug sample was collected, it was sent to Defendant's drug testing contractor, Outcome, LLC. (Ex. F, Penton Depo., at 40:21-41:4).

46.     After April Pfannenstiel's drug screen was sent to Outcome, LLC, Benjamin Arteaga, Sr., Plaintiff's Line Manager, and Shirley Ha, Value Stream Manager, wanted to know the results. (Declaration of Jonette Penton, attached hereto as Exhibit H, at ¶4).

47.     Mr. Arteaga and Ms. Ha needed to know the results for staffing purposes, specifically, when they could expect April Pfannenstiel back. (Ex. F, Penton Depo., at 44:20-22).

48.     It is common for Jonette Penton, as Regional Nurse Case Manager for Defendant's Topeka, Kansas facility, to receive requests from management as to the status of drug tests. (Ex. F, Penton Depo., at 43:1-4).

49.     On April 24, 2018, Jonette Penton sent an email to Outcome, LLC, inquiring into Plaintiff's post-injury drug test results. (Ex. F, Penton Depo., at 40:21-25, 42:10-21).

50.     Plaintiff took an approved leave of absence due to her injuries and returned to work on or around April 30, 2018. (Doc. 52, PTO, at p. 4, Stip. Fact No. 24).

51.     On or around May 2, 2018, Jonette Penton sent an email to Defendant's workers compensation occupational health provider regarding the scheduling of treatment for Plaintiff after her work-related injury of April 21, 2018. (Doc. 52, PTO, at p. 5, Stip. Fact No. 25).

52.     On June 4, 2018, Jonette Penton was informed by Defendant's workers' compensation insurance provider, Liberty Mutual, that its attempts to reach April Pfannenstiel regarding medical treatment for her work-related injury were unsuccessful.  (Ex. H, Penton Decl., at ¶9).

53.     On July 5, 2018, Liberty Mutual advised Jonette Penton that April Pfannenstiel's last visit for medical treatment related to her work-related injury was May 23, 2018, and that it was closing its file for her because attempts to reach her were unsuccessful.  (Ex. H, Penton Decl., at ¶10).

54.     Following April Pfannenstiel's work-related injury, she returned to work for 17 shifts. (Ex. H, Penton Decl., at ¶¶7-8, Ex. A).

55.     April Pfannenstiel testified that following her work-related injury, she never returned to work.  (Deposition of Plaintiff April Pfannenstiel, Volume II, attached hereto as Exhibit K, at 139:20-140:2).

### Incident Regarding May 2018 Police Report

56.     On May 18, 2018, a police report was filed with the Topeka Police Department alleging April Pfannenstiel had talked about wanting to kill people, being involved in drive-by shootings, and hanging out with a killer. (Doc. 52, PTO, at p. 5, Stip. Fact No. 26).

57.     On or around May 22, 2018, a detective from the Topeka Police Department came to Defendant's Topeka, Kansas facility and asked to speak with April Pfannenstiel who was not there. (Doc. 52, PTO, at p. 5, Stip. Fact No. 27).

58.     On May 22, 2018, Detectives had gone to April Pfannenstiel's home and left a card. (Ex. C, Pltf. Depo., at 90:10-25).

59.     On May 22, 2018, at 10:36a.m., April Pfannenstiel text messaged Benjamin Arteaga, Sr., stating: "Please call me when you when. The detective called me back. Said he needs me to come down to police station about some accusations that had been made against me from a possible coworker." (Ex. E, Arteaga, Sr., Depo., at 107:7-19).

60.     Shortly thereafter, April Pfannenstiel again texted Benjamin Arteaga, Sr., stating: "I don't trust this and I know I'm probably going to end up in jail today. I have a bad feeling and I haven't even done anything. I guess a lot more was supposedly said. The shooting up the place was just one of them." (Ex. E, Arteaga, Sr., Depo., at 124:2-22).

61.     From April 9, 2018 to May 25, 2018, the Associates Relations Manager assigned to the Topeka facility, Mr. Rashid, was out on Paternity Leave. (Ex. G, Rashid Decl., at ¶¶4, 7).

62.     While Mr. Rashid was on Paternity Leave, Nichole (Niki) Phillips, also an Associate Relations Manager with Mars, Incorporated, covered Mr. Rashid's Associate Relations responsibilities and duties at multiple facilities, including the Mars Wrigley Confectionery facility in Topeka, Kansas. (Ex. G, Rashid Decl., at ¶8).

63.     After the detective left the facility, Benjamin Arteaga, Sr., contacted Niki Phillips, the Associate Relations Manager covering the Associate Relations responsibilities at the Mars Wrigley Confectionery facility in Topeka, Kansas at that time, by phone to inform Ms. Phillips that there was a detective on site that wanted to question April Pfannenstiel. (Deposition of Nichole Phillips, attached hereto as Exhibit I, at 61:4-14; Ex. G, Rashid Decl., at ¶8).

64.     On May 22, 2018, after learning that the Topeka Police Department was looking for her, April Pfannenstiel voluntarily presented herself to law enforcement and was subsequently arrested for failing to appear for a hearing related to a misdemeanor charge of criminal damage to property. (Doc. 52, PTO, at p. 5, Stip. Fact No. 28; Ex. I, Phillips Depo., at 107:11-15; Ex. A, Phillips Decl., at Ex. A).

65.     On May 22, 2018, after Niki Phillips' telephone conversation with Benjamin Arteaga, Sr., Ms. Phillips then called April Pfannenstiel, who confirmed that a detective wanted to question her, and that she wanted to take the night and connect the following day. (Ex. I, Phillips Depo., at 65:5-19).

66.     As a result of the detective showing up to the Mars Wrigley Confectionery facility, Niki Phillips launched an investigation of April Pfannenstiel to determine the reason for the detective showing up on site. (Ex. G, Rashid Decl., at ¶9; Ex. I, Phillips Depo., at 59:6-7).

67. Niki Phillips then contacted April Pfannenstiel by telephone again on May 23, 2018. (Ex. I, Phillips Depo., at 68:1-11).

68. During Niki Phillips' phone call with April Pfannenstiel, Ms. Pfannenstiel told Ms. Phillips that she had been contacted by local law enforcement regarding a complaint that was made against her by Jacob Edwards about her involvement with somebody who had just been charged with murder. (Ex. I, Phillips Depo., at 66:3-11).

69. April Pfannenstiel told Niki Phillips that the detective made her aware that she had been named in a police report as somebody who was going to shoot up Mars with Rahnel Rayford. (Ex. I, Phillips Depo., at 68:25-69:11, 69:14-19).

70. Ms. Pfannenstiel stated that because she knew Rahnel Rayford, who had been charged with murder, she was being questioned about it. (Ex. C, Pltf. Depo., at 89:6-90:7, 92:17-23; Ex. I, Phillips Depo., at 66:6-11, 68:25-69:11).

71. Ms. Pfannenstiel stated that she knew Rahnel Rayford because they used to work together and because she had sold him a car. (Ex. C, Pltf. Depo., at 103:21-25; Ex. I, Phillips Depo., at 69:14-19).

72. April Pfannenstiel told Ms. Phillips that the detective told her that Jacob Edwards had made the police report. (Doc. 52, PTO, at p. 6, Stip. Fact No. 34; Ex. I, Phillips Depo., at 69:14-19).

73. April Pfannenstiel told Ms. Phillips that she knew it was Jacob Edwards who made the police report and that she believed people did not like her at the work site, specifically Mr. Edwards, because April Pfannenstiel got some of his friends fired.  (Ex. I, Phillips Depo., at 68:18-24, 69:14-19; Ex. C, Pltf. Depo., at 61:20-62:5).

74.     April Pfannenstiel also informed Niki Phillips that she had been arrested because she had changed her phone number and when the detectives could not get a hold of her, they issued a bench warrant for her arrest. (Ex. I, Phillips Depo., at 68:25-69:11, 95:8-16, 106:21-107:4).

75.     On May 23, 2018, Defendant placed Plaintiff on paid leave while Defendant conducted an investigation into the allegations. (Doc. 52, PTO, at p. 6, Stip. Fact No. 35).

76.     Following her conversation with April Pfannenstiel, Niki Phillips spoke with Detective Davies, the law enforcement officer that went to the Topeka facility on May 22, 2018, about April Pfannenstiel and the police report. (Ex. I, Phillips Depo., at 77:17-78:1; Doc. 52, PTO, at p. 5, Stip. Fact No. 31).

77.     Detective Davies stated that about 80 percent of what April Pfannenstiel had told her was true. (Ex. I, Phillips Depo., at 78:4-10).

78.      Detective Davies informed Niki Phillips that he had left a message for April Pfannenstiel to contact with him; however, instead of contacting him, she went to Shawnee County to clear up a bench warrant that had been issued for her arrest because she failed to appear in court for her misdemeanor criminal damage to property charge. (Ex. I, Phillips Depo., at 78:12-23; Ex. A, Phillips Decl., at Ex. A).

79.      Detective Davies also informed Niki Phillips that he did not tell April Pfannenstiel who filed the police report and that person wanted to remain anonymous. (Ex. I, Phillips Depo., at 78:4-10, 79:21-80:3, 103:23-104:2; Ex. A, Phillips Decl., at Ex. A).

80.     Detective Davies would not tell Niki Phillips who filed the police report. (Ex. I, Phillips Depo., at 103:23-104:2; Ex. A, Phillips Decl., at Ex. A).

81.     Plaintiff later admitted that the detective would not release the identity of who filed the police report while the investigation was on-going and that she received a copy of the report

only at the end of the investigation which stated that Jacob Edwards made the report.  (Ex. C, Pltf. Depo., at 87:12-18).

## Plaintiff's Termination

82.    As a result of her investigation, Niki Phillips recommended that April Pfannenstiel be terminated. (Ex. G, Rashid Decl., at ¶10).

83.    Upon his return to work after Paternity Leave, Idol Rashid reviewed Niki Phillips' recommendation to terminate April Pfannenstiel. (Ex. G, Rashid Decl., at ¶11).

84.    Idol Rashid and Niki Phillips discussed the recommendation to terminate Ms. Pfannenstiel with their manager, Senior Associate Relations Manager Christopher Krugman. (Ex. G, Rashid Decl., at ¶12; Ex. I, Phillips Depo., at 75:20-24, 84:14-17, 94:22-95:2; Declaration of Christopher Krugman, attached hereto as Exhibit J, at ¶8).

85.    Christopher Krugman, Idol Rashid, and Niki Phillips were not aware that April Pfannenstiel filed a Worker's Compensation claim nor were they told by Jonette Penton about Plaintiff's work-related injury or her worker's compensation claim. (Ex. A, Phillips Decl., at ¶6; Ex. G, Rashid Decl., at ¶18; Ex. J, Krugman Decl., at ¶12; Ex. H, Penton Decl., at ¶5).

86.    Idol Rashid was involved in and finalized the decision to terminate April Pfannenstiel's employment from Mars Wrigley Confectionery. (Ex. G, Rashid Decl., at ¶¶13-14).

87.    On May 30, 2018, Defendant terminated Plaintiff's employment. (Doc. 52, PTO, at p. 6, Stip. Fact No. 37).

88.    On May 30, 2018, Idol Rashid participated in a phone call notifying April Pfannenstiel that her employment was terminated. (Ex. G, Rashid Decl., at ¶15).

89.     After April Pfannenstiel was terminated, Idol Rashid and Niki Phillips received a copy of a one-page Non Criminal Incidents Report made to the Topeka Police Department, filed May 18, 2018. (Ex. A, Phillips Decl., at ¶5; Ex. G, Rashid Decl., at ¶17).

90.     At no point in time did Christopher Krugman ever receive a copy of the Non Criminal Incidents Report made to the Topeka Police Department, nor did he ever become aware of who filed the Criminal Incidents Report. (Ex. J, Krugman Decl., at ¶11).

91.     When April Pfannenstiel submitted the Non Criminal Incidents Report to the Company, Idol Rashid and Niki Phillips saw that Jacob Edwards was the person who had filed the police report against Ms. Pfannenstiel. (Ex. A, Phillips Decl., at ¶5; Ex. G, Rashid Decl., at ¶17).

92.     At the time of April Pfannenstiel's termination and up to the point of discovery in this matter, Idol Rashid and Niki Phillips were not aware that April Pfannenstiel had an existing Workers' Compensation claim against Mars Wrigley Confectionery nor do Associate Relations Managers have any involvement in Worker's Compensation claims. (Ex. A, Phillips Decl., at ¶6; Ex. I, Phillips Depo., at 56:8-11; 57:10-13; Ex. G, Rashid Decl., at ¶18).

93.     The reason for April Pfannenstiel's termination was for falsifying information and lying during a Company investigation, which is an integrity issue in violation of Mars Wrigley Confectionery policies. (Ex. G, Rashid Decl., at ¶19; Ex. I, Phillips Depo., at 103:2-104:2, 105:4-106:16, 106:21-107:4, 107:11-108:12, 111:2-112:5, 112:20-25).

94.     Specifically, April Pfannenstiel was terminated for making:

> a.      False statements regarding person who filed police report (Ex. I, Phillips Depo., at 103:2-104:2);
>
> b.      False statements regarding why she had been arrested (Ex. I, Phillips Depo., at 106:21-107:4, 107:11-15, 111:2-112:5); and

15

c.    False statements to Niki Phillips regarding the substance of the police report

(Ex. I, Phillips Depo., at 105:4-106:16, 107:16-108:12).

## III.    STATEMENT OF QUESTIONS PRESENTED

1.    What is the proper summary judgment standard?

2.    What is the proper framework for analyzing a claim for retaliation under Title VII?

    A.    Should the Court enter summary judgment because Plaintiff cannot establish a prima facie case for retaliation in violation of 40 U.S.C. §§ 2000e *et seq.*?

3.    What is the proper framework for analyzing a claim for retaliation under the FMLA?

    B.    Should the Court enter summary judgment because Plaintiff cannot establish a prima facie case for retaliation in violation of 29 U.S.C. § 2615(a)(2)?

4.    What is the proper framework for analyzing a claim for wrongful termination under Kansas Common Law?

    C.    Should the Court enter summary judgment because Plaintiff cannot establish a prima facie case for wrongful termination in violation of the Kansas Public Policy?

## IV.    ARGUMENT AND AUTHORITIES

1.    **<u>SUMMARY JUDGMENT STANDARD</u>**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

The moving party bears the initial burden of showing the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may do so "by

pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Adler*, 144 F.3d at 671.  Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which the nonmoving party carries the burden of proof.  *Celotex Corp.*, 477 U.S. at 322-3.  The non-movant may not rely upon unsubstantiated allegations or facts unsupported by competent evidence.  *Kidd v. Taos Ski Valley, Inc.*, 88 F.3d 848, 853 (10th Cir. 1996).

## 2.   **PLAINTIFF'S TITLE VII RETALIATION CLAIM MUST BE DISMISSED.**

In Count II of the Complaint, Plaintiff contends that Mars retaliated against her for making reports of harassment and retaliation.  Amended Complaint, Count I, page 8.  Title VII forbids an employer from discriminating against an employee who "has opposed any practice" made unlawful by Title VII or because she "participated ... in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  To prevail on a Title VII retaliation claim, a plaintiff must show that retaliation played a part in a materially adverse employment decision. *Boese v. Fort Hays State University*, 814 F.Supp.2d 1138, 1145 (D Kan. 2011).  A materially adverse action is one that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Hutchinson v. City of Okla. City*, 919 F. Supp. 2d 1163, 1177.

Because she has no direct evidence that Mars retaliated against her, Plaintiff's claims must be analyzed under the *McDonnell Douglas* framework.  *Boese*, 814 F.Supp.2d at 1138.  To establish a *prima facie* case of retaliation, a plaintiff must establish that: (1) she engaged in a protected activity; (2) her exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was materially adverse to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action.  *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1202 (10th Cir. 2008).  In addition, the United States

Supreme Court has held that "Title VII retaliation claims must be proved according to traditional principles of but-for causation ... This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 133 S. Ct. 2517 (2013). If a plaintiff establishes a *prima facie* case, the burden shifts to the defendant to produce evidence of a non-discriminatory reason for the conduct. *Boese*, 814 F. Supp. 2d at 1145. Upon a successful showing of a legitimate, non-discriminatory reason, the burden shifts back to the plaintiff to establish pretext. *Id*. Plaintiff's retaliation claim must be dismissed because she cannot meet her burden to establish a *prima facie* case or pretext.

### A.    Two of Plaintiff's Three Complaints Do Not Constitute Protected Activity Under Title VII.

With respect to the first element of her *prima facie* case, Plaintiff asserts that she engaged in three instances of protected opposition to harassment and retaliation when she (1) complained to Michelle Waggoner that James Gustin and Travis Bussen sexually harassed her; (2) complained to her supervisor, Benjamin Arteaga, about Jacob Edwards and Jordan Stilley; and (3) told Nichole Phillips that Jacob Edwards made a police report against Plaintiff. Pl. Am. Compl., p. 3-4. While Mars concedes Plaintiff's March 2017 complaint of sexual harassment qualifies as a protected activity, the remaining complaints clearly do not.

The Tenth Circuit has stated that vague references to discrimination and harassment without any indication that it was motivated by a protected category under Title VII *does not* constitute protected activity and will not support a retaliation claim. *Boese*, 814 F. Supp. 2d at 1147 (citing *Anderson v. Academy School Dist. 20*, 122 Fed. Appx. 912, 916 (10th Cir. 2004) (unpublished)). Moreover, this Court has explained that "[c]omplaining to management about

working conditions without alleging that the adverse conditions are the result of...sex...simply is not protected under Title VII." *Boese*, 814 F. Supp. 2d at 1146; *see also Taher v. Wichita State Univ.*, 426 F. Supp. 2d 1203, 1221 (D. Kan. 2007) (holding that plaintiff had not engaged in protected activity because although he complained generally of discrimination and harassment, he did not complain that any such actions were motivated by his national origin or any other illegal motive). In fact, "vague references to retaliation or harassment do not automatically convert a general workplace complaint into a protected activity." *Boese*, 814 F. Supp. 2d at 1146.

### i.      September 2017 Complaint about Jacob Edwards and Jordan Stilley

Plaintiff's reports to her supervisor about Jacob Edwards ("Edwards") and Jordan Stilley ("Stilley") were plainly unmotivated by her sex or any other protected category under Title VII. Plaintiff admits that her complaints to her supervisor, Benjamin Arteaga ("Arteaga"), concerned how Stilley and Edwards were making comments that Plaintiff was "unsafe" and taking extra breaks. Statement of Uncontroverted Facts ("SOUF") ¶¶ 25-26. Although Plaintiff discussed her frustration about Edward and Stilley's comments, she never stated that she believed their comments were motivated by her sex or any other illegal motive. SOUF ¶¶ 25-26. Accordingly, these complaints cannot be classified as a protected activity under Title VII.

### ii.      Incident Regarding Police Report in May 2018

For similar reasons, Plaintiff's May 2018 comments do not constitute protected activity under Title VII. During a conversation between Plaintiff and Nichole Phillips ("Phillips") about the police report, Plaintiff told Phillips that the detective told her that Edwards had made the police report. SOUF ¶ 72. Plaintiff further told Phillips that she knew it was Edwards who made the police report and that she believed he did not like her because Plaintiff got some of his friends fired. SOUF ¶ 73. At no point did Plaintiff communicate that Edwards' allegations were

motivated because of her sex or any illegal motive protected under Title VII.  SOUF ¶¶ 68-73.  On

the contrary, Plaintiff stated her belief that she was listed in the police report because she had a

link to a former associate named Rahnel who was involved in a murder.  SOUF ¶¶ 68-71.  There

is no evidence that the police report was motivated by factors protected by Title VII; therefore,

Plaintiff's complaint cannot support her retaliation claim.  *Boese*, 814 F. Supp. 2d at 1147.

**B.**      **There is No Causal Connection Between Plaintiff's Exercise of a Protected Activity and Any Materially Adverse Employment Action Taken Against Her.**

In order to establish her *prima facie* case of retaliation, Plaintiff must demonstrate the

existence of a causal connection between a protected activity and a materially adverse action.

*Boese*, 814 F. Supp. 2d at 1146.  Unless there is very close temporal proximity between the

protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to

establish causation.  *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001).

Moreover, the Tenth Circuit has held that even a three-month period, standing on its own, is

insufficient to establish causation.  *O'Neal*, 237 F.3d at 1253 (citing *Anderson v. Coors Brewing

Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)).

**i.      March 2017 Complaint About Travis Bussen and James Gustin**

Although Mars concedes that Plaintiff engaged in protected activity during her March 2017

complaint of sexual harassment, Plaintiff fails to establish a causal connection between this

protected activity and a materially adverse action, namely, her termination.  Plaintiff's termination

occurred on May 30, 2018, which was approximately *14 months* after her March 2017 report of

sexual harassment.  SOUF ¶¶ 14, 88.  Moreover, Mars swiftly responded to Plaintiff's complaint

of sexual harassment by commencing an investigation into Plaintiff's allegations and subsequently

terminating both Travis Bussen and James Gustin, the individuals who made inappropriate sexual

comments to Plaintiff.  SOUF ¶¶ 16, 18, 19.  Plaintiff further fails to provide additional evidence to establish causation except for her September 2017 comments and her comments regarding the May 2018 police report.  For the reasons stated in Sec. 2(A)(i) and 2(A)(ii), however, neither of these incidents qualify as protected activities under Title VII and cannot be used to establish a causal connection.

### C.   Even if Plaintiff Established a Prima Face Case, Mars Had a Legitimate, Non-Retaliatory Reason for Plaintiff's Termination.

Even if Plaintiff were able to establish a *prima facie* case of retaliation, which she cannot, Mars had a legitimate, non-retaliatory reason for terminating her employment.  In providing a legitimate, non-discriminatory reason for a plaintiff's termination, "the employer need not litigate the merits of its reason, prove its reason was bona fide, or prove its reason was applied in a nondiscriminatory fashion."  *E.E.O.C. v. Flasher Co.*, 986 F.2d 1312, 1316 (10th Cir. 1992) (citations omitted).  Upon production of such a reason, "the presumption of retaliatory intent raised by the *prima facie* case 'simply drops out of the picture.'"  *Ingels v. Thiokol Corp.*, 42 F.3d 616, 621 (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 125 L. Ed. 2d 407, 113 S. Ct. 2742, 2749 (1993)).

In this case, Mars has offered ample evidence of its legitimate, non-discriminatory reason. Specifically, Plaintiff was terminated for making repeated false statements during a Company investigation, including: (1) making a false statement when she told Phillips that Detective Davies informed her Jacob Edwards was the person who filed the police report; (2) making a false statement when Plaintiff told Phillips that she had been arrested and issued a bench warrant because she changed her phone number and the detectives could not get a hold of her to speak with her about the allegations in the police report; and (3) making a false statement to Phillips about the

substance of the police report.  SOUF ¶¶ 93, 94(a)-(c).  Phillips reasonably believed Plaintiff was lying based upon Phillips' own conversation with Detective Davies, who stated that only about 80 percent of what Plaintiff told Phillips was true.  SOUF ¶ 77.  In contradiction to what Plaintiff told Phillips, Detective Davies informed Phillips that he did not tell Plaintiff who filed the police report and that person wanted to remain anonymous. SOUF ¶ 79.  Even further, Detective Davies explained that instead of Plaintiff contacting him in response to his voicemail, Plaintiff went to Shawnee County to clear up a bench warrant that had been issued for her arrest, as she previously failed to appear in court for her misdemeanor criminal damage to property charge.  SOUF ¶ 78. Mars need only articulate a legitimate, non-retaliatory reason for Plaintiff's termination, and it has clearly done so.

### D.   Plaintiff Failed to Meet Her Burden to Establish Mars' Stated Basis for Termination Was Pretextual.

Plaintiff has failed to produce any evidence to support a claim that Mars' legitimate, non-retaliatory reason was a pretext for discrimination.  The pertinent inquiry here is not whether the defendant's stated reasons for termination were wise, fair, or correct, but whether the defendant honestly believed in those reasons and acted in good faith.  *Lawson v. Potter*, 463 F. Supp. 2d 1270, 1283 (D. Kan. 2006).  The court's role is not to act as a "super personnel department" that second guesses employers' business judgments. *Simms v. Oklahoma es rel. Department of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1330 (quoting *Verniero v. Air Force Academy Sch. Dist. No. 20*, 705 F.2d 388, 390 (10th Cir. 1983)).  Moreover, the "mere conjecture that the employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment. *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997).

In this case, Phillips impartially conducted an investigation regarding the reason the Detective wanted to talk to Plaintiff, which consisted of conversations with Plaintiff and the investigating Detective.  SOUF ¶¶ 66-74, 76, 80.  Phillips' termination recommendation was based upon her honest belief that Plaintiff lied to Phillips during the investigation, and Plaintiff's false statements were substantiated by the investigating detective.  SOUF ¶¶ 77, 93, 94.  Specifically, the detective told Phillips that only about 80 percent of what Plaintiff stated about the police report allegations was true.  SOUF ¶ 77.  Phillips communicated her termination recommendation to Idol Rashid, the Associate Relations Manager assigned to the Topeka, Kansas facility, upon Rashid's return from paternity leave.  SOUF ¶ 83.  Mr. Rashid was aware that Plaintiff had previously been charged with assault with a deadly weapon.  SOUF ¶ 35.  Moreover, Phillips and Rashid further discussed their termination recommendation with their own manager, Senior Associate Relations Manager Christopher Krugman.  SOUF ¶ 84.  There is not a scintilla of evidence to demonstrate that Phillips or Rashid did not honestly believe that Plaintiff made false statements and lied throughout the Company's investigation.  Accordingly, summary judgment is appropriate for Plaintiff's Title VII retaliation claim.

## 2.      PLAINTIFF'S FMLA RETALIATION CLAIM MUST BE DISMISSED.

In Count II, Plaintiff alleges Mars retaliated against her for requesting and using FMLA leave for her medical conditions.  To establish a *prima facie* case of FMLA retaliation, a plaintiff must show (1) she engaged in activity protected under FMLA; (2) subsequent adverse action by the employer; and (3) a causal connection between such activity and the employer's action.  *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 208-9 (10th Cir. 1997).  In its analysis, this court uses the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*.  411 U.S. 792, 802-3, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).  Under this framework, the defendant has an

opportunity to rebut a *prima facie* case of retaliation by offering legitimate non-retaliatory reasons for the adverse action. *Id.* Once defendant offers such reasons, a plaintiff has the ultimate burden to demonstrate that the challenged employment decision was the result of intentional retaliation by presenting evidence that defendant's reasons are unworthy of belief. *Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1263 (10th Cir. 1998).

Although Mars concedes that Plaintiff meets the first two of the three elements of her *prima facie* case, Plaintiff cannot provide sufficient evidence to establish a causal connection between the protected activity and subsequent termination. Moreover, Plaintiff fails in her burden to produce evidence indicating Mars' legitimate, non-retaliatory reason for termination is unworthy of credence. For these reasons, Plaintiff's FMLA retaliation claim must be dismissed.

### A. Plaintiff Fails to Provide Additional Evidence to Overcome the Lack of Temporal Proximity Between the Protected Activity and Her Termination.

This Court has held that unless the adverse action is very closely connected in time to the protected activity, the plaintiff must rely on additional evidence beyond mere temporal proximity to establish causation. *Ney v. City of Hoisington*, 508 F. Supp. 2d 877, 888 (D. Kan. 2007). Specifically, a "six-week period between protected activity and adverse action may be sufficient, standing alone, to show causation, but a *three-month period*, standing alone, is insufficient." *Ney*, 508 F. Supp. 2d at 888 (emphasis added).

In this case, the time between Plaintiff's last day of continuous FMLA leave and her subsequent termination was 107 days, or 3 months and 19 days. SOUF ¶¶ 41, 87. For her intermittent FMLA leave, the time between the initial date intermittent leave was available to her and her termination is even more significant at 253 days, over 8 months before her termination

date of May 30, 2018.  SOUF ¶ 31.  Under Tenth Circuit precedent, this length of time fails to establish the causation element of Plaintiff's *prima facie* case.  *Ney*, 508 F. Supp. 2d at 888.

Plaintiff has no evidence of any other ground upon which to base the causation requirement, which is required when temporal proximity is lacking.  *See Ney*, 508 F. Supp. 2d at 888.  On the contrary, there is ample evidence of Mars' efforts to be proactive and flexible regarding Plaintiff's medical leave requests.   Specifically, Plaintiff submitted four separate requests for FMLA leave between September 2017 and November 2017, which were each approved by Mars.  SOUF ¶¶ 31-33, 40-41.  Even more, in March 2017, even *before* Plaintiff was eligible for FMLA leave because she had not been employed for 12 months at that time,  ¶1; 29 C.F.R. §825.110(a)(1), the Company offered her the chance to take medical leave that was fully paid.  SOUF ¶ 20.  Any inference that Plaintiff's termination was due to retaliatory motive is further undermined by the undisputed fact that Ms. Phillips, who investigated and recommended Plaintiff's termination, was not the P&O or Associate Relations Manager who handled Plaintiff's various FMLA leave requests from September 2017 through February 2017. SOUF ¶¶ 12, 20, 31, 32, 36, 37, 40, 41.  Nothing about the timing of Plaintiff's termination in May 2018 substantiates Plaintiff's belief that she was terminated simply because she requested and used FMLA leave.  As Plaintiff has no evidence sufficient to establish a causal connection between her FMLA leave and termination, her *prima facie* case fails.

### B.   Defendant Had a Legitimate, Non-Discriminatory Reason for Plaintiff's Termination.

Even if Plaintiff could establish a *prima facie* case of FMLA retaliation, her claim must fail nonetheless because Mars had a legitimate, non-discriminatory reason for her discharge.  *See* Sec. 2(c), *supra*.

C.   **Plaintiff Cannot Meet Her Burden to Show Mars' Legitimate Reason was Pretextual.**

The burden returns to Plaintiff to show there is a genuine dispute of material fact as to whether Mars' explanations for terminating her employment was pretextual. *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1172 (10th Cir. 2006).  To meet this burden, a plaintiff must produce evidence of such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence" and infer that the employer did not act for the stated reasons.  *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193 (10th Cir. 2006).  Plaintiff cannot meet this burden.

Plaintiff's statements that Jacob Edwards made the allegations against her ultimately proved true after her termination.  SOUF ¶¶ 72, 73, 89, 90, 91.   However, before Plaintiff's termination, Phillips reasonably believed that Plaintiff was lying based upon the investigating detective's statements that the person who filed the police report wanted to remain anonymous and, as such, he did not share with Plaintiff who filed the report. SOUF ¶¶ 79, 80.  Plaintiff admits that the detective would not release this information while the investigation was on-going.  SOUF ¶ 81.  This does not overcome Phillips' good faith belief that Plaintiff was lying, as even a "mistaken belief can be a legitimate reason for an employment decision."   *EEOC*, 986 F.2d at 1312.

The mere timing between Plaintiff's return to work from FMLA leave and her termination are not indicative of Mars' retaliatory intent.  Tenth Circuit precedent has "refused to allow even very close temporal proximity to operate as a proxy for the evidentiary requirement that the plaintiff demonstrate pretext."  *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164 (10th

Cir. 2006).   Ultimately, Plaintiff submitted no additional evidence to show the inconsistency, incoherency, or weakness in Mars' reason for her termination.  *Argo*, 452 F.3d at 1193.  Moreover, Plaintiff fails to demonstrate how Mars acted contrary to any written or unwritten policy in terminating her employment or treated similarly situated employees differently than Plaintiff.  *See, e.g., Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000).  For these reasons, Plaintiff's FMLA retaliation claim must be dismissed.

### 3.   PLAINTIFF'S WRONGFUL TERMINATION IN VIOLATION OF KANSAS PUBLIC POLICY MUST FAIL.

In Count III, Plaintiff alleges that her exercise of workers' compensation rights was a motivating factor in Mars' decision to terminate her employment.   To establish a retaliatory discharge in violation of Kansas Public Policy, this court has adopted the *McDonnell Douglas* burden-shifting analysis.  K.S.A. § 44-501; *Ortega v. IBP. Inc.*, 255 Kan. 513, 526, 874 P.2d 1188, 1196 (D. Kan. 1994).  First, Plaintiff must establish a *prima facie* case of retaliatory discharge by proving: (1) the employee filed a workers' compensation claim; (2) the employer had knowledge of the workers' compensation claim or the fact that the employee had sustained a work-related injury; (3) the employer terminated the employee; and (4) there is a causal connection between the protected activity or injury and the termination.  *Ortega*, 255 Kan. at 526.

If a plaintiff is able to establish her *prima facie* case, the burden shifts to defendant to provide evidence of a legitimate, nondiscriminatory reason for [its] conduct."  *Ortega*, 255 Kan. at 526.  If defendant meets this obligation, plaintiff must then prove that "the reasons offered by [defendant] were merely a pretext for discrimination."  *Id.* (quotation omitted). Under Kansas law, the party "having the burden of proving a discharge from employment in retaliation for having filed a workers' compensation claim must establish that claim by a preponderance of the evidence,

*but the evidence must be clear and convincing in nature.*" *Ortega*, 255 Kan. at 528 (emphasis added); *Spradley v. Custom Campers, Inc.*, 68 F. Supp. 2d 1225, 1235 (D. Kan. 1999).

In this case, Mars concedes the first and third elements of Plaintiff's *prima facie* case because Plaintiff filed a worker's compensation claim and Plaintiff was later terminated from employment.  Plaintiff cannot, however, establish the remaining elements of her *prima facie* case.

### A.   The Decisionmakers of Plaintiff's Termination Were Unaware of Plaintiff's Worker's Compensation Claim.

In proving her *prima facie* case, Plaintiff must establish that the employer had knowledge of Plaintiff's worker's compensation claim.  *Coleman v. Blue Cross Blue Shield of Kansas*, 487 F. Supp. 2d 1225, 1254 (D. Kan. 2007).  In this case, Plaintiff cannot to do so.  Phillips and Rashid, the Associate Relations Managers and decisionmakers behind Plaintiff's termination, were unaware of Plaintiff's worker's compensation claim at the time of her termination.  SOUF ¶ 92. Moreover, Christopher Krugman, the Senior Associate Relations manager with whom Phillips and Rashid consulted, was also unaware of Plaintiff's worker's compensation claim.  SOUF ¶ 85.  In further proof of the decisionmakers' lack of knowledge, Phillips testified that Associate Relations Managers like herself do not have any involvement in the handling of worker's compensation claims, and this instance was no exception.  SOUF ¶ 92.  In fact, the Topeka site's Nurse Case Manager, Jonette Penton ("Penton"), was responsible for handling Plaintiff's worker's compensation claim, to include scheduling treatment for Plaintiff's work-related injury.  SOUF ¶¶ 51-53.  Penton affirms that she did not tell Phillips about Plaintiff's work-related injury or worker's compensation claim.  SOUF ¶ 85.  Accordingly, the second element of Plaintiff's *prima facie* case is not satisfied.

**B.**     **Plaintiff Fails to Submit Clear and Convincing Evidence That Her Termination Was Causally Connected to Her Worker's Compensation Claim.**

In addition, Plaintiff cannot meet the fourth and final element of her *prima facie* case, which requires her to establish through evidence of a clear and convincing quality that there was a causal connection between her worker's compensation claim and her subsequent termination. *Ortega*, 255 Kan. at 528, 874 P.2d at 1198.  To determine whether a causal connection exists, Kansas courts typically begin by asking whether the protected activity and termination are "closely connected in time."  *Proctor v. UPS*, 502 F.3d 1200, 1212 (10th Cir. 2007).  In addition, the court may also consider "the pattern of actions taken by defendant" when analyzing whether a causal connection exists.  *Bracken v. Dixon Indust., Inc.*, 272 Kan. 1272, 38 P.3d 679, 682 (2002).

Notwithstanding the 39 days between Plaintiff's work-related injury and termination, Mars' actions taken in response to Plaintiff's injury and subsequent claim do not clearly and convincingly establish a causal connection.  In addition to her temporal proximity claim,  Plaintiff asserts a causal connection exists because Jonette Penton, the Topeka site's Nurse Care Manager, sent an email to the drug testing contractor inquiring into the results of Plaintiff's post-injury drug test results and, further, stating that Plaintiff's managers, Benjamin Arteaga and Shirley Ha, were asking about the results.  SOUF ¶¶ 46-49.[1]  Plaintiff's second claim carries no weight, as neither Penton nor the drug testing contractor were the decisionmakers for Plaintiff's termination. SOUF ¶¶ 82-86.  Moreover, Penton did not communicate with the actual decisionmakers about Plaintiff's worker's compensation claim.  SOUF ¶ 85.  Although Plaintiff attempts to color Penton's inquiries as suspicious, it is common for Penton to receive requests from management as to the status of

---

[1] Per Company policy, when an associate sustains a work-related injury and they are sent to a physician for care, the associate is required to undergo a post-accident drug test.  Accordingly, Plaintiff was required to undergo a post-accident drug test following her work-related injury on April 21, 2018.  SOUF ¶¶ 43-44.

drug tests.  SOUF ¶ 48.  The evidence presented is not of clear and convincing quality so as to establish that a causal connection exists.

### C.    Mars Had a Legitimate, Non-Discriminatory Reason for Plaintiff's Termination.

Even if Plaintiff were able to establish her *prima facie* case, Wrigley had a legitimate, non-retaliatory reason for terminating Plaintiff's employment that was wholly unelated to Plaintiff's work-related injury or her worker's compensation claim.  *See* Sec. 2(C), *supra*.  Moreover, Phillips' investigation commenced three weeks *after* Plaintiff returned to work from her approved leave of absence when the detective came to the facility to speak with Plaintiff about the police report which had been filed four days prior.  SOUF ¶ 50, 56, 57, 65, 66.  Accordingly, the investigation and Plaintiff's false statements constitute independent acts that arose after Plaintiff's workers compensation claim that ultimately led to Plaintiff's termination.  *See e.g. Williams v. Goodyear Tire & Rubber Co.*, No. 09-4105-RDR, 2011 U.S. Dist. LEXIS 140844, at *29 (D. Kan. Dec. 7, 2011)(finding the timing of the termination actually supported defendant's position since it occurred shortly after investigation); *Kimbrell v. Armsted Rail Co.*, No. 13-CV-2227, 2014 U.S. Dist. LEXIS 65304, at *5 (D. Kan. May 13, 2014)(finding legitimate non-retaliatory reason when plaintiff's interview in investigation was held four days after work-related injury). The evidence submitted by Plaintiff does not bridge the "causal gap" between Plaintiff's worker's compensation claim and Mars' investigation and, even more, Plaintiff's mere conjecture is an insufficient rebuttal to Mars' non-discriminatory termination reason.  *See, e.g., Malek v. Martin Marietta Corp.*, 859 F. Supp. 458, 467 (D. Kan. 1994).

### D.    Plaintiff Cannot Provide Clear and Convincing Evidence to Prove Mars Acted with Retaliatory Intent or Provided a Pretextual Reason for Her Termination.

To avoid summary judgment at this point, Plaintiff must assert specific facts of a "clear and convincing" quality to "establish[ ] a triable issue as to whether the employer's reason for discharge is a mere cover-up or pretext for retaliatory discharge." *Rosas v. IBP, Inc.*, 869 F. Supp. 912, 916 (D. Kan. 1994); *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1455 (10th Cir. 1994). Plaintiff must show more than "mere conjecture" and, instead, establish that the employer's stated reason for termination "was so inconsistent, implausible, incoherent, or contradictory that it is unworthy of belief" such that plaintiff was "more likely than not the victim of illegal retaliation by her employer." *Coleman*, 487 F. Supp. 2d at 1255-6. Moreover, "temporal proximity of adverse employment action to protected activity is not dispositive in the pretext analysis." *McClurg v. GTECH Corp.*, 61 F. Supp. 2d 1150; *Spradley*, 68 F. Supp. 2d at 1236.

The temporal proximity between Plaintiff's worker's compensation claim and her termination does not, on its own, prove that Mars' termination reason was implausible or unworthy of belief. On the contrary, the evidence plainly shows that Mars properly followed Company policy and, moreover, did not disguise its motive or terminate Plaintiff for an improper reason, namely for filing a worker's compensation claim. Specifically, Plaintiff was given a paid leave of absence due to her work-related injury that occurred on April 21, 2018, and Plaintiff returned to work on April 30, 2018. SOUF ¶¶ 42, 50. Despite Plaintiff's self-serving testimony that she never returned to work after her work-related injury, Plaintiff's time detail shows that she worked 17 days until she was placed on paid leave pending the Company's investigation into the police report filed against her. SOUF ¶¶ 54, 75. Furthermore, no one involved in the termination decision was aware of, or involved with, Plaintiff's work-related injury or worker's compensation claim during the decision-making process. SOUF ¶¶ 85, 92. Additionally, Phillips launched an independent investigation of Plaintiff, determined that Plaintiff made false statements in the investigation, and

confirmed her termination recommendation with two other impartial Associate Relations managers.  SOUF ¶¶ 66, 83-85.  *See, e.g., Macon v. UPS*, 743 F.3d 708, 715 (affirmed summary judgment where independent panel assessed plaintiff's misconduct and agreed upon propriety of plaintiff's discipline).  In response, Plaintiff has failed to adduce specific facts proving Mars' discharge of Plaintiff was motivated for *any* improper or disingenuous reason, much less because of her worker's compensation claim.  *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998).  Accordingly, summary judgment is appropriate for Plaintiff's wrongful termination claim.

## I.      CONCLUSION

For the foregoing reasons, Wrigley respectfully requests that summary judgment be entered in its favor upon each of Plaintiff's claims and that this Court dismiss Plaintiff's claims with prejudice.


Date:   July 31, 2020                    Respectfully Submitted,

                                         /s/ *J. Phillip Gragson*
                                         J. Phillip Gragson, #16103
                                         Henson, Hutton, Mudrick, Gragson & Vogelsberg LLP
                                         3649 SW Burlingame Road, Ste. 200
                                         Topeka, KS  66111-2155
                                         Telephone:  (785) 232-2200 x 223
                                         Facsimile:  (785) 232-3344
                                         Email:  jpgragson@hensonlawoffice.com

                                         Thomas R. Davies, Esq., Pro Hac Vice
                                         Laura Bailey Gallagher, Esq., Pro Hac Vice
                                         Harmon & Davies, P.C.
                                         2306 Columbia Ave.
                                         Lancaster, PA  17603
                                         Telephone: (717) 291-2236
                                         Facsimile:  (717) 291-5739
                                         tdavies@h-dlaw.com

lgallagher@h-dlaw.com

*Counsel for Defendant*
*Mars Wrigley Confectionery*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing Defendant's Memorandum in Support of Motion for Summary Judgment was filed electronically via CM/ECF on this 31st day of July, 2020 and electronic notification was provided to:

Joshua P. Wunderlich, Esq.
Cornerstone Law Firm
8350 N. St. Clair Ave., Suite 225
Kansas City, MO  64151
jwunderlich@cornerstonefirm.com
*Attorney for Plaintiff*

/s/ J. Phillip Gragson
J. Phillip Gragson, #16103

33