**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **APRIL PFANNENSTIEL,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:19-cv-02096-JAR |
| | ) | |
| **MARS WRIGLEY CONFECTIONERY** | ) | |
| **US, LLC,** | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INDEX OF EXHIBITS..................................................................................................iii

TABLE OF AUTHORITIES ........................................................................................ iv

I.      INTRODUCTION................................................................................. 1

II.     PLAINTIFF'S RESPONSES TO DEFENDANT'S STATEMENT OF UNCONTROVERTED FACTS ...................................................... 4

III.    PLAINTIFF'S ADDITIONAL STATEMENT OF UNCONTROVERTED FACTS ............................................................. 27

IV.    SUMMARY JUDGMENT STANDARD ............................................ 33

V.     ARGUMENT AND AUTHORITIES ................................................. 34

   A.    Plaintiff's Title VII Retaliation Claim Should Not be Dismissed. ........................ 34

      1.  Rule of Law ................................................................................ 35

      2.  Plaintiff's Reports of a Hostile Work Environment Constitute Protected Activity Under Title VII.......................................................................... 37

      3.  A Causal Connection Exists Between Plaintiff's Reports of a Hostile Work Environment and the Adverse Employment Decision to Which She Was Subjected. ........................................................................... 39

      4.  Defendant's Proffered Rationale For the Termination of Plaintiff's Employment is Pretextual. .................................................................... 41

   B.    Plaintiff's FMLA Retaliation Claim Should Not Be Dismissed.......................... 45

      1.  Plaintiff Can Offer Evidence Beyond Temporal Proximity to Support a Prima Facie Argument that Defendant Retaliated Against Her for Using FMLA Leave .................................................................................. 46

      2.  Defendant's Proffered Rationale For the Termination of Plaintiff's Employment is Pretextual. .................................................................... 47

   C.    Plaintiff's Claim for Wrongful Termination in Violation of Kansas Public Policy Should Not Be Dismissed.......................................................................... 47

      1.  Circumstantial Evidence Exists That the Decisionmakers of Plaintiff's Termination Were Aware of Plaintiff's Worker's Compensation Claim........... 47

      2.  A Causal Connection Exists Between Plaintiff's Worker's Compensation Claim and the Adverse Employment Decision to Which She Was Subjected. ............... 48

      3.  Defendant's Proffered Rationale For the Termination of Plaintiff's Employment is Pretextual. .................................................................... 48

V.     CONCLUSION ................................................................................. 50

# INDEX OF EXHIBITS

Exhibit A:    April 23, 2018, through April 24, 2018, email thread between Jonette Penton and
              Anne Coffee
              Plaintiff's Deposition Exhibit 26 (DEF000955-1 through 000955-2)

Exhibit B:    May 2, 2018, email from Jonette Penton
              Plaintiff's Deposition Exhibit 28 (DEF000961 through 000961c-3)

Exhibit C:    Excerpts from December 16, 2019, First Deposition of Plaintiff

Exhibit D:    Excerpts from January 7, 2020, Deposition of Benjamin Arteaga, Sr.

Exhibit E:    Excerpts from January 8, 2020, Deposition of Nichole Phillips

Exhibit F:    Nichole Phillips May 23, 2018, Investigation Notes
              (DEF001160)

Exhibit G:    May 24, 2018, Email from Idol Rashid to Nichole Phillips
              Plaintiff's Deposition Exhibit 14 (DEF001080-1 through 001080-2)

Exhibit H:    February 14, 2018, email from Jacob Edwards to Rashid Idol
              (DEF000255) (Designation of Confidentiality waived by Defendant in writing)

Exhibit I:    February 16, 2018, email from Jacob Edwards to Idol Rashid
              (DEF000256) (Motion for Leave to File Under Seal Granted – Filed Separately)

Exhibit J:    March 1, 2018, email from Idol Rashid to Christopher Krugman
              Plaintiff's Deposition Exhibit 15 (DEF000879)

Exhibit K:    Excerpts from January 7, 2020, Deposition of Shirley Ha

Exhibit L:    April 30, 2018, email from Jacob Edwards to Clarence Chaney and Jonette Penton
              Plaintiff's Deposition Exhibit 8 (DEF000747a-1 through DEF000747a-2)

Exhibit M:    November 8, 2017, email thread among Benjamin Arteaga, Harry Smith, and Idol
              Rashid
              Plaintiff's Deposition Exhibit 6 (DEF000902 through DEF000902a-2)

Exhibit N:    Excerpts from June 2, 2020, Deposition of Jonette Penton

Exhibit O:    May 23, 2018 text message from Plaintiff to Benjamin Arteaga, Sr.
              Excerpt from Plaintiff's Deposition Exhibit 10 (DEF000197)

Exhibit P:    May 29, 2018, Topeka Police Department Non Criminal Incidents Report
              Defendant's Deposition Exhibit 1 (PFANNENSTIEL 000001 through 000002)

Exhibit Q:    February 2-5, 2018, email thread between Shirley Ha to Idol Rashid
              (DEF000229)

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Coors Brewing Co.*, 181 F.3d 1171 (10th Cir.1999) ................................ 40

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................ 33

*Aramburu v. Boeing Co.,* 112 F.3d 1398 (10th Cir. 1997) ........................................ 37

*Argo v. Blue Cross & Blue Shield of Kansas, Inc.*, 452 F.3d 1193 (10th Cir. 2006).................... 40

*Canfield v. Office of the Sec'y of State for the State of Kansas*,
    209 F. Supp. 3d 1219 (D. Kan. 2016) .................................................... 44

*Didier v. Abbott Labs.*, 614 Fed. Appx. 366 (10th Cir. 2015) ...................................... 35

*Downs v. Jostens, Inc.*, 23 F. Supp. 3d 1332 (D. Kan. 2014) ...................................... 36

*EEOC v. BCI Coca–Cola Bottling Co.*, 450 F.3d 476 (10th Cir. 2006)............................... 44

*EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184 (10th Cir. 2000)............................. 33

*Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875 (10th Cir. 2018)................................. 33

*Godoy-Guzman v. Unified Government of Wyandotte County and Kansas City Kansas*,
    No. 2:17-cv-02660-HLT, 2019 WL 6894529 (D. Kan. Dec. 18, 2019) ......................... 38, 45

*Griddine v. GP1 KS-SB, Inc.*,
    2:17-CV-02138-JAR, 2019 WL 1002049 (D. Kan. Feb. 28, 2019) .......................... 18, 19, 20

*Gutierrez v. Cobos*, 841 F.3d 895 (10th Cir. 2016) ...................................... 33

*Haney v. Preston*, No. 08–2658 JAR/GLR, 2010 WL 5392670 (D. Kan. Dec. 22, 2010).......... 39

*Herrera v. United Airlines, Inc.*, 754 Fed. Appx. 684 (10th Cir. 2018) .................... 36, 37, 43, 45

*Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187 (10th Cir. 2008) ...................................... 34, 36

*Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220 (10th Cir. 2000)......................... 37, 41

*Koopman v. Water Dist. No. 1*, 972 F.2d 1160 (10th Cir. 1992)................................ 33

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ........................................ 34

*McGarry v. Board of County Comm'rs of County of Pitkin*, 175 F.3d 1193 (10th Cir. 1999) ..... 35

*McGee v. Stonebridge Life Ins. Co.*,
    No. 05–4002–JAR, 2006 WL 2422399 (D. Kan. Aug. 14, 2006) .............................. 18, 19, 20

*McGowan v. City of Eufala*, 472 F.3d 736 (10th Cir. 2006)........................................ 36

*Montes v. Vail Clinic, Inc.*, 497 F.3d 1160 (10th Cir. 2007) ................................ 34, 35

*Morgan v. Hilti, Inc.*, 108 F.3d 1319 (10th Cir. 1997) .......................................... 41, 46

*Ney v. City of Hoisington*, 508 F. Supp. 2d 877 (D. Kan. 2007) ................................. 46

*Ramsey v. City & County of Denver*, 907 F.2d 1004 (10th Cir. 1990)......................... 35

*Reed v. Unified Sch. Dist. No. 233*, 299 F. Supp. 2d 1215 (D. Kan. 2004)................................ 35

*Roberts v. Roadway Exp., Inc.*, 149 F.3d 1098 (10th Cir. 1998) .................................................... 34

*Seamons v. Snow*, 206 F.3d 1021 (10th Cir. 2000) ................................................................ 33, 45

*Somoza v. Univ. of Denver*, 513 F.3d 1206 (10th Cir. 2008) ........................................................ 37

*Swackhammer v. Sprint/United Mgmt. Co.,* 493 F.3d 1160 (10th Cir. 2007) .................. 36, 37, 45

*Thomas v. Farmers Ins. Exch.*,
    No. 18-2564-DDC-ADM, 2020 WL 1467315 (D. Kan. Mar. 26, 2020) ............................... 35

*University of Texas Southwestern Medical Center v. Nassar,* 570 U.S. 338 (2013) .................... 36

*Wells v. Colorado Dep't of Transp.*, 325 F.3d 1205 (10th Cir. 2003) .......................................... 42

## Statutes

42 U.S.C. § 2000e–3 ......................................................................................................................... 36

## Rules

Fᴇᴅ. R. Cɪᴠ. P. 56 ............................................................................................................................. 33

## I.    INTRODUCTION

Plaintiff April Pfannenstiel ("Plaintiff") began working for Defendant Mars Wrigley Confectionary US, LLC ("Defendant") in May 2016.[1] In March 2017, Plaintiff alleged that she had been sexually harassed by two of her supervisors, James Gustin and Travis Bussen. In response to her allegations, Defendant investigated her claims, found them to be credible, and terminated the employment of the supervisors. In September 2017, Plaintiff and two of her coworkers, Jacob Edwards and Jordan Stilley, made complaints against each other to a supervisor, Benjamin Arteaga, Sr.: Plaintiff complaining that she did not feel comfortable working with Mr. Stilley or Mr. Edwards and that Mr. Edwards was making comments that Plaintiff was not safe to work with, while Mr. Edwards and Mr. Stilley were alleging that Plaintiff was taking extra breaks. As to the latter allegation, Mr. Arteaga held a meeting at which Mr. Stilley began shouting at Plaintiff, alleging that she had gotten other people fired and stating that he was upset because, in his estimation, Plaintiff was getting special treatment from Defendant because of "a lawsuit" she "held over" it. Mr. Stilley's behavior during this meeting seemed to have again confirmed Plaintiff's reports, and Mr. Stilley's employment was terminated.

Shortly thereafter, Plaintiff went on a number of stints of FMLA leave between September 2017 and February 2018, first for anxiety, then for carpal tunnel syndrome, release surgery, and recovery therefrom, working only sporadically during that period. Plaintiff ultimately returned to work on February 13, 2018. Almost immediately, Mr. Edwards renewed his campaign against her, reporting to Idol Rashid, a human resources representative for Defendant, that stale reports of encounters that Plaintiff had had with police were making him feel unsafe. Mr. Rashid placed

---

[1] On or around October 2, 2017, Mars changed its name with the Kansas Secretary of State from Mars Chocolate North America, LLC, to Mars Wrigley Confectionary US, LLC. Plaintiff's employment with Mars began under the former name but concluded under the latter.

Plaintiff on suspension, and investigated Mr. Edwards' concerns, ultimately determining that because the charges were dropped, they were of no concern, and returning Plaintiff to work.

Plaintiff again went on medical leave at the end of April 2018 when she sustained an on-the-job injury after slipping on an errant hairnet in the women's locker room. Defendant sent her for a drug test per company policy. Communications from Jonette Penton, Defendant's nurse case manager for the facility at which Plaintiff worked, to the contractor testing Plaintiff's sample, seemed to reveal an impatience over the results of Plaintiff's test stemming from pressure from Ms. Penton's superiors. Plaintiff returned to work on April 30, 2018, and a few days after that, as part of a message to Defendant's occupational health medical provider arranging for Plaintiff's continuing care from her injury, Ms. Penton again makes a strange comment, this time raising, for no apparent reason, that Plaintiff had some performance issues, which was irrelevant to Plaintiff's anticipated care.

Immediately upon Plaintiff's return to work on April 30, Mr. Edwards again began complaining about Plaintiff, this time for looking at him sideways and making off-handed comments about him. This time, Mr. Edwards' allegations were investigated by Nichole Phillips, a human resources representative covering for Mr. Rashid. This was Ms. Phillips' first exposure to Plaintiff and to the dynamic between Plaintiff and Mr. Edwards. After looking into Mr. Edwards' complaints, Ms. Phillips' investigation was inconclusive because of conflicting accounts from witnesses, so she simply instructed Plaintiff and Mr. Edwards to stay away from each other.

On May 22, 2018, Plaintiff sent a text message to Mr. Arteaga, notifying him that she would not be at work because she was going to the Topeka Police Department to discuss an allegations that had been made against her in a police report. Later that evening, Plaintiff told Ms. Phillips that she had been arrested, that she understood Mr. Edwards to have made the police

report, and that she believed that the report was being made in retaliation for the termination of Mr. Bussen's, Mr. Gustin's, and Mr. Stilley's employment. This was the first that Ms. Phillips had heard about the incidents from March 2017 and September 2017. Eight days later, after talking to a detective from the Topeka Police Department and her supervisors, Ms. Phillips recommended the termination of Plaintiff's employment.

## II.   PLAINTIFF'S RESPONSES TO DEFENDANT'S STATEMENT OF UNCONTROVERTED FACTS

Pursuant to Fed. R. Civ. P. 56 and L.R. 56.1, Plaintiff provides the following responses to Defendant's statements of allegedly uncontroverted material facts (Defendant's statements will heretofore be referred to as "DSOF" and Plaintiff's responses thereto shall be referred to as "Response to DSOF") in opposition to Defendant's Motion for Summary Judgment:

1.   On May 2, 2016, Plaintiff April Pfannenstiel began working for Defendant Mars Wrigley Confectionery at Defendant's Topeka, Kansas facility as a Wrapper Operator. (Doc. 52, PTO, at p. 2, Stip. Fact No. 1).

**RESPONSE:  Uncontroverted.[2]**

2.   Mars Wrigley Confectionery is a member of the Mars, Incorporated family of companies.  (Declaration of Nichole Phillips, attached hereto as Exhibit A, at ¶3).

**RESPONSE:  Uncontroverted.**

3.   Mars Wrigley Confectionery manufactures and distributes confectionery and snack food products, specifically M&Ms Peanut, M&Ms Caramel, Snickers, and Twix. (Deposition of Shirley Ha, attached hereto as Exhibit B, at 38:16-38:17).

**RESPONSE:  Uncontroverted.**

4.   April Pfannenstiel worked as a Wrapper Operator for Snickers. (Deposition of Plaintiff April Pfannenstiel, Volume I, attached hereto as Exhibit C, at 22:5-6).

**RESPONSE:  Uncontroverted.**

5.   Snickers were and are the only candy bar made by the Filled Bar Department. (Ex. B, Ha Depo., at 17:24-18:8).

---

[2] To the extent Plaintiff does not controvert any DSOF, it is only for the purpose of this summary judgment motion, and reserves the right to adduce additional evidence at trial should more information become available prior thereto.

**RESPONSE: Uncontroverted.**

6.      The Filled Bar Department was divided into three different teams, with each team working different shifts. (Deposition of Michelle Waggoner, attached hereto as Exhibit D, at 29:23-30:1, 30:11-16).

**RESPONSE: Uncontroverted.**

7.      Each team was divided into two lines: the packaging side and the processing side. (Deposition of Benjamin Arteaga, Sr., attached hereto as Exhibit E, at 22:11-15).

**RESPONSE: Uncontroverted.**

8.      April Pfannenstiel worked on the packaging side. (Ex. C, Pltf. Depo., at 24:21-25:2, 120:6-9).

**RESPONSE: Uncontroverted.**

9.      On March 1, 2017, Travis Bussen, a Team Lead on the processing side, delivered a written attendance warning to Plaintiff. (Doc. 52, PTO, at p. 2, Stip. Fact No. 2; Ex. C, Pltf. Depo., at 49:14-23).

**RESPONSE: Uncontroverted.**

10.      James Gustin, who at the time was April Pfannenstiel's Team Lead, was not at the Topeka facility when Ms. Pfannenstiel was given the written attendance warning. (Ex. C, Pltf. Depo., at 26:2-5, 42:3-8, 45:5-7).

**RESPONSE: Uncontroverted.**

11.      Travis Bussen was not April Pfannenstiel's Team Lead, however, when James Gustin was out, Mr. Bussen would cover the packaging side as well. (Ex. D, Waggoner Depo., at 29:17-22; Ex. C, Pltf. Depo., at 49:14-23).

**RESPONSE: Uncontroverted.**

12.     On March 1, 2017, after receiving the written attendance warning, April Pfannenstiel spoke to People & Organization ("P&O") Manager, Michelle Waggoner, stating that she did not agree with the written attendance warning. (Doc. 52, PTO, at p. 2, Stip. Fact No. 3).

**RESPONSE:  Uncontroverted.**

13.     Michelle Waggoner rescinded the written attendance warning after April Pfannenstiel showed her text messages between herself and Travis Bussen that Ms. Waggoner felt Ms. Pfannenstiel could have been interpreted to mean that she had permission to be out for the full day. (Ex. D, Waggoner Depo., at 10:7-23).

**RESPONSE:  Uncontroverted.**

### March 2017 Complaint of Sexual Harassment

14.     On March 2, 2017, in response to follow-up questions from Ms. Waggoner, Ms. Pfannenstiel reported that James Gustin and Travis Bussen sexually harassed her. (Doc. 52, PTO, at p. 2, Stip. Fact No. 4).

**RESPONSE:  Uncontroverted.**

15.     Initially, April Pfannenstiel was not forthcoming to Michelle Waggoner with some of the information regarding the alleged sexual harassment because she did not want to start an investigation.  However, after Ms. Waggoner informed Ms. Pfannenstiel that she had an obligation to investigate it now that she had knowledge of it, Ms. Pfannenstiel began sharing additional information. (Ex. D, Waggoner Depo., at 31:14-32:5).

**RESPONSE:  Uncontroverted.**

16.     After April Pfannenstiel reported the sexual harassment, Defendant suspended James Gustin and Travis Bussen pending a further investigation. (Doc. 52, PTO, at p. 2, Stip. Fact No. 5).

**RESPONSE:  Uncontroverted.**

17.     The day after reporting the alleged sexual harassment, April Pfannenstiel requested some time off.  Michelle Waggoner told Ms. Pfannenstiel, who was visibly upset, to talk with Jonette Penton, the Regional Nurse Case Manager.  Mars approved Ms. Pfannenstiel's request for time off. (Ex. D, Waggoner Depo., at 36:11-17; Ex. C, Pltf. Depo., at 58:6-15; Deposition of Jonette Penton, attached hereto as Exhibit F, at 12:9-10).

**RESPONSE:  Uncontroverted.**

18.     Michelle Waggoner conducted an investigation into the reported sexual harassment that included speaking with other associates and was able to verify April Pfannenstiel's allegations of sexual harassment were credible. (Ex. D, Waggoner Depo., at 35:14-22).

**RESPONSE:  Uncontroverted.**

19.     On March 3, 2017, after the investigation verified April Pfannenstiel's allegations of sexual harassment were credible, Defendant terminated James Gustin's and Travis Bussen's employment. (Doc. 52, PTO, at p. 2, Stip. Fact No. 6; Ex. D, Waggoner Depo., at 35:23-36:1).

**RESPONSE:  Uncontroverted.**

20.     Between March 14, 2017 and April 2, 2017, Plaintiff took paid medical leave which the Company had offered. (Doc. 52, PTO, at p. 2, Stip. Fact No. 7).

**RESPONSE:  Uncontroverted.**

21.     Prior to reporting the alleged sexual harassment, April Pfannenstiel approached Harry Smith, a Team Lead on another team, and asked to be moved to his team but did not tell him why. (Ex. C, Pltf. Depo., at 56:18-57:12).

**RESPONSE:  Uncontroverted.**

22.     In March of 2017, Benjamin Arteaga, Sr., began working for Mars Wrigley Confectionary at the Topeka, Kansas facility as a Team Lead. (Ex. E, Arteaga, Sr., Depo., at 14:25-15:5).

**RESPONSE: Uncontroverted.**

23.     When Benjamin Arteaga, Sr., began working as a Team Lead, April Pfannenstiel was out on leave; however, Harry Smith, another Team Lead, informed Mr. Arteaga that Ms. Pfannenstiel was going to be joining his team. (Ex. E, Arteaga, Sr., Depo., at 31:12-32:1, 55:11-15).

**RESPONSE: Uncontroverted.**

24.     When April Pfannenstiel returned from paid medical leave, she transferred onto Benjamin Arteaga, Sr.'s team. (Ex. C, Pltf. Depo., at 60:8-16; Ex. E, Arteaga, Sr., Depo., at 37:20-38:3).

**RESPONSE: Uncontroverted.**

**September 2017 Complaint Regarding Jacob Edwards and Jordan Stilley**

25.     Plaintiff made at least one report to Benjamin Arteaga, Sr., that she did not feel comfortable working with Jacob Edwards and Jordan Stilley and that they were making comments at work that Plaintiff was unsafe.  (Doc. 52, PTO, at p. 3, Stip. Fact. No. 8-9).

**RESPONSE: Uncontroverted.**

26.     On September 13, 2017, Ms. Pfannenstiel's co-workers, Jacob Edwards and Jordan Stilley, complained to Benjamin Arteaga, Sr., that Ms. Pfannenstiel was taking extra breaks. (Doc. 52, PTO, at p. 3, Stip. Fact No. 10).

**RESPONSE: Uncontroverted.**

27.     On September 14, 2017, Benjamin Arteaga, Sr., had a meeting with Ms. Pfannenstiel, Jacob Edwards, Jordan Stilley, and Hailey Luxe to discuss the complaints of Ms. Pfannenstiel taking extra breaks. (Doc. 52, PTO, at p. 3, Stip. Fact No. 11).

**RESPONSE: Uncontroverted.**

28.     During this meeting, Jordan Stilley started yelling and cursing at Plaintiff and Mr. Stilley was sent home pending an investigation. (Doc. 52, PTO, at p. 3, Stip. Fact No. 12).

**RESPONSE: Uncontroverted.**

29.     At this meeting, Jordan Stilley also made comments regarding April Pfannenstiel getting James Gustin and Travis Bussen fired. (Ex. E, Arteaga, Sr., Depo., at 52:19-53:3, 53:12-20; Ex. C, Pltf. Depo., at 70:1-12).

**RESPONSE: Uncontroverted.**

30.     Due to his conduct during the meeting, Defendant terminated Jordan Stilley shortly thereafter. (Doc. 52, PTO, at p. 3, Stip. Fact No. 13).

**RESPONSE: Uncontroverted.**

### Plaintiff's FMLA Leave Requests

31.     Beginning on September 19, 2017, the Company offered Plaintiff the chance to take intermittent FMLA leave. (Doc. 52, PTO, at p. 3, Stip. Fact No. 14).

**RESPONSE: Uncontroverted.**

32.     Beginning September 22, 2017, Plaintiff began taking FMLA leave for exacerbation of her anxiety. (Doc. 52, PTO, at p. 3, Stip. Fact No. 15).

**RESPONSE: Uncontroverted.**

33.     Between September 27, 2017 and October 3, 2017, Plaintiff took FMLA medical leave due to carpal tunnel syndrome. (Doc. 52, PTO, at p. 3, Stip. Fact No. 16).

**RESPONSE:  Uncontroverted.**

34.     On October 6, 2017, the Topeka-Capital Journal reported that Plaintiff was booked into Shawnee County Jail in connection with aggravated assault with a deadly weapon on October 5, 2017. (Doc. 52, PTO, at p. 4, Stip. Fact No. 17).

**RESPONSE:  Uncontroverted.**

35.     Idol Rashid, Associate Relations Manager for the Mars Wrigley Confectionery facility in Topeka, was aware of the report in the Topeka-Capital Journal that Plaintiff was booked into Shawnee County Jail in connection with aggravated assault with a deadly weapon on October 5, 2017. (Declaration of Idol Rashid, attached hereto as Exhibit G, at ¶¶4, 6; Ex. C, Pltf. Depo., at 78:8-19).

**RESPONSE:  Uncontroverted.**

36.     Mr. Rashid was an Associate Relations Manager with Mars, Incorporated, from November 10, 2014 to September 28, 2018. (Ex. G, Rashid Decl., at ¶3).

**RESPONSE:  Uncontroverted.**

37.     Mr. Rashid was assigned to multiple facilities, including the Mars Wrigley Confectionery facility located in Topeka, Kansas. (Ex. G, Rashid Decl., at ¶4).

**RESPONSE:  Uncontroverted.**

38.     April Pfannenstiel admitted that she had a gun charge and a criminal damage to property charge and that those charges were dropped. (Ex. C, Pltf. Depo., at 77:18-78:1, 82:17-20, 85:9-10).

**RESPONSE:  Uncontroverted.**

39.     Between October 4, 2017 and November 22, 2017, Plaintiff only worked a total of nine shifts. (Doc. 52, PTO, at p. 4, Stip. Fact No. 18).

**RESPONSE:  Uncontroverted.**

40.     From November 2, 2017 to November 10, 2017, Plaintiff took FMLA medical leave due to her generalized anxiety disorder. (Doc. 52, PTO, at p. 4, Stip. Fact No. 19).

**RESPONSE:  Uncontroverted.**

41.     Between November 27, 2017 and February 12, 2018, Plaintiff took FMLA medical leave due to carpal tunnel surgery on both hands. (Doc. 52, PTO, at p. 4, Stip. Fact No. 20).

**RESPONSE:  Uncontroverted.**

## Plaintiff's Worker's Compensation Claim

42.     On April 21, 2018, Plaintiff sustained a work-related injury when she slipped on a hair net in the locker room and strained her back. (Doc. 52, PTO, at p. 4, Stip. Fact No. 21).

**RESPONSE:  Uncontroverted.**

43.     Per Company policy, when an associate sustains a work-related injury and they are sent to a physician for care, the associate is required to undergo a post-accident drug test. (Ex. F, Penton Depo., at 40:8-14).

**RESPONSE:  Uncontroverted.**

44.     Pursuant to Company policy, Plaintiff was required to undergo a post-accident drug test. (Doc. 52, PTO, at p. 4, Stip. Fact No. 22).

**RESPONSE:  Uncontroverted.**

45.     After April Pfannenstiel's drug sample was collected, it was sent to Defendant's drug testing contractor, Outcome, LLC. (Ex. F, Penton Depo., at 40:21-41:4).

**RESPONSE:  Uncontroverted.**

46.     After April Pfannenstiel's drug screen was sent to Outcome, LLC, Benjamin Arteaga, Sr., Plaintiff's Line Manager, and Shirley Ha, Value Stream Manager, wanted to know the results. (Declaration of Jonette Penton, attached hereto as Exhibit H, at ¶4).

**RESPONSE: Uncontroverted.**

47.     Mr. Arteaga and Ms. Ha needed to know the results for staffing purposes, specifically, when they could expect April Pfannenstiel back. (Ex. F, Penton Depo., at 44:20-22).

**RESPONSE: Uncontroverted.**

48.     It is common for Jonette Penton, as Regional Nurse Case Manager for Defendant's Topeka, Kansas facility, to receive requests from management as to the status of drug tests. (Ex. F, Penton Depo., at 43:1-4).

**RESPONSE: Uncontroverted.**

49.     On April 24, 2018, Jonette Penton sent an email to Outcome, LLC, inquiring into Plaintiff's post-injury drug test results. (Ex. F, Penton Depo., at 40:21-25, 42:10-21).

**RESPONSE: Uncontroverted, but incomplete. Specifically, in response to an email sent on April 23, 2018, at 2:57 PM, that indicated that Ms. Pfannenstiel's drug screen sample "would most likely ship to the lab [that day] and be there [the next] morning," and that the sender would "watch for it to arrive," Ms. Penton sent a reply email to Outcome, LLC, less than 24 hours later, on April 24, 2018, at 12:58 PM stating, "Any updates on arrival of this one. The powers that be are inquiring." (Plaintiff's Exhibit A, April 23, 2018, through April 24, 2018, email thread between Jonette Penton and Anne Coffee.)**

50.     Plaintiff took an approved leave of absence due to her injuries and returned to work on or around April 30, 2018. (Doc. 52, PTO, at p. 4, Stip. Fact No. 24).

**RESPONSE: Uncontroverted.**

51.    On or around May 2, 2018, Jonette Penton sent an email to Defendant's workers compensation occupational health provider regarding the scheduling of treatment for Plaintiff after her work-related injury of April 21, 2018. (Doc. 52, PTO, at p. 5, Stip. Fact No. 25).

**RESPONSE: Uncontroverted, but incomplete. Specifically, in her email to Defendant's workers compensation occupational health provider, Ms. Penton notes, "There are also performance based issues for this associate." She made this note even though she was not responsible for performance-related issues or discipline related to performance issues at that time, and even though the medical provider would have no reason to deal with those issues. (Plaintiff's Exhibit B, May 2, 2018, email from Jonette Penton.)**

52.    On June 4, 2018, Jonette Penton was informed by Defendant's workers' compensation insurance provider, Liberty Mutual, that its attempts to reach April Pfannenstiel regarding medical treatment for her work-related injury were unsuccessful. (Ex. H, Penton Decl., at ¶9).

**RESPONSE: Uncontroverted.**

53.    On July 5, 2018, Liberty Mutual advised Jonette Penton that April Pfannenstiel's last visit for medical treatment related to her work-related injury was May 23, 2018, and that it was closing its file for her because attempts to reach her were unsuccessful. (Ex. H, Penton Decl., at ¶10).

**RESPONSE: Uncontroverted.**

54.    Following April Pfannenstiel's work-related injury, she returned to work for 17 shifts. (Ex. H, Penton Decl., at ¶¶7-8, Ex. A).

**RESPONSE: Uncontroverted.**

55.     April Pfannenstiel testified that following her work-related injury, she never returned to work.  (Deposition of Plaintiff April Pfannenstiel, Volume II, attached hereto as Exhibit K, at 139:20-140:2).

**RESPONSE: Uncontroverted that Plaintiff so testified, but irrelevant.**

**Incident Regarding May 2018 Police Report**

56.     On May 18, 2018, a police report was filed with the Topeka Police Department alleging April Pfannenstiel had talked about wanting to kill people, being involved in drive-by shootings, and hanging out with a killer. (Doc. 52, PTO, at p. 5, Stip. Fact No. 26).

**RESPONSE: Uncontroverted.**

57.     On or around May 22, 2018, a detective from the Topeka Police Department came to Defendant's Topeka, Kansas facility and asked to speak with April Pfannenstiel who was not there. (Doc. 52, PTO, at p. 5, Stip. Fact No. 27).

**RESPONSE: Uncontroverted.**

58.     On May 22, 2018, Detectives had gone to April Pfannenstiel's home and left a card. (Ex. C, Pltf. Depo., at 90:10-25).

**RESPONSE: Uncontroverted.**

59.     On May 22, 2018, at 10:36a.m., April Pfannenstiel text messaged Benjamin Arteaga, Sr., stating: "Please call me when you when. The detective called me back. Said he needs me to come down to police station about some accusations that had been made against me from a possible coworker." (Ex. E, Arteaga, Sr., Depo., at 107:7-19).

**RESPONSE: Controverted to the extend a presumed scrivener's error results in a misrepresentation of the record. The first sentence of the text message in question states, "Please call me when you can." (Id.)**

60.     Shortly thereafter, April Pfannenstiel again texted Benjamin Arteaga, Sr., stating: "I don't trust this and I know I'm probably going to end up in jail today. I have a bad feeling and I haven't even done anything. I guess a lot more was supposedly said. The shooting up the place was just one of them." (Ex. E, Arteaga, Sr., Depo., at 124:2-22).

**RESPONSE: Uncontroverted.**

61.     From April 9, 2018 to May 25, 2018, the Associates Relations Manager assigned to the Topeka facility, Mr. Rashid, was out on Paternity Leave. (Ex. G, Rashid Decl., at ¶¶4, 7).

**RESPONSE: Uncontroverted.**

62.     While Mr. Rashid was on Paternity Leave, Nichole (Niki) Phillips, also an Associate Relations Manager with Mars, Incorporated, covered Mr. Rashid's Associate Relations responsibilities and duties at multiple facilities, including the Mars Wrigley Confectionery facility in Topeka, Kansas. (Ex. G, Rashid Decl., at ¶8).

**RESPONSE: Uncontroverted.**

63.     After the detective left the facility, Benjamin Arteaga, Sr., contacted Niki Phillips, the Associate Relations Manager covering the Associate Relations responsibilities at the Mars Wrigley Confectionery facility in Topeka, Kansas at that time, by phone to inform Ms. Phillips that there was a detective on site that wanted to question April Pfannenstiel. (Deposition of Nichole Phillips, attached hereto as Exhibit I, at 61:4-14; Ex. G, Rashid Decl., at ¶8).

**RESPONSE: Uncontroverted.**

64.     On May 22, 2018, after learning that the Topeka Police Department was looking for her, April Pfannenstiel voluntarily presented herself to law enforcement and was subsequently arrested for failing to appear for a hearing related to a misdemeanor charge of criminal damage to

property. (Doc. 52, PTO, at p. 5, Stip. Fact No. 28; Ex. I, Phillips Depo., at 107:11-15; Ex. A, Phillips Decl., at Ex. A).

**RESPONSE: Uncontroverted.**

65.     On May 22, 2018, after Niki Phillips' telephone conversation with Benjamin Arteaga, Sr., Ms. Phillips then called April Pfannenstiel, who confirmed that a detective wanted to question her, and that she wanted to take the night and connect the following day. (Ex. I, Phillips Depo., at 65:5-19).

**RESPONSE: Uncontroverted.**

66.     As a result of the detective showing up to the Mars Wrigley Confectionery facility, Niki Phillips launched an investigation of April Pfannenstiel to determine the reason for the detective showing up on site. (Ex. G, Rashid Decl., at ¶9; Ex. I, Phillips Depo., at 59:6-7).

**RESPONSE: Uncontroverted.**

67.     Niki Phillips then contacted April Pfannenstiel by telephone again on May 23, 2018. (Ex. I, Phillips Depo., at 68:1-11).

**RESPONSE: Controverted. Plaintiff did not speak with Ms. Phillips until "[a] couple days later." (Plaintiff's Exhibit C, December 16, 2019, First Deposition of Plaintiff at 93:15-18.)**

68.     During Niki Phillips' phone call with April Pfannenstiel, Ms. Pfannenstiel told Ms. Phillips that she had been contacted by local law enforcement regarding a complaint that was made against her by Jacob Edwards about her involvement with somebody who had just been charged with murder. (Ex. I, Phillips Depo., at 66:3-11).

**RESPONSE: Uncontroverted.**

69.     April Pfannenstiel told Niki Phillips that the detective made her aware that she had been named in a police report as somebody who was going to shoot up Mars with Rahnel Rayford. (Ex. I, Phillips Depo., at 68:25-69:11, 69:14-19).

**RESPONSE: Uncontroverted.**

70.     Ms. Pfannenstiel stated that because she knew Rahnel Rayford, who had been charged with murder, she was being questioned about it. (Ex. C, Pltf. Depo., at 89:6-90:7, 92:17-23; Ex. I, Phillips Depo., at 66:6-11, 68:25-69:11).

**RESPONSE: Uncontroverted.**

71.     Ms. Pfannenstiel stated that she knew Rahnel Rayford because they used to work together and because she had sold him a car. (Ex. C, Pltf. Depo., at 103:21-25; Ex. I, Phillips Depo., at 69:14-19).

**RESPONSE: Uncontroverted.**

72.     April Pfannenstiel told Ms. Phillips that the detective told her that Jacob Edwards had made the police report. (Doc. 52, PTO, at p. 6, Stip. Fact No. 34; Ex. I, Phillips Depo., at 69:14-19).

**RESPONSE: Uncontroverted.**

73.     April Pfannenstiel told Ms. Phillips that she knew it was Jacob Edwards who made the police report and that she believed people did not like her at the work site, specifically Mr. Edwards, because April Pfannenstiel got some of his friends fired. (Ex. I, Phillips Depo., at 68:18-24, 69:14-19; Ex. C, Pltf. Depo., at 61:20-62:5).

**RESPONSE: Uncontroverted.**

74.     April Pfannenstiel also informed Niki Phillips that she had been arrested because she had changed her phone number and when the detectives could not get a hold of her, they issued a bench warrant for her arrest. (Ex. I, Phillips Depo., at 68:25-69:11, 95:8-16, 106:21-107:4).

**RESPONSE: Uncontroverted.**

75.     On May 23, 2018, Defendant placed Plaintiff on paid leave while Defendant conducted an investigation into the allegations. (Doc. 52, PTO, at p. 6, Stip. Fact No. 35).

**RESPONSE: Uncontroverted.**

76.     Following her conversation with April Pfannenstiel, Niki Phillips spoke with Detective Davies, the law enforcement officer that went to the Topeka facility on May 22, 2018, about April Pfannenstiel and the police report. (Ex. I, Phillips Depo., at 77:17-78:1; Doc. 52, PTO, at p. 5, Stip. Fact No. 31).

**RESPONSE: Uncontroverted.**

77.     Detective Davies stated that about 80 percent of what April Pfannenstiel had told her was true. (Ex. I, Phillips Depo., at 78:4-10).

**RESPONSE: Plaintiff objects to this purported statement of fact because it is based on inadmissible hearsay. *See McGee v. Stonebridge Life Ins. Co.*, No. 05–4002–JAR, 2006 WL 2422399, at \*1 (D. Kan. Aug. 14, 2006) ("A party may not rely upon inadmissible hearsay evidence to support a motion for summary judgment"). More specifically, Ms. Phillips' deposition testimony about statements Detective Davies made to her consists of inadmissible hearsay as Defendant clearly intends to use the statements for the truth of the matter. *See Griddine v. GP1 KS-SB, Inc.*, 2:17-CV-02138-JAR, 2019 WL 1002049, at \*5 (D. Kan. Feb. 28, 2019) (noting courts "should disregard any inadmissible statements (e.g. hearsay) contained within affidavits or deposition transcripts that could not be presented at trial in any form").**

**To the extent a response is necessary, this statement is controverted. Ms. Phillips never told Ms. Pfannenstiel that she had spoken with a detective. (Plf.'s Ex. C, Plf. Depo I at 86:25-87:3.)**

78.     Detective Davies informed Niki Phillips that he had left a message for April Pfannenstiel to contact with him; however, instead of contacting him, she went to Shawnee County to clear up a bench warrant that had been issued for her arrest because she failed to appear in court for her misdemeanor criminal damage to property charge. (Ex. I, Phillips Depo., at 78:12-23; Ex. A, Phillips Decl., at Ex. A).

**RESPONSE: Plaintiff objects to this purported statement of fact because it is based on inadmissible hearsay. *See McGee v. Stonebridge Life Ins. Co.*, No. 05–4002–JAR, 2006 WL 2422399, at \*1 (D. Kan. Aug. 14, 2006) ("A party may not rely upon inadmissible hearsay evidence to support a motion for summary judgment"). More specifically, Ms. Phillips' deposition testimony about statements Detective Davies made to her consists of inadmissible hearsay as Defendant clearly intends to use the statements for the truth of the matter. *See Griddine v. GP1 KS-SB, Inc.*, 2:17-CV-02138-JAR, 2019 WL 1002049, at \*5 (D. Kan. Feb. 28, 2019) (noting courts "should disregard any inadmissible statements (e.g. hearsay) contained within affidavits or deposition transcripts that could not be presented at trial in any form"). To the extent a response is necessary, this statement is controverted. Ms. Phillips never told Ms. Pfannenstiel that she had spoken with a detective. (Plf.'s Ex. C, Plf. Depo I at 86:25-87:3.)**

79.     Detective Davies also informed Niki Phillips that he did not tell April Pfannenstiel who filed the police report and that person wanted to remain anonymous. (Ex. I, Phillips Depo., at 78:4-10, 79:21-80:3, 103:23-104:2; Ex. A, Phillips Decl., at Ex. A).

**RESPONSE: Plaintiff objects to this purported statement of fact because it is based on inadmissible hearsay.** *See McGee v. Stonebridge Life Ins. Co.*, **No. 05–4002–JAR, 2006 WL 2422399, at \*1 (D. Kan. Aug. 14, 2006) ("A party may not rely upon inadmissible hearsay evidence to support a motion for summary judgment"). More specifically, Ms. Phillips' deposition testimony about statements Detective Davies made to her consists of inadmissible hearsay as Defendant clearly intends to use the statements for the truth of the matter.** *See Griddine v. GP1 KS-SB, Inc.*, **2:17-CV-02138-JAR, 2019 WL 1002049, at \*5 (D. Kan. Feb. 28, 2019) (noting courts "should disregard any inadmissible statements (e.g. hearsay) contained within affidavits or deposition transcripts that could not be presented at trial in any form"). To the extent a response is necessary, this statement is controverted. Ms. Phillips never told Ms. Pfannenstiel that she had spoken with a detective. (Plf.'s Ex. C, Plf. Depo I at 86:25-87:3.)**

80.     Detective Davies would not tell Niki Phillips who filed the police report. (Ex. I, Phillips Depo., at 103:23-104:2; Ex. A, Phillips Decl., at Ex. A).

**RESPONSE: Plaintiff objects to this purported statement of fact because it is based on inadmissible hearsay.** *See McGee v. Stonebridge Life Ins. Co.*, **No. 05–4002–JAR, 2006 WL 2422399, at \*1 (D. Kan. Aug. 14, 2006) ("A party may not rely upon inadmissible hearsay evidence to support a motion for summary judgment"). More specifically, Ms. Phillips' deposition testimony about statements Detective Davies made to her consists of inadmissible hearsay as Defendant clearly intends to use the statements for the truth of the matter.** *See Griddine v. GP1 KS-SB, Inc.*, **2:17-CV-02138-JAR, 2019 WL 1002049, at \*5 (D. Kan. Feb. 28, 2019) (noting courts "should disregard any inadmissible statements (e.g. hearsay) contained within affidavits or deposition transcripts that could not be presented at trial in any form").**

**To the extent a response is necessary, this statement is controverted. Ms. Phillips never told Ms. Pfannenstiel that she had spoken with a detective. (Plf.'s Ex. C, Plf. Depo I at 86:25-87:3.)**

81.    Plaintiff later admitted that the detective would not release the identity of who filed the police report while the investigation was on-going and that she received a copy of the report only at the end of the investigation which stated that Jacob Edwards made the report.  (Ex. C, Pltf. Depo., at 87:12-18).

**RESPONSE:  Controverted. This mischaracterizes Plaintiff's testimony. The portion of Plaintiff's deposition cited by Defendant does not conclusively articulate that Ms. Pfannenstiel *first* found out that Mr. Edwards filed the police report in question when she received a copy of the report at the end of the investigation. Further, Plaintiff also testified that Mr. Edwards had made comments when he filed the police report, that he was bragging about it to people, and telling people that Plaintiff was going to be fired soon. (Plf.'s Ex. C, Plf. Depo I at 87:23-88:10.)**

<u>Plaintiff's Termination</u>

82.    As a result of her investigation, Niki Phillips recommended that April Pfannenstiel be terminated. (Ex. G, Rashid Decl., at ¶10).

**RESPONSE:  Uncontroverted.**

83.    Upon his return to work after Paternity Leave, Idol Rashid reviewed Niki Phillips' recommendation to terminate April Pfannenstiel. (Ex. G, Rashid Decl., at ¶11).

**RESPONSE:  Uncontroverted.**

84.    Idol Rashid and Niki Phillips discussed the recommendation to terminate Ms. Pfannenstiel with their manager, Senior Associate Relations Manager Christopher Krugman. (Ex.

G, Rashid Decl., at ¶12; Ex. I, Phillips Depo., at 75:20-24, 84:14-17, 94:22-95:2; Declaration of

Christopher Krugman, attached hereto as Exhibit J, at ¶8).

**RESPONSE: Uncontroverted.**

85.   Christopher Krugman, Idol Rashid, and Niki Phillips were not aware that April

Pfannenstiel filed a Worker's Compensation claim nor were they told by Jonette Penton about

Plaintiff's work-related injury or her worker's compensation claim. (Ex. A, Phillips Decl., at ¶6;

Ex. G, Rashid Decl., at ¶18; Ex. J, Krugman Decl., at ¶12; Ex. H, Penton Decl., at ¶5).

**RESPONSE: Uncontroverted.**

86.   Idol Rashid was involved in and finalized the decision to terminate April

Pfannenstiel's employment from Mars Wrigley Confectionery. (Ex. G, Rashid Decl., at ¶¶13-14).

**RESPONSE: Uncontroverted.**

87.   On May 30, 2018, Defendant terminated Plaintiff's employment. (Doc. 52, PTO,

at p. 6, Stip. Fact No. 37).

**RESPONSE: Uncontroverted.**

88.   On May 30, 2018, Idol Rashid participated in a phone call notifying April

Pfannenstiel that her employment was terminated. (Ex. G, Rashid Decl., at ¶15).

**RESPONSE: Uncontroverted.**

89.   After April Pfannenstiel was terminated, Idol Rashid and Niki Phillips received a

copy of a one-page Non Criminal Incidents Report made to the Topeka Police Department, filed

May 18, 2018. (Ex. A, Phillips Decl., at ¶5; Ex. G, Rashid Decl., at ¶17).

**RESPONSE: Controverted. Benjamin Arteaga, Sr., Plaintiff's supervisor at the time**

**of her termination, thinks that Ms. Pfannenstiel was still employed with Defendant at the**

time she sent him a picture of the police report bearing Mr. Edwards' name via text message. (Plaintiff's Exhibit D, January 7, 2020, Deposition of Benjamin Arteaga, Sr. at 116:2-24.)

90.     At no point in time did Christopher Krugman ever receive a copy of the Non Criminal Incidents Report made to the Topeka Police Department, nor did he ever become aware of who filed the Criminal Incidents Report. (Ex. J, Krugman Decl., at ¶11).

**RESPONSE: Uncontroverted.**

91.     When April Pfannenstiel submitted the Non Criminal Incidents Report to the Company, Idol Rashid and Niki Phillips saw that Jacob Edwards was the person who had filed the police report against Ms. Pfannenstiel. (Ex. A, Phillips Decl., at ¶5; Ex. G, Rashid Decl., at ¶17).

**RESPONSE:  Controverted to the extent it is meant to imply that Mr. Rashid and Ms. Phillips were first given information that Mr. Edwards might be implicated in the false police report against Plaintiff. Ms. Phillips admits that Plaintiff notified her that she believed Mr. Edwards was behind the false police report. (Plaintiff's Exhibit E, January 8, 2020, Deposition of Nichole Phillips at 104:3-5.)**

92.     At the time of April Pfannenstiel's termination and up to the point of discovery in this matter, Idol Rashid and Niki Phillips were not aware that April Pfannenstiel had an existing Workers' Compensation claim against Mars Wrigley Confectionery nor do Associate Relations Managers have any involvement in Worker's Compensation claims. (Ex. A, Phillips Decl., at ¶6; Ex. I, Phillips Depo., at 56:8-11; 57:10-13; Ex. G, Rashid Decl., at ¶18).

**RESPONSE: Uncontroverted.**

93.     The reason for April Pfannenstiel's termination was for falsifying information and lying during a Company investigation, which is an integrity issue in violation of Mars Wrigley

Confectionery policies. (Ex. G, Rashid Decl., at ¶19; Ex. I, Phillips Depo., at 103:2-104:2, 105:4-106:16, 106:21-107:4, 107:11-108:12, 111:2-112:5, 112:20-25).

**RESPONSE: Controverted. Circumstantial evidence exists that such rationale for Plaintiff's termination is pretextual. For example, the temporal proximity between Plaintiff's conversations with Ms. Phillips on May 23, and May 24, 2018, and her termination on May 30, 2018, was mere days. (Plf.'s Ex. E, Phillips Depo. at 46:20-22, 93:16-21.) Moreover, assuming, *arguendo*, that Ms. Phillips actually had a conversation with Detective Davies as alleged, and that it went as she described, her own notes indicate that Detective Davies admitted to her that he, "cannot tell what the other detective said." (Plaintiff's Exhibit F, Nichole Phillips May 23, 2018, Investigation Notes.) This is a strong indication that she could not have reasonably believed that Plaintiff's statements that someone had told her that Mr. Edwards had made the police report were actually false. Additionally, Ms. Phillips was aware of Plaintiff's prior verified reports of sexual harassment, as well as her prior reports of retaliation by Jacob Edwards and Jordan Stilley, and her belief that Mr. Edwards' false police report was also retaliatory—specifically Plaintiff's belief that Mr. Edwards was engaging in this behavior because she "had gotten some of his friends fired"—prior to the decision to terminate Plaintiff's employment. (Plf.'s Ex. E, Phillips Depo. at 44:20-45:7, 72:11-18, 73:11-74:5, 96:23-97:14, 120:8-11; Plaintiff's Exhibit G., May 24, 2018, Email from Idol Rashid to Nichole Phillips.) In fact, Mr. Stilley admitted on or around September 28, 2017, that he was "yell[ing] and curs[ing] at [Plaintiff]" at least in part because he believed she "receive[d] special treatment for a lawsuit she '[held] over Mars'." (Plf.'s Ex. G., May 24, 2018, Rashid email.) Ms. Phillips also implies that she did not need to wait and see a copy of Mr. Edwards' false police report before terminating Plaintiff's employment because**

Plaintiff **"was on leave for several days and did not produce it until after her separation,"** but admits that Plaintiff *could not* have produced a copy of the police report earlier than she did. (Plf.'s Ex. E, Phillips Depo. at 110:5-20.)

94.   Specifically, April Pfannenstiel was terminated for making:

a.   False statements regarding person who filed police report (Ex. I, Phillips Depo., at 103:2-104:2);

b.   False statements regarding why she had been arrested (Ex. I, Phillips Depo., at 106:21-107:4, 107:11-15, 111:2-112:5); and

c.   False statements to Niki Phillips regarding the substance of the police report (Ex. I, Phillips Depo., at 105:4-106:16, 107:16-108:12).

**RESPONSE: Controverted. At best, Defendant can only claim that Ms. Phillips** *suspected* **that Plaintiff's statements were false, especially since Plaintiff's assertion that Mr. Edwards was the one that had made the false police report against her turned out to be true. (Plf.'s Ex. E, Phillips Depo. at 104:3-8.) Even Plaintiff's statements that Ms. Phillips alleges were untrue, were at worst, subject to a different interpretation than information that Ms. Phillips had obtained elsewhere. For instance, Plaintiff** *admitted* **to Ms. Phillips that there had been a warrant for her arrest. (Plf.'s Ex. E, Phillips Depo. at 68:16-69:11.) Ms. Phillips also admitted that she required legal advice from Defendant's counsel to inform her interpretation of Plaintiff's explanation for the warrant. (Plf.'s Ex. E, Phillips Depo. at 107:5-10.) Despite that, she apparently assumed Plaintiff had the legal knowledge to accurately explain the reason for the warrant against her.**

**Circumstantial evidence exists that such rationale for Plaintiff's termination is pretextual. For example, the temporal proximity between Plaintiff's conversations with Ms.**

Phillips on May 23, and May 24, 2018, and her termination on May 30, 2018, was mere days. (Plf.'s Ex. E, Phillips Depo. at 46:20-22, 93:16-21.) Moreover, assuming, *arguendo*, that Ms. Phillips actually had a conversation with Detective Davies as alleged, and that it went as she described, her own notes indicate that Detective Davies admitted to her that he, "cannot tell what the other detective said." (Plf.'s Ex. F, Phillips Investigation Notes.) This is a strong indication that she could not have reasonably believed that Plaintiff's statements that someone had told her that Mr. Edwards had made the police report were actually false. Additionally, Ms. Phillips was aware of Plaintiff's prior verified reports of sexual harassment, as well as her prior reports of retaliation by Jacob Edwards and Jordan Stilley, and her belief that Mr. Edwards' false police report was also retaliatory—specifically Plaintiff's belief that Mr. Edwards was engaging in this behavior because she "had gotten some of his friends fired"—prior to the decision to terminate Plaintiff's employment. (Plf.'s Ex. E, Phillips Depo. at 44:20-45:7, 72:11-18, 73:11-74:5, 96:23-97:14, 120:8-11; Plf.'s Ex. G., May 24, 2018, Rashid email.) In fact, Mr. Stilley admitted on or around September 28, 2017, that he was "yell[ing] and curs[ing] at [Plaintiff]" at least in part because he believed she "receive[d] special treatment for a lawsuit she '[held] over Mars'." (Plf.'s Ex. G., May 24, 2018, Rashid email.) Ms. Phillips also implies that she did not need to wait and see a copy of Mr. Edwards' false police report before terminating Plaintiff's employment because Plaintiff "was on leave for several days and did not produce it until after her separation," but admits that Plaintiff *could not* have produced a copy of the police report earlier than she did. (Plf.'s Ex. E, Phillips Depo. at 110:5-20.)

III.    **PLAINTIFF'S ADDITIONAL STATEMENT OF UNCONTROVERTED FACTS**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Plaintiff provides the following statement of additional uncontroverted material facts ("ASOF") in opposition to Defendant's Motion for Summary Judgment:

1.      Ms. Phillips only became aware of Plaintiff in March or April of 2018. (Plf.'s Ex. E, Phillips Depo. at 31:1-6.)

2.      Ms. Phillips first became aware of Plaintiff with respect to a complaint made about her by Jacob Edwards that she glared at him one time because he asked to move teams. (Plf.'s Ex. E, Phillips Depo. at 31:15-32:5.)

3.      Ms. Phillips learned about Plaintiff's allegations of sexual harassment against James Gustin and Travis Bussen before Plaintiff's employment was terminated, but only as early as May 22, 2018, the date that law enforcement came to Defendant's Topeka, Kansas facility. (Plf.'s Ex. E, Phillips Depo. at 42:25-43:13, 44:20-45:7, 60:18-61:1.)

4.      Ms. Phillips only became aware of the details of the incident between Plaintiff and Jordan Stilley in September 2017 upon receiving the email from Idol Rashid outlining the incident on May 24, 2018. (Plf.'s Ex. E, Phillips Depo. at 73:11-18.)

5.      Plaintiff returned to work from FMLA leave on February 13, 2018. (Doc. #52, Pretrial Order at Stipulated Fact #20.)

6.      The very next day, Jacob Edwards sent a complaint to Idol Rashid indicating that he and other coworkers are upset because they found out an unnamed coworker (Plaintiff) had "been charged with several crimes dating back to 2017" and saying they didn't feel comfortable or safe because the company did not give them notice of the crimes, citing Case No. 2017-CR-00212 from Shawnee County Courts. (Plaintiff's Exhibit H, February 14, 2018, email from Jacob Edwards to Rashid Idol.)

7.     Two days later, Jacob Edwards sent another email to Mr. Rashid following up on his supposed concerns regarding this same coworker. (Plaintiff's Exhibit I, February 16, 2018, email from Jacob Edwards to Idol Rashid.)

8.     On March 1, 2018, Rashid Idol notified Christopher Krugman that "the assault with deadly weapons charged was dismissed so I will be reaching out to the complaining party then notifying April when she can return." (Plaintiff's Exhibit J, March 1, 2018, email from Idol Rashid to Christopher Krugman.)

9.     Shirley Ha, Value Stream Manager and supervisor for Defendant, testified that Plaintiff met with her to discuss workplace concerns some time after Plaintiff returned from leave for her carpal tunnel surgery in 2018, but before Mr. Edwards made his April 30, 2018, complaint. During this meeting, Plaintiff told Ms. Ha that she felt isolated from her team, and there were "still comments around, from her team, around [sic] she was out a lot on FMLA…" and that "…the commentary is that Jacob [Edwards] moved away because of her…" Ms. Ha further testified "… the team was obviously causing—they're just basically mentioning some of those comments to her, which didn't sit well with her." (Plaintiff's Exhibit K, January 7, 2020, Deposition of Shirley Ha at 61:9-62:17, 68:21-69:10 (noting Plaintiff met with Ms. Ha to discuss her concerns at some point before the April 30, 2018 complaint from Edwards).)

10.    Jacob Edwards had previously gone to Ms. Ha to complain about Plaintiff shortly after the September 14, 2017 meeting, at which time Mr. Edwards told Ms. Ha. "… Jordan [Stilley] was his friend and that he agrees with Jordan, that April has abused some form of policy, and that this has been going on for a while." Ms. Ha responded by telling Mr. Edwards she would look into it and speak to Mr. Arteaga to understand what was going on. (Plf.'s Ex. K, Ha Depo. at 49:11-50:12.)

11.     When Ms. Ha spoke with Mr. Arteaga about Mr. Edwards' concerns, Mr. Arteaga told Ms. Ha that Mr. Edwards was "really close" to Mr. Stilley, that Mr. Arteaga was aware of Mr. Edwards concerns, and that Mr. Arteaga had already explained to Mr. Edwards and Mr. Stilley that the "reason why" Plaintiff might have been absent from work was "not something that he can discuss with them." (Plf.'s Ex. K, Ha Depo. at 50:13-21.)

12.     On April 30, 2018, Plaintiff returned from a leave of absence related to her workers compensation injury. (Doc. #52, Pretrial Order at Stipulated Fact #24.)

13.     On that very day, Mr. Edwards made an allegation that Plaintiff had given him a "death stare" and made a hurtful comment about changing teams, again claiming he didn't feel safe at work because of her. (Plaintiff's Exhibit L, April 30, 2018, email from Jacob Edwards to Clarence Chaney and Jonette Penton; Plf.'s Ex. E, Phillips Depo. at 33:18-25.)

14.     Ms. Phillips investigated Mr. Edwards' allegations of April 30, 2018. (Plf.'s Ex. E, Phillips Depo. at 35:23-37:2, 37:7-40:2.)

15.     The results of Ms. Phillips' investigation into Mr. Edwards' allegations were inconclusive, and, because of the conflicting witnesses, both Mr. Edwards and Plaintiff were simply told that they need to stay away from each other. (Plf.'s Ex. E, Phillips Depo. at 40:3-7, 104:20-105:3.)

16.     Ms. Phillips admitted that during the course of dealing with Mr. Edwards' April 30, 2018 complaint about Plaintiff, she became aware that Mr. Edwards had previously requested, and was granted, an "accommodation" to be moved from the same team as Plaintiff; Ms. Phillips testified her understanding of why Mr. Edwards had requested not to work with Plaintiff was, in pertinent part, that "[h]e believed that she was a dangerous person and hung out with dangerous people." (Plf.'s Ex. E, Phillips Depo. at 41:10-42:6.)

17.     Jacob Edwards was not disciplined for making the police report against Plaintiff. (Plf.'s Ex. E, Phillips Depo. at 113:1-3.)

18.     Jacob Edwards and Plaintiff worked the same shift on the same team with the same supervisor (Plf.'s Ex. D, Arteaga Depo. at 69:17-70:5, 93:17-94:6.)

19.     Plaintiff took FMLA leave from November 2, through November 10, 2017, due to her generalized anxiety disorder. (Doc. #52, Pretrial Order at Stipulated Fact #19.)

20.     On November 8, 2017, while Plaintiff was out on FMLA leave, Benjamin Arteaga, Sr., drafted a "Final Written Warning" for Plaintiff with regard to her attendance for Idol Rashid's review, apparently in response to a conversation Mr. Rashid had had with Harry Smith. (Plaintiff's Exhibit M, November 8, 2017, email thread among Benjamin Arteaga, Harry Smith, and Idol Rashid.)

21.     Jonette Penton, the Topeka site's Nurse Case Manager, testified that she received requests from "management" regarding the status of drug tests following every work injury. (Plaintiff's Exhibit N, June 2, 2020, Deposition of Jonette Penton at 43:1-7.)

22.     On April 24, 2018, Ms. Penton sent an email to Defendant's drug testing contractor, inquiring into Plaintiff's post-injury drug test results, stating, "Any updates on the arrival of this one. The powers that be are inquiring." (Doc. #52, Pretrial Order at Stipulated Fact #23; Plf.'s Ex. A, Penton/Coffee email thread.)

23.     On May 2, 2018, Ms. Penton sent an email to Defendant's workers compensation occupational health provider regarding the scheduling of treatment for Plaintiff after her work-related injury which included the statement, "[t]here are also performance based issues for this associate." (Doc. #52, Pretrial Order at Stipulated Fact #25, Plf.'s Ex. B, May 2, 2018, Penton email.)

24.     Ms. Penton was not responsible for discipline related to performance issues at the time she sent her May 2, 2018, email to Defendant's workers compensation occupational health provider, and she admits that the medical provider would have no reason to deal with those issues. (Plf.'s Ex. N, Penton Depo. at 46:24-47:3, 48:8-11.)

25.     On May 23, 2018, at 10:10 a.m., Plaintiff sent a text message to Mr. Arteaga stating, "I am heading to the police station now to see if I can get a copy of the report that was made. I talked to the detective and he is going to guide me through the process of getting Jacob charged with false reporting. I told you I'm done with playing these little games that interfere with my daily life. It's not fair and I need him to leave me alone." (Plf.'s Ex. D, Arteaga Depo. at 106:24-107:6, 111:25-112:22; Plaintiff's Exhibit O, May 23, 2018 text message from Plaintiff to Benjamin Arteaga, Sr.)

26.     On May 29, 2020, the Topeka Police Department issued a Non Criminal Incidents Report regarding allegations made by Jacob Edwards against Plaintiff. (Plaintiff's Exhibit P, May 29, 2018, Topeka Police Department Non Criminal Incidents Report.)

27.     The report issued by the Topeka Police Department was written by a Detective Blood. (Plf.'s Ex. P, May 29, 2018, Topeka Police Report.)

28.     The report issued by the Topeka Police Department indicates that Detective Blood interviewed Plaintiff regarding Mr. Edwards' complaints. (Plf.'s Ex. P, May 29, 2018, Topeka Police Report.)

29.     The report issued by the Topeka Police Department also references a Deputy S. Gilchrist. (Plf.'s Ex. P, May 29, 2018, Topeka Police Report.)

30.    The report issued by the Topeka Police Department indicates that Deputy Gilchrist took Mr. Edwards' complaint regarding Plaintiff. (Plf.'s Ex. P, May 29, 2018, Topeka Police Report.)

31.    The report issued by the Topeka Police Department indicates that Detective Blood made the determination that Mr. Edwards' complaints about Plaintiff did not merit concern. (Plf.'s Ex. P, May 29, 2018, Topeka Police Report.)

32.    The report issued by the Topeka Police Department does not reference the involvement of a Detective Davies with the investigation. (Plf.'s Ex. P, May 29, 2018, Topeka Police Report.)

33.    On February 2, 2018—while Plaintiff was still on a continuous leave of absence for her carpal tunnel surgery—Ms. Ha complained to Mr. Rashid that Plaintiff purportedly "consistently failed to provide her paperwork in time," and asked Mr. Rashid "[i]s it really acceptable to continue in this manner?" (Plaintiff's Exhibit Q, February 2-5, 2018, email thread between Shirley Ha to Idol Rashid).

34.    Mr. Rashid responded to Ms. Ha by stating Ms. Penton "followed the correct response of escalating [Plaintiff's] failures with the letter that was sent out and we will need to continue to monitor it with Legal's help." Mr. Rashid further stated, "[i]t's unfortunate that she is not abiding by the expectations n the process while we are providing her this benefit and I would not call it acceptable." (Plf.'s Ex. Q, February 2-5, 2018, Ha/Rashid email thread).

## IV.   SUMMARY JUDGMENT STANDARD

Summary Judgment must be granted when the moving party has provided evidence that demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A party who moves for summary judgment bears the burden of showing that there is no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). "There is a genuine dispute of material fact 'if a rational jury *could* find in favor of the nonmoving party on the evidence presented'." *Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 882 (10th Cir. 2018) (quoting *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000)) (emphasis provided). When a court is deciding whether to grant summary judgment, the evidence is viewed in the light most favorable to, and all reasonable inferences are drawn in favor of, the nonmoving party. *Id.* (citing *Gutierrez v. Cobos*, 841 F.3d 895, 900 (10th Cir. 2016)). "It is axiomatic that a judge may not evaluate the credibility of witnesses in deciding a motion for summary judgment." *Seamons v. Snow*, 206 F.3d 1021, 1026 (10th Cir. 2000) (citing *Liberty Lobby, Inc.*, 477 U.S. at 255; *Koopman v. Water Dist. No. 1*, 972 F.2d 1160, 1164 (10th Cir. 1992)).

## V.   ARGUMENT AND AUTHORITIES

Plaintiff brings three claims against Defendant: (1) Retaliation pursuant to Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"); (2) Retaliation pursuant to the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et. Seq.* ("FMLA"); and (3) wrongful termination for filing a worker's compensation claim in violation of Kansas public policy. Defendant moves for summary judgement on all three claims. For the reasons as set out below, Defendant's motion should be denied on all counts.

### A.   Plaintiff's Title VII Retaliation Claim Should Not be Dismissed.

At the outset, it should be noted that Defendant does not appear to challenge whether Plaintiff suffered an adverse employment action, nor could it reasonably do so, as Defendant admits that it terminated Plaintiff's employment on May 30, 2018. (DSOF #87.) *See e.g. Roberts v. Roadway Exp., Inc.*, 149 F.3d 1098, 1104 (10th Cir. 1998) ("Actions such as suspensions or terminations are by their nature adverse, even if subsequently withdrawn.") Thus, Plaintiff can establish a *prima facie* claim for purposes of Defendant's motion for summary judgment with regard to her Title VII retaliation claim if she can establish that she engaged in a protected activity and that a causal connection exists between her termination and such protected activity. *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1202 (10th Cir. 2008) (citing *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007)).

Defendant assumes that Plaintiff cannot produce direct evidence of retaliation, necessitating analysis of Plaintiff's Title VII claim pursuant to the burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-803 (1973). However, such a conclusion is premature. "Direct evidence is evidence that, on its face, demonstrates that the employment decision was reached for discriminatory reasons." *Thomas v. Farmers Ins. Exch.*, No. 18-2564-

DDC-ADM, 2020 WL 1467315, at *8 (D. Kan. Mar. 26, 2020) (quoting *Didier v. Abbott Labs.*, 614 Fed. Appx. 366, 372 (10th Cir. 2015)). Courts have emphasized the importance of context and temporal proximity in determining whether comments reflecting personal bias qualify as direct evidence of discrimination. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1217 (10th Cir. 2013) (quoting *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1118 (10th Cir. 2007)). *See also Reed v. Unified Sch. Dist. No. 233*, 299 F. Supp. 2d 1215, 1232 (D. Kan. 2004) (holding that evidence that a supervisor "in fact relied on [the] plaintiff's complaint of discrimination in deciding that he would not provide her with a recommendation … constitute[d] direct evidence of discrimination and render[ed] any analysis of pretext unnecessary.") (citing *Ramsey v. City & County of Denver*, 907 F.2d 1004, 1008 (10th Cir. 1990); *McGarry v. Board of County Comm'rs of County of Pitkin*, 175 F.3d 1193, 1200 & n.4 (10th Cir. 1999)).

Defendant freely admits that Ms. Phillips made the decision to terminate Plaintiff's employment expressly based on statements Plaintiff made to her On May 22, 2018. (DSOF #93-94.) Moreover, Ms. Phillips admits that she understood at least some of Plaintiff's statements to be a complaint that Mr. Edwards was illegally retaliating against her because her prior complaints of harassment led to the termination of some of their coworkers. (Response to DSOF #93-94.) Thus, if Plaintiff's complaints on May 22, 2018 are constituted a protected activity, there is an indisputable causal link between Plaintiff's complaint and her termination, rendering a *McDonnell Douglas* analysis irrelevant. However, even if the Court finds that the record does not support a finding of direct evidence, Plaintiff can easily establish that Defendant's proffered rationale for terminating Plaintiff's employment is grossly pretextual.

### 1. Rule of Law

"Title VII makes it unlawful to retaliate against an employee because the employee has opposed any practice made unlawful by Title VII, or because the employee has 'participated ... in

an investigation, proceeding or hearing'." *Downs v. Jostens, Inc.,* 23 F. Supp. 3d 1332, 1337 (D. Kan. 2014) (quoting 42 U.S.C. § 2000e–3(a)). "In the absence of direct evidence of retaliation, the court assesses retaliation claims under the *McDonnell Douglas* burden-shifting framework." *Id.* To demonstrate a *prima facie* claim of retaliation under Title VII, Plaintiff must show: (1) she "engaged in protected opposition to discrimination;" (2) she "suffered an adverse employment action during or after [her] protected opposition that a reasonable employee would have found materially adverse; and (3) a causal connection exists between the protected activity and the materially adverse action." *Id.* at 1338 (citing *Hinds,* 523 F.3d at 1201–02; *McGowan v. City of Eufala,* 472 F.3d 736, 741 (10th Cir. 2006)).[3] "If plaintiff establishes a *prima facie* case, the burden shifts to defendant to articulate a facially nonretaliatory reason for its actions," and if "defendant articulates a legitimate nonretaliatory reason, the burden shifts back to plaintiff to present evidence from which a jury might conclude that defendant's proffered reason is pretextual …" *Id.*

"'A plaintiff shows pretext by demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons'." *Herrera v. United Airlines, Inc.,* 754 Fed. Appx. 684, 691–92 (10th Cir. 2018) (quoting *Swackhammer v. Sprint/United Mgmt. Co.,* 493 F.3d 1160, 1167 (10th Cir. 2007)). A plaintiff typically demonstrates pretext in one of three ways: (1) evidence that defendant's justification for the adverse employment action was unworthy of belief; (2) evidence that defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances; or (3) evidence that defendant

---

[3] A plaintiff asserting a claim of retaliation under Title VII "must show that his protected activity was the but-for cause of the alleged adverse employment action." *Id.* (citing *University of Texas Southwestern Medical Center v. Nassar,* 570 U.S. 338, 360 (2013)).

acted contrary to an unwritten policy or company practice when making the adverse employment decision against plaintiff. *Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000). Additionally, another "common method of showing pretext is by arguing disparate treatment…[u]nder this approach, a plaintiff can establish pretext by 'demonstrating that the employer treated the plaintiff differently from other similarly-situated employees[4] who violated work rules of comparable seriousness.'" *Herrara,* 754 Fed. Appx. at 692 (quoting *Swackhammer,* 493 F.3d at 1167-68)).

## 2. Plaintiff's Reports of a Hostile Work Environment Constitute Protected Activity Under Title VII.

Defendant concedes that Plaintiff's reports of sexual harassment in March 2017 constituted protected activity but denies that her reports against Jacob Edwards and Jordan Stilley in September 2017 or her report regarding Jacob Edwards in May 2018 did. Defendant argues that said reports are not actionable because the alleged conduct at issue therein was "plainly unmotivated by her sex or any other protected category under Title VII." (Doc. #54 at 19-20.) However, Defendant's argument represents a mischaracterization of the nature of Plaintiff's reports and is inconsistent with the law. *See Somoza v. Univ. of Denver*, 513 F.3d 1206, 1213 (10th Cir. 2008) (noting informal complaints to supervisors regarding perceived disparate treatment by others in the workplace are a protected activity sufficient for a Title VII retaliation claim).

With regard to Plaintiff's report of Mr. Edwards' and Mr. Stilley's conduct in September 2017, Defendant argues that Plaintiff only reported to Benjamin Arteaga, Sr., that Mr. Stilley and Mr. Edwards were making comments about her, that she did not connect her allegations at that

---

[4] For an individual to be "similarly situated" to Plaintiff, he or she must have: (1) "deal[t] with the same supervisor," and (2) been "subject to the same standards governing performance evaluation and discipline." *Aramburu v. Boeing Co.,* 112 F.3d 1398, 1404 (10th Cir. 1997).

time to any protected category. (Doc. #54 at 19.) However, this completely ignores the fact that prior to the termination of Plaintiff's employment, Ms. Phillips was aware that Plaintiff believed her treatment at the hands of Mr. Edwards and Mr. Stilley was connected to Plaintiff's prior reports of sexual harassment which had resulted in the termination of other employees. (Response to DSOF #93.) Moreover, Mr. Stilley went so far as to *admit* that at least part of his treatment of Plaintiff was the result of her purportedly "receiv[ing] special treatment for a lawsuit she '[held] over Mars'." (*Id.*) Indeed, Mr. Stilley's admission was plainly stated in an email Ms. Phillips had received and reviewed prior to terminating Plaintiff's employment. (*Id.*) Consequently, it was clear to Defendant by—at the latest—May 24, 2018 that Plaintiff's reports of Mr. Edwards' and Mr. Stilley's conduct constituted good faith reports of retaliatory harassment. *See e.g. Godoy-Guzman v. Unified Government of Wyandotte County and Kansas City Kansas*, No. 2:17-cv-02660-HLT, 2019 WL 6894529, at *10 (D. Kan. Dec. 18, 2019) (noting an employer can be liable for co-workers' retaliatory harassment where its "supervisory or management personnel either (1) orchestrate the harassment or (2) know about the harassment and acquiesce in it in such a manner as to condone or encourage the co-worker's actions.") (internal quotations and citations omitted). Therefore, even if Plaintiff's reports did not initially appear to be protected conduct at the time she made them to Mr. Arteaga, it should have been clear that they constituted protected conduct—*i.e.* complaints of co-worker retaliatory harassment—at time her employment was terminated.

Likewise, Ms. Phillips admits that Plaintiff told her that Plaintiff believed that Mr. Edwards had filed the police report against her because she had "gotten some of his friends fired." (Response to DSOF #93.) Ms. Phillips further admits that the only employees she was aware of who were fired because of allegations made by Plaintiff were James Gustin, Travis Bussen, and Jordan Stilley. (*Id.*). As previously noted, Defendant concedes that Plaintiff's reports against James Gustin

and Travis Bussen were protected conduct. Therefore, any good faith reports that she was the subject of harassment *because of* such reports, such as Plaintiff's report that Mr. Edwards had filed a false police report against her, would be protected reports of retaliatory harassment. *See Haney v. Preston*, No. 08–2658 JAR/GLR, 2010 WL 5392670, at *12 (D. Kan. Dec. 22, 2010) (noting the *prima facie* elements for a claim of retaliatory harassment are that plaintiff "engaged in protected opposition to discrimination," that "defendant subjected him to conduct that might well have dissuaded a reasonable employee from making a charge of discrimination," and that "a causal nexus exists between the plaintiff's opposition and the defendant's conduct."). Defendant's argument that only one of Plaintiff's reports constitutes a protected activity is without merit.

### 3. A Causal Connection Exists Between Plaintiff's Reports of a Hostile Work Environment and the Adverse Employment Decision to Which She Was Subjected.

Defendant argues that because Plaintiff's report that she had been sexually harassed was made "approximately 14 months" before her termination, she cannot prove a causal connection between her report and her termination. Assuming that Plaintiff's reports regarding Jordan Stilley's and Jacob Edwards' conduct in September 2017 and Jacob Edwards' false police report in May 2018 were unprotected conduct, Defendant opts not to analyze whether, if protected, such reports would establish the required causal connection. Defendant fails to perform that analysis at its own peril.

As shown, Plaintiff's reports of the September 2017 incidents and Plaintiff's statements to Defendant regarding Mr. Edwards' false police report *were*, in fact, protected conduct. Plaintiff can thus establish a *prima facie* claim of retaliation based on said reports if she can prove a causal connection between the reports and the adverse employment action that was the termination of her employment. In *Argo v. Blue Cross & Blue Shield of Kansas, Inc.*, the Court held that the 24 days between the plaintiff's complaint of sexual harassment by his female supervisor and the

termination of his employment was sufficiently close temporal proximity to allow an inference that a causal connection existed between the internal grievance and the decision to terminate. 452 F.3d 1193, 1202 (10th Cir. 2006) (citing *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir.1999) (indicating that a period of six weeks gives rise to a rebuttable inference of a causal connection, but that a period of three months does not)). It should be clear that Plaintiff's complaint to Ms. Phillips that she believed Mr. Edwards police report was retaliation for her reports that resulted in the termination of other employees was satisfactorily close in temporal proximity— eight days, at the longest—to be afforded a rebuttable presumption of a causal connection. *Coors Brewing Co.*, 181 F.3d at 1179.

Defendant may argue that Plaintiff's reports regarding the events of September 2017 and her March 2017 sexual harassment complaint should not be afforded the same presumption, because such complaints occurred more than three months prior to the termination of her employment. However, any arguments to that effect would be misplaced. More specifically, while Defendant claims Ms. Phillips was the first to recommend the termination of Plaintiff's employment based on her purportedly "impartial" investigation Defendant admits this investigation consisted only of Ms. Phillips' conversations with the investigating Detective, and with the Plaintiff "regarding the reason the Detective wanted to talk to Plaintiff." (DSOF #66-74, 76, 80, 82; *see also* Doc. #54 at 23.) Ms. Phillips also admitted that she first became aware of Plaintiff's report of sexual harassment and the events of September 2017 in May 2018 (ASOF #3-4.) In other words, Plaintiff's other two protected activities were *new* to the primary decision-maker for her termination at the time that she made the decision. Consequently, all of Plaintiff's reports are entitled to a presumption that the termination of her employment was causally connected thereto.

**4.   Defendant's Proffered Rationale For the Termination of Plaintiff's Employment is Pretextual.**

Assuming, *arguendo,* that Defendant has satisfied its burden of providing a legitimate, non-discriminatory and non-retaliatory reason to terminate Plaintiff's employment, the record is rife with evidence that Defendant's stated reason was pretextual. Defendant preemptively argues that any evidence may proffer to show pretext would be asking the Court to "act as a 'super personnel department' that second guesses [Defendant's] business judgments," or else would be "mere conjecture." (Doc. #54, at 22 (citing *Simms*, 165 F.3d at 1330; *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).) However, the evidence instead shows that defendant's justification for the adverse employment action was wholly unworthy of belief. *Kendrick*, 220 F.3d at 1230.

Defendant asserts Ms. Phillips reasonably came to the conclusion that Plaintiff made various false statements regarding the issues surrounding the events of May 22, 2018. However, several of the statements of fact on which Defendant relies for this argument are premised on inadmissible hearsay statements from Detective Davies as relayed only through Ms. Phillips' testimony. (*See* Response to DSOF # 77-80.) Moreover, Plaintiff's assertion that Mr. Edwards was the one that had made the false police report against her turned out to be true. (Response to DSOF #94.) Even Plaintiff's statements that Ms. Phillips claims were untrue were, at worst, subject to a different interpretation than information that Ms. Phillips had obtained elsewhere. For example, it is undisputed that Plaintiff admitted to Ms. Phillips that there had been a warrant for her arrest. (*Id.*) However, in her deposition, Ms. Phillips admitted that she had to seek legal advice from Defendant's counsel to inform her interpretation of Plaintiff's explanation for the warrant. (*Id.*) Although Ms. Phillips was not able to interpret whether Plaintiff had provided accurate information about the reason for her warrant without legal assistance, she apparently assumed Plaintiff had requisite legal knowledge to accurately explain the reason for the warrant against her.

And as previously noted, the temporal proximity between Plaintiff's conversations with Ms. Phillips on May 22, and May 23, 2018, and her termination on May 30, 2018, was mere days.[5] (*Id.*) Moreover, Ms. Phillips' own notes indicate that Detective Davies told her that he, "cannot tell what the other detective said." (*Id.*) Accordingly, there exists a genuine disputed issue of material fact as to whether Ms. Phillips could have reasonably believed that Plaintiff's statement that *another detective* had told her that Mr. Edwards had made the police report were actually false. (*See also* ASOF # 25-32.) Finally, Ms. Phillips was aware of Plaintiff's prior verified reports of sexual harassment, as well as her prior reports of retaliation by Jacob Edwards and Jordan Stilley, and Plaintiff's belief that Mr. Edwards' false police report was retaliatory. (*Id.*) More specifically Ms. Phillips was indisputably aware of Plaintiff's belief that Mr. Edwards had complained about her and filed a false police report about her because she "had gotten some of his friends fired"— prior to recommending the termination of Plaintiff's employment. (*Id.*)

While Ms. Phillips implied that she did not need to wait and see a copy of Mr. Edwards' false police report before terminating Plaintiff's employment because Plaintiff "was on leave for several days and did not produce it until after her separation," she also admitted that Plaintiff could not have produced a copy of the police report earlier than she did. (*Id.*) Finally, only one month prior to the date Ms. Phillips suggested terminating Plaintiff's employment, Ms Phillips investigated yet another complaint that Mr. Edwards made regarding Plaintiff. (ASOF #13-14.) Notably, Mr. Edwards made this complaint on the same day Plaintiff returned to work after taking a leave of absence related to her worker's compensation injury. (ASOF #12-13.) Although Ms. Phillips received conflicting information from witnesses during her investigation into this

---

[5] "[E]vidence supporting the prima facie case is often helpful in the pretext stage." *Wells v. Colorado Dep't of Transp.*, 325 F.3d 1205, 1218 (10th Cir. 2003).

complaint, (ASOF #15), she did not assume Mr. Edwards had made false statements regarding Plaintiff and decide to terminate his employment. Instead, Mr. Edwards and Plaintiff were told to stay away from each other.[6] (*Id.*) Notably, despite the instruction to leave Plaintiff alone, after it was conclusively determined that Mr. Edwards had made a bogus police report against Plaintiff, Mr. Edwards was not terminated or even subjected to any discipline by Defendant. (ASOF #17.) Additionally, Mr. Edwards and Plaintiff worked the same shift on the same team with the same supervisor. (ASOF #18.) Therefore, Defendant's disparate treatment of Plaintiff as compared to Mr. Edwards, a similarly-situated male comparator who had *not* previously engaged in protected activity under Title VII, is even further evidence that Defendant's stated reason for Plaintiff's termination—*i.e.* her supposed false statements—was merely a pretext for the true, retaliatory motive for her termination. *See Herrara*, 754 Fed. Appx. at 692.

Although Defendant clearly admits that Ms. Phillips spearheaded the termination of Plaintiff's employment, it also attempts to lessen her contribution to the decision by arguing that Idol Rashid and Christopher Krugman also provided input. Their involvement in the termination decision, however, does not lessen Defendant's liability for several reasons. First, even if it had been the case that Ms. Phillips' was *solely* a fact-finder (and not also involved in the decision making), and that Mr. Rashid and Mr. Krugman relied solely on Ms. Phillips' investigation and made the decision themselves, Defendant would still be liable under a theory of "cat's paw" liability, *See e.g. Canfield v. Office of the Sec'y of State for the State of Kansas*, 209 F. Supp. 3d

---

[6] Ms. Phillips also learned during this investigation that Mr. Edwards had previously requested an "accommodation" to get away from working with Plaintiff, raising concerns that closely mirrored the allegations ultimately contained in the police report. (ASOF #16.) This further supports the conclusion that it was unreasonable for Ms. Phillips to wholly dismiss the veracity of Plaintiff's statements to her regarding her belief that Mr. Edwards filed the police report in their May 22, 2018, conversation.

1219, 1225 (D. Kan. 2016) (citing *EEOC v. BCI Coca–Cola Bottling Co.*, 450 F.3d 476, 484 (10th

Cir. 2006))) (explaining that "cat's paw" theory is one in which the bias of a subordinate employee

caused an adverse employment action even though the formal decisionmaker did not hold such

bias).[7] Second, neither Mr. Rashid nor Mr. Krugman are innocent in their involvement in the

decision to terminate Plaintiff's employment, because neither gentleman was insulated from the

knowledge of the retaliation Plaintiff was experiencing from her coworkers. More specifically, on

February 14, 2018—just one day after Plaintiff returned to work from her medical leave of

absence—Mr. Edwards made a complaint to Mr. Rashid regarding "a coworker" (*i.e.* Plaintiff) and

her criminal history. (ASOF #5-7.) Mr. Edwards persisted in his complaint against Plaintiff by

following up with Mr. Rashid two days later. (*Id.*) Although Mr. Edwards did not specifically

identify Plaintiff's name in his complaints, as evidenced by Mr. Rashid's March 1, 2018 email to

Mr. Krugman, both gentlemen understood the complaints to be about Plaintiff. (ASOF #8.) At that

time, Mr. Rashid told Mr. Krugman that there was little to be concerned about regarding Mr.

Edwards' complaint, as the charges against Plaintiff had been dismissed. (*Id.*)

   Given these facts, and in light of the nearly identical allegations made against Plaintiff in

the May 2018 police report—*i.e.* just three months after Mr. Edwards' complaints about her—it

defies credulity for Defendant to claim that that Mr. Rashid and Ms. Phillips had *no basis* to believe

that Plaintiff was telling the truth when she told the company that Mr. Edwards made the police

report against her. (*See e.g.* ASOF #5-8, 16.) In short, Defendant's assertion that the decision to

terminate Plaintiff's employment was merely a simple business decision neither related to, nor

motivated by retaliation is entirely belied by the factual record in this matter. Plaintiff has pointed

---

[7] Of course, because Defendant admits that Ms. Phillips had decision-making authority (DSOF #82), Plaintiff need not rely on a "cat's paw" theory.

to ample evidence of the "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Defendant's stated reason for terminating Plaintiff's employment, and as such, summary judgment is not warranted. *Herrara,* 754 Fed. Appx. at 692 (quoting *Swackhammer,* 493 F.3d at 1167-68)). To take Ms. Phillips' explanation for Plaintiff's termination at face value would be to assess Ms. Phillips as credible without considering the plethora of evidence to the contrary. The Court is prohibited from reaching such a conclusion. *See Seamons*, 206 F.3d at 1026. I Instead, the determination of whether Ms. Phillips—and thus, Defendant's—explanation for the termination of Plaintiff's employment was merely a pretext for retaliation should be left to the jury. Accordingly, given the totality of the evidence, it is "reasonable to infer" that Defendant "may have been looking or reasons to terminate Plaintiff's employment," and consequently, Plaintiff has adduced evidence "sufficient to permit a reasonable jury to find the requisite causal connection between Plaintiff's protected activity and [her] termination." *Godoy-Guzman*, 2019 WL 6894529, at *10 (denying summary judgment as to the plaintiff's Title VII retaliation claim).

## B. Plaintiff's FMLA Retaliation Claim Should Not Be Dismissed.

Defendant concedes that Plaintiff engaged in a protected activity by exercising her rights under the FMLA by using FMLA leave, and that she suffered an adverse employment action with the termination of her employment, but contends that Plaintiff cannot establish a causal connection between her use of FMLA leave and her termination, and further, even if she could, she would be unable to prove pretext to overcome Defendant's allegedly legitimate, non-discriminatory rationale. (Doc. #54, Def.'s Memo. in Supp. of Mot. for Summ. J. at 24.) Unlike Plaintiff's claim of retaliation under Title VII, Plaintiff concedes that *McDonnell Douglas* applies to this case, as no direct evidence has been presented that Defendant retaliated against Plaintiff for taking FMLA leave. However, sufficient evidence does exist that could lead a reasonable juror to find a causal connection between Plaintiff's FMLA leave and her termination, and as Plaintiff has already

established, it is hard to see Defendant's rationale for Plaintiff's termination as anything but pretextual.

### 1. Plaintiff Can Offer Evidence Beyond Temporal Proximity to Support a Prima Facie Argument that Defendant Retaliated Against Her for Using FMLA Leave

Defendant argues that Plaintiff has no evidence to support her allegation that Defendant retaliated against her for using leave under the FMLA. However, Defendant's argument ignores three important facts: (1) that Plaintiff complained to manager Shirley Ha that she felt isolated and that her team (including Mr. Edwards) made negative comments about her use of FMLA; (2) that Mr. Edwards complained to both Mr. Atreaga and Ms. Ha that he believed Plaintiff was possibly abusing the leave policy, and (3) that Ms. Ha and Mr. Rashid expressed hostility about Plaintiff's use of leave and purported delays in providing paperwork for same in February 2018. (ASOF # 9, 10, 34, 35). Defendant further argues that the temporal proximity in this case is insufficient to support, in and of itself, a causal connection between Plaintiff's exercise of her FMLA rights and the termination, citing the 107 days, or 3 months and 19 days, between Plaintiff's "last day of continuous FMLA leave." (Doc. #54 at 24-25 (citing *Ney v. City of Hoisington*, 508 F. Supp. 2d 877, 888 (D. Kan. 2007)).) However, Defendant ignores that on November 8, 2017, while Plaintiff was out on FMLA leave, her supervisor, Benjamin Arteaga, Sr., and Idol Rashid worked together to prepare a "Final Written Warning" for Plaintiff based on her attendance, ostensibly because of time she missed because of her FMLA leave. (ASOF #19-20.) Although Plaintiff does not allege the writeup itself to be retaliatory, this conduct on Mr. Arteaga's and Mr. Rashid's behalf is sufficient evidence of a retaliatory animus on their behalf to establish a *prima facie* case of FMLA retaliation. *See e.g. Hilti, Inc.*, 108 F.3d at 1325 ("[The plaintiff] has established a prima facie case of FMLA retaliation, in that [the defendant] sent her a letter of discipline concerning attendance problems on the day she returned from the leave.")

## 2. Defendant's Proffered Rationale For the Termination of Plaintiff's Employment is Pretextual.

In the interest of brevity and efficiency, Plaintiff hereby incorporates her argument regarding the pretextual nature of Defendant's proffered rationale for terminating her employment as outlined in Section V(A)(4), *supra*. With the exception of that portion of Plaintiff's argument utilizing the extremely close proximity between Plaintiff's reports of harassment to Ms. Phillips and her termination to show pretext, the remainder of Plaintiff's argument is equally applicable here.

## C. Plaintiff's Claim for Wrongful Termination in Violation of Kansas Public Policy Should Not Be Dismissed.

Defendant does not dispute that Plaintiff filed a claim for workers compensation benefits, or, again, that she suffered an adverse employment action. (Doc. #54 at 28.) As with Plaintiff's other claims, Defendant focuses its argument on its misguided assertion that Ms. Phillips' explanation for terminating Plaintiff's employment was a simple, rational business decision. (*Id.*). Defendant further argues that none of the individuals who ultimately made or approved the decision to terminate Plaintiff's employment were aware of Plaintiff's claim for workers compensation benefits. However, sufficient evidence exists that a reasonable juror could find it clear and convincing otherwise.

## 1. Circumstantial Evidence Exists That the Decisionmakers of Plaintiff's Termination Were Aware of Plaintiff's Worker's Compensation Claim

Defendant alleges that Ms. Phillips, Mr. Rashid, and Mr. Krugman all had no idea that Plaintiff had made a worker's compensation claim in April 2018. (Doc. #54 at 28.) However, this ignores the testimony of Jonette Penton, the Topeka site's Nurse Case Manager, that she gets requests from "management" regarding the status of drug tests following every work injury. (ASOF #21.)

**2. A Causal Connection Exists Between Plaintiff's Worker's Compensation Claim and the Adverse Employment Decision to Which She Was Subjected.**

Although Defendant does not go so far as to concede that the 39 days between Plaintiff's work injury and the termination of her employment are sufficient to establish a *prima facie* claim for worker's compensation retaliation under Kansas law, Defendant, as it must, does seem to recognize that short span of time would be sufficient under federal law for retaliation claims. To be sure, 30 days falls well within the span of time that would otherwise raise a rebuttable presumption of causal connection for claims of retaliation under Title VII or the FMLA.

Defendant also argues that there is no evidence that Ms. Phillips, Mr. Rashid and Mr. Krugman were all aware of Plaintiff's worker's compensation claim. Of course, this argument is undermined by Jonette Penton's communication to Defendant's contract drug testing provider that "the powers that be" were inquiring into the results of Plaintiff's drug test following her work injury. (ASOF #22.) Ms. Penton admits that, "the powers that be" refers to "management", and, accordingly, a jury should be afforded the opportunity to determine for itself the validity of Ms. Penton's explanation. This is especially true in light of Ms. Penton's admission that she made arguably degrading comments about Plaintiff's performance to Defendant's workers compensation occupational health provider on May 2, 2018, despite having no responsibility for those types of issues at the time, and despite the fact that such allegations have no bearing on the provider's treatment of Plaintiff. (ASOF #23-24.)

**3. Defendant's Proffered Rationale For the Termination of Plaintiff's Employment is Pretextual.**

In the interest of efficiency, Plaintiff hereby incorporates her argument regarding the pretextual nature of Defendant's proffered rationale for terminating her employment as outlined in Section V(A)(4), *supra*. Plaintiff's argument, including the temporal proximity between Plaintiff's protected activity and the termination of her employment, is equally applicable here.

## V.   CONCLUSION

The evidence paints a clear picture that Defendant's management viewed Plaintiff as a complainer and were looking at a reason to get rid of her. When Plaintiff presented what was yet another report of harassment—a report that was mostly true in all critical respects—management instead focused on a few trivial inconsistencies in Plaintiff's statements and pretended to hang their proverbial hats on those inconsistencies as a means to its ends. This intent is especially clear in light of all of the circumstances surrounding the way Plaintiff had been treated ever since her first report of sexual harassment in March 2017, and in contrast to the way that Ms. Phillips, especially, had treated Mr. Edwards in light of statements he had made regarding Plaintiff that were arguably *as false* as those made by Plaintiff about him. Sufficient evidence abounds that genuine issues of material fact exist as to whether Defendant retaliated against Plaintiff for engaging in several different protected activities.

WHEREFORE, Plaintiff respectfully requests that the Court DENY Defendant's Motion for Summary Judgment and award any other appropriate relief.

Respectfully Submitted,

CORNERSTONE LAW FIRM

By: _____
Joshua P. Wunderlich D. Kan. #78506
j.wunderlich@cornerstonefirm.com
M. Katherine Paulus   KS BAR #23866
m.paulus@cornerstonefirm.com
5821 NW 72nd St.
Kansas City, Missouri 64151
Telephone               (816) 581-4040
Facsimile               (816) 741-8889

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

The undersigned certifies that on the __26th__ day of __August__, 2020, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

J. Phillip Gragson          jpgragson@hensonlawoffice.com
Henson, Hutton, Mudrick, Gragson & Vogelsberg LLP
3649 SW Burlingame Road, Ste. 200
Topeka, KS 66111-2155

Thomas R. Davies          tdavies@h-dlaw.com
Laura Bailey Gallagher    lgallagher@h-dlaw.com
Harmon & Davies, P.C.
2306 Columbia Ave.
Lancaster, PA 17603

By: _____
      Attorney for Plaintiff