**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **APRIL PFANNENSTIEL,** | ) |
| | ) |
| **Plaintiff,** | ) **CIVIL ACTION** |
| | ) **CASE NO.   2:19-CV-02096** |
| | ) |
| **v.** | ) |
| | ) |
| **MARS WRIGLEY CONFECTIONERY,** | ) |
| | ) |
| **Defendant.** | ) |

**DEFENDANT'S REPLY IN FURTHER SUPPORT OF ITS
<u>MOTION FOR SUMMARY JUDGMENT</u>**

In further support of its Motion for Summary Judgment, Defendant Mars Wrigley Confectionery (hereinafter "Mars" or "Defendant") hereby provides the following Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 and D. Kan. Rule 56.1.

**I.     INTRODUCTION**

On August 26, 2020, Plaintiff April Pfannenstiel filed her Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's Response").  Defendant Mars initially set forth 94 facts to support its position that summary judgment in Mars' favor is appropriate on all of Plaintiff's claims.  Of those 94 facts, Plaintiff agrees outright that 80 of those facts are uncontroverted.  Of the remaining 14 facts, Plaintiff controverts only 10.  Plaintiff controverts four of those facts (Defendant's SOUF Nos. 77, 78, 79, and 80) under the claim that the fact is based on inadmissible hearsay.  However, as indicated below, pursuant to the Federal Rules of Evidence, Rule 803(5), these facts are a part of a recorded recollection, and therefore, would be admissible

as an exception to the rule against hearsay.  Plaintiff also controverts these four facts under the claim that Ms. Phillips never told Plaintiff that she had spoken with a detective.  Even if Plaintiff's assertion were true, this would have no effect on the fact set forth by Defendant, and therefore, would not controvert Defendant's SOUF Nos. 77, 78, 79, and 80.  As to the remaining 10 facts that Plaintiff seeks to controvert, Defendant has replied to each of Plaintiff's responses to those facts and set forth sufficient evidence to disprove Plaintiff's contention that the fact is controverted.  Therefore, Plaintiff has failed to controvert any of the facts set forth in Defendant's SOUF, thereby failing to show any genuine issues of material fact that would preclude summary judgment.

Plaintiff also offers 34 additional facts that she claims are material and support her position that summary judgment should not be awarded in favor Defendant.  However, even if the Court were to find these facts to be material, Defendant does not controvert a single fact, nor do these facts even raise the slightest existence of a genuine issue of material fact.  Should the Court find these facts do create a factual dispute, none of these purported facts rise to the level of material facts that are in genuine dispute.  "[T]he 'mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.'" *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1261 (10th Cir. 2008) (quoting *Scott v. Harris*, 550 U.S. 372, 377 (2007)(emphasis added)).  Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment confirms that summary judgment should be awarded in Defendant's favor because Plaintiff cannot establish that there is any genuine issue of material fact.  Therefore, the Court should enter summary judgment upon each of Plaintiff's claims in favor of Defendant Mars Wrigley Confectionery and dismiss Plaintiff's claims with prejudice.

## II.    MARS' REPLY IN SUPPORT OF ITS STATEMENT OF UNCONTROVERTED FACTS

Pursuant to Fed. R. Civ. P. 56 and L.R. 56.1(b), Mars replies to Plaintiff's Responses to Defendant's Statement of Uncontroverted Facts.  Many of Plaintiff's issues purport to dispute "facts" by alleging they are "incomplete" or are inadmissible hearsay.  However, in the instances where Plaintiff alleges that Mars' fact is "incomplete," the additional information set forth by Plaintiff is irrelevant and does not create a genuine issue of material fact.  Additionally, in every instance where Plaintiff alleges that Mars' fact is based on inadmissible hearsay, the fact is admissible as a recorded recollection, an exception to the rule against hearsay.  In addition, Mars notes that Plaintiff does not dispute the following facts: 1-48, 50, 52-54, 56-58, 60-66, 68-76, 82-88, 90, 92.[1]  With respect to statements of facts that Plaintiff purports to dispute, Mars replies as follows (with each original statement of fact and Plaintiff's Response included for ease of reference):

49.    On April 24, 2018, Jonette Penton sent an email to Outcome, LLC, inquiring into Plaintiff's post-injury drug test results. (Ex. F, Penton Depo., at 40:21-25, 42:10-21).

**RESPONSE:** Uncontroverted, but incomplete. Specifically, in response to an email sent on April 23, 2018, at 2:57 PM, that indicated that Ms. Pfannenstiel's drug screen sample "would most likely ship to the lab [that day] and be there [the next] morning," and that the sender would "watch for it to arrive," Ms. Penton sent a reply email to Outcome, LLC, less than 24 hours later, on April 24, 2018, at 12:58 PM stating, "Any updates on arrival of this one. The powers that be

---

[1] Unless otherwise noted, "Defendant's MSJ" refers to Defendant Mars' Memorandum in Support of Defendant's Motion for Summary Judgment [ECF No. 54].  "Defendant's SOUF" refers to the section in Defendant's MSJ titled "Statement of Uncontroverted Facts."   "Plaintiff's Exhibit _" refers to the exhibit filed by Plaintiff in support of Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment.  "Plaintiff's ASOUF" refers to the section in Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment titled "Plaintiff's Additional Statement of Uncontroverted Facts."

are inquiring." (Plaintiff's Exhibit A, April 23, 2018, through April 24, 2018, email thread between Jonette Penton and Anne Coffee.)

**Mars' Reply:** Mars does not dispute Plaintiff's Response; however, Plaintiff's Response is irrelevant and does not create a genuine issue of material fact.  Ms. Penton's testified that "the powers that be" were Benjamin Arteaga, Sr., Plaintiff's Line Manager, and Shirley Ha, Value Stream Manager.  (Exhibit F to Defendant's MSJ, at 44:11-22).  At Defendant's SOUF No. 48, which Plaintiff did not controvert, Ms. Penton testified, "it was common for [her], as Regional Nurse Case Manager for Defendant's Topeka, Kansas facility, to receive requests from management as to the status of drug tests."  Ms. Penton also testified that Ms. Ha and Mr. Arteaga needed to know the results of Plaintiff's drug test for staffing purposes, specifically, when they could expect Plaintiff back. (Exhibit F to Defendant's MSJ, at 44:11-22).  These facts, which Defendant included at SOUF Nos. 46 and 47, were uncontroverted by Plaintiff.  Therefore, Plaintiff's response to Defendant's SOUF No. 49 is irrelevant to the fact asserted in Defendant's SOUF No. 49, and does not create a genuine issue of material fact.

51.    On or around May 2, 2018, Jonette Penton sent an email to Defendant's workers compensation occupational health provider regarding the scheduling of treatment for Plaintiff after her work-related injury of April 21, 2018. (Doc. 52, PTO, at p. 5, Stip. Fact No. 25).

**RESPONSE:** Uncontroverted, but incomplete. Specifically, in her email to Defendant's workers compensation occupational health provider, Ms. Penton notes, "There are also performance based issues for this associate." She made this note even though she was not responsible for performance-related issues or discipline related to performance issues at that time, and even though the medical provider would have no reason to deal with those issues. (Plaintiff's Exhibit B, May 2, 2018, email from Jonette Penton.)

4

**Mars' Reply:** Mars does not dispute Plaintiff's Response; however, Plaintiff's Response is irrelevant and does not create a genuine issue of material fact. Ms. Penton testified that she is not responsible for any kind of performance-related discipline. (Plaintiff's Exhibit N, at 46:20-47:3). Ms. Penton further testified that the workers' compensation medical provider does not deal with any employee's performance-based issues. (Plaintiff's Exhibit N, at 47:9-48:12). Plaintiff's ASOUF No. 24, which Mars does not controvert, states, "Ms. Penton was responsible for discipline related to performance issues at the time she sent her May 2, 2018, email to Defendant's workers compensation occupational health provider, and admits that the medical provider would have no reason to deal with those issues." Therefore, Plaintiff's Response to Defendant's SOUF No. 51 is irrelevant to the fact asserted in Defendant's SOUF No. 51, and does not create a genuine issue of material fact.

55.     April Pfannenstiel testified that following her work-related injury, she never returned to work. (Deposition of Plaintiff April Pfannenstiel, Volume II, attached hereto as Exhibit K, at 139:20-140:2).

**RESPONSE:** Uncontroverted that Plaintiff so testified, but irrelevant.

**Mars' Reply:** Defendant's SOUF No. 55 is relevant because Plaintiff did in fact return to work following her work-related injury for 17 shifts. This fact was included in Defendant's SOUF at No. 54, which was uncontroverted by Plaintiff. Therefore, Defendant's SOUF No. 55 is relevant, and because Plaintiff does not controvert this fact, there is no genuine issue of material fact.

### <u>Incident Regarding May 2018 Police Report</u>

59.     On May 22, 2018, at 10:36a.m., April Pfannenstiel text messaged Benjamin Arteaga, stating: "Please call me when you when. The detective called me back. Said he needs me

to come down to police station about some accusations that had been made against me from a possible coworker." (Ex. E, Arteaga, Depo., at 107:7-19).

**RESPONSE:** Controverted to the extend a presumed scrivener's error results in a misrepresentation of the record. The first sentence of the text message in question states, "Please call me when you can." (*Id.*)

**Mars' Reply:** Mars does not dispute Plaintiff's Response.  Mars agrees that the text message in question states, "Please call me when you can."  Although necessary to reflect the correct words in the text message, Plaintiff's Response does not create a genuine issue of material fact.

67.     Niki Phillips then contacted April Pfannenstiel by telephone again on May 23, 2018. (Ex. I, Phillips Depo., at 68:1-11).

**RESPONSE:** Controverted. Plaintiff did not speak with Ms. Phillips until "[a] couple days later." (Plaintiff's Exhibit C, December 16, 2019, First Deposition of Plaintiff at 93:15-18.)

**Mars' Reply:** Mars disputes Plaintiff's Response that Plaintiff did not speak with Ms. Phillips until a couple days later.  During Benjamin Arteaga's deposition, Plaintiff's counsel questioned Mr. Arteaga regarding the text messages between Plaintiff and Mr. Arteaga identified at DEF000166 – DEF000207 and introduced by Plaintiff as Exhibit 10.  Mr. Arteaga testified that those text messages were between Mr. Arteaga and Plaintiff.  (Additional Excerpts from Deposition of Benjamin Arteaga, Sr., attached hereto as Exhibit A, at 105:20-107:6, Exhibit 10).  Specifically, DEF000197 – DEF000198 is a series of text messages between Plaintiff and Mr. Arteaga from Wednesday May 23, 2018 beginning at 10:10a.m.  (Exhibit A, Deposition of Benjamin Arteaga, Sr., at Exhibit 10, DEF000197-DEF000198).  On May 23, 2018, Mr. Arteaga sent a text message to Plaintiff, stating, "Hey did Nikki reach out to you?" (*Id.*), and on the same

date, Plaintiff responded, "Yes. Just got off the phone with her …she told me for now not to go on site…and she would let me know what's next[.]" (*Id.*)  Additionally, in Plaintiff's Response to Defendant's SOUF No. 94, Plaintiff states, "For example, the temporal proximity between Plaintiff's conversations with Ms. Phillips on May 23, and May 24, 2018, and her termination on May 30, 2018, was mere days."  Based on the text messages between identified at DEF000197 – DEF000198, and Plaintiff's admission in Plaintiff's Response to Defendant's SOUF No. 94, it is uncontroverted that Plaintiff did in fact speak with Niki Phillips on May 23, 2018.  Therefore, Plaintiff's Response to Defendant's SOUF No. 67 is controverted, inaccurate, disproven, and does not create a genuine issue of material fact.

77.    Detective Davies stated that about 80 percent of what April Pfannenstiel had told her was true. (Ex. I, Phillips Depo., at 78:4-10).

**RESPONSE:** Plaintiff objects to this purported statement of fact because it is based on inadmissible hearsay. *See McGee v. Stonebridge Life Ins. Co.*, No. 05–4002–JAR, 2006 WL 2422399, at *1 (D. Kan. Aug. 14, 2006) ("A party may not rely upon inadmissible hearsay evidence to support a motion for summary judgment"). More specifically, Ms. Phillips' deposition testimony about statements Detective Davies made to her consists of inadmissible hearsay as Defendant clearly intends to use the statements for the truth of the matter. *See Griddine v. GP1 KS-SB, Inc.*, 2:17-CV-02138-JAR, 2019 WL 1002049, at *5 (D. Kan. Feb. 28, 2019) (noting courts "should disregard any inadmissible statements (e.g. hearsay) contained within affidavits or deposition transcripts that could not be presented at trial in any form").  To the extent a response is necessary, this statement is controverted. Ms. Phillips never told Ms. Pfannenstiel that she had spoken with a detective. (Plf.'s Ex. C, Plf. Depo I at 86:25-87:3.)

**Mars' Reply:** Mars disputes Plaintiff's Response that Defendant's SOUF No. 77 is based on inadmissible hearsay.  This statement made by Detective Davies was recorded by Niki Phillips in her notes that were written contemporaneously with her telephone call with Detective Davies on May 23, 2018 and accurately reflect Ms. Phillips' knowledge.  These notes were attached as Exhibit A to the Declaration of Nichole Phillips, which was filed as Exhibit A to Defendant's MSJ. This statement by Detective Davies is part of a record made by Ms. Phillips constituting a recorded recollection, which, pursuant to the Federal Rules of Evidence, Rule 803(5), is an exception to the rule against hearsay and is not excluded by the rule against hearsay.  Additionally, Plaintiff's response that Ms. Phillips never told Ms. Pfannenstiel that she had spoken with a detective is irrelevant and does not controvert the fact asserted in Defendant's SOUF No. 77.  Therefore, Plaintiff's objection to the admissibility of Defendant's SOUF No. 77 is controverted, inaccurate, disproven, and does not create a genuine issue of material fact.

78.     Detective Davies informed Niki Phillips that he had left a message for April Pfannenstiel to contact with him; however, instead of contacting him, she went to Shawnee County to clear up a bench warrant that had been issued for her arrest because she failed to appear in court for her misdemeanor criminal damage to property charge. (Ex. I, Phillips Depo., at 78:12-23; Ex. A, Phillips Decl., at Ex. A).

**RESPONSE:** Plaintiff objects to this purported statement of fact because it is based on inadmissible hearsay. *See McGee v. Stonebridge Life Ins. Co.*, No. 05–4002–JAR, 2006 WL 2422399, at *1 (D. Kan. Aug. 14, 2006) ("A party may not rely upon inadmissible hearsay evidence to support a motion for summary judgment"). More specifically, Ms. Phillips' deposition testimony about statements Detective Davies made to her consists of inadmissible hearsay as Defendant clearly intends to use the statements for the truth of the matter. *See Griddine v. GP1*

*KS-SB, Inc.*, 2:17-CV-02138-JAR, 2019 WL 1002049, at *5 (D. Kan. Feb. 28, 2019) (noting courts "should disregard any inadmissible statements (e.g. hearsay) contained within affidavits or deposition transcripts that could not be presented at trial in any form"). To the extent a response is necessary, this statement is controverted. Ms. Phillips never told Ms. Pfannenstiel that she had spoken with a detective. (Plf.'s Ex. C, Plf. Depo I at 86:25-87:3.)

**Mars' Reply:** Mars disputes Plaintiff's Response that Defendant's SOUF No. 78 is based on inadmissible hearsay. This statement made by Detective Davies was recorded by Niki Phillips in her notes that were written contemporaneously with her telephone call with Detective Davies on May 23, 2018 and accurately reflect Ms. Phillips' knowledge. These notes were attached as Exhibit A to the Declaration of Nichole Phillips, which was filed as Exhibit A to Defendant's MSJ. This statement by Detective Davies is part of a record made by Ms. Phillips constituting a recorded recollection, which, pursuant to the Federal Rules of Evidence, Rule 803(5), is an exception to the rule against hearsay and is not excluded by the rule against hearsay. Additionally, Plaintiff's response that Ms. Phillips never told Ms. Pfannenstiel that she had spoken with a detective is irrelevant and does not controvert the fact asserted in Defendant's SOUF No. 78. Therefore, Plaintiff's objection to the admissibility of Defendant's SOUF No. 78 is controverted, inaccurate, disproven, and does not create a genuine issue of material fact.

79.    Detective Davies also informed Niki Phillips that he did not tell April Pfannenstiel who filed the police report and that person wanted to remain anonymous. (Ex. I, Phillips Depo., at 78:4-10, 79:21-80:3, 103:23-104:2; Ex. A, Phillips Decl., at Ex. A).

**RESPONSE:** Plaintiff objects to this purported statement of fact because it is based on inadmissible hearsay. *See McGee v. Stonebridge Life Ins. Co.*, No. 05–4002–JAR, 2006 WL 2422399, at *1 (D. Kan. Aug. 14, 2006) ("A party may not rely upon inadmissible hearsay

evidence to support a motion for summary judgment"). More specifically, Ms. Phillips' deposition testimony about statements Detective Davies made to her consists of inadmissible hearsay as Defendant clearly intends to use the statements for the truth of the matter. *See Griddine v. GP1 KS-SB, Inc.*, 2:17-CV-02138-JAR, 2019 WL 1002049, at *5 (D. Kan. Feb. 28, 2019) (noting courts "should disregard any inadmissible statements (e.g. hearsay) contained within affidavits or deposition transcripts that could not be presented at trial in any form"). To the extent a response is necessary, this statement is controverted. Ms. Phillips never told Ms. Pfannenstiel that she had spoken with a detective. (Plf.'s Ex. C, Plf. Depo I at 86:25-87:3.)

**Mars' Reply:** Mars disputes Plaintiff's Response that Defendant's SOUF No. 79 is based on inadmissible hearsay.  This statement made by Detective Davies was recorded by Niki Phillips in her notes that were written contemporaneously with her telephone call with Detective Davies on May 23, 2018 and accurately reflect Ms. Phillips' knowledge.  These notes were attached as Exhibit A to the Declaration of Nichole Phillips, which was filed as Exhibit A to Defendant's MSJ. This statement by Detective Davies is part of a record made by Ms. Phillips constituting a recorded recollection, which, pursuant to the Federal Rules of Evidence, Rule 803(5), is an exception to the rule against hearsay and is not excluded by the rule against hearsay.  Additionally, Plaintiff's response that Ms. Phillips never told Ms. Pfannenstiel that she had spoken with a detective is irrelevant and does not controvert the fact asserted in Defendant's SOUF No. 79.  Therefore, Plaintiff's objection to the admissibility of Defendant's SOUF No. 79 is controverted, inaccurate, disproven, and does not create a genuine issue of material fact.

80.     Detective Davies would not tell Niki Phillips who filed the police report. (Ex. I, Phillips Depo., at 103:23-104:2; Ex. A, Phillips Decl., at Ex. A).

**RESPONSE:** Plaintiff objects to this purported statement of fact because it is based on inadmissible hearsay. *See McGee v. Stonebridge Life Ins. Co.*, No. 05–4002–JAR, 2006 WL 2422399, at *1 (D. Kan. Aug. 14, 2006) ("A party may not rely upon inadmissible hearsay evidence to support a motion for summary judgment"). More specifically, Ms. Phillips' deposition testimony about statements Detective Davies made to her consists of inadmissible hearsay as Defendant clearly intends to use the statements for the truth of the matter. *See Griddine v. GP1 KS-SB, Inc.*, 2:17-CV-02138-JAR, 2019 WL 1002049, at *5 (D. Kan. Feb. 28, 2019) (noting courts "should disregard any inadmissible statements (e.g. hearsay) contained within affidavits or deposition transcripts that could not be presented at trial in any form"). To the extent a response is necessary, this statement is controverted. Ms. Phillips never told Ms. Pfannenstiel that she had spoken with a detective. (Plf.'s Ex. C, Plf. Depo I at 86:25-87:3.)

**Mars' Reply:** Mars disputes Plaintiff's Response that Defendant's SOUF No. 80 is based on inadmissible hearsay.  This statement made by Detective Davies was recorded by Niki Phillips in her notes that were written contemporaneously with her telephone call with Detective Davies on May 23, 2018 and accurately reflect Ms. Phillips' knowledge.  These notes were attached as Exhibit A to the Declaration of Nichole Phillips, which was filed as Exhibit A to Defendant's MSJ. This statement by Detective Davies is part of a record made by Ms. Phillips constituting a recorded recollection, which, pursuant to the Federal Rules of Evidence, Rule 803(5), is an exception to the rule against hearsay and is not excluded by the rule against hearsay.  Additionally, Plaintiff's response that Ms. Phillips never told Ms. Pfannenstiel that she had spoken with a detective is irrelevant and does not controvert the fact asserted in Defendant's SOUF No. 80.  Therefore, Plaintiff's objection to the admissibility of Defendant's SOUF No. 80 is controverted, inaccurate, disproven, and does not create a genuine issue of material fact.

81.    Plaintiff later admitted that the detective would not release the identity of who filed the police report while the investigation was on-going and that she received a copy of the report only at the end of the investigation which stated that Jacob Edwards made the report. (Ex. C, Pltf. Depo., at 87:12-18).

**RESPONSE:** Controverted. This mischaracterizes Plaintiff's testimony. The portion of Plaintiff's deposition cited by Defendant does not conclusively articulate that Ms. Pfannenstiel *first* found out that Mr. Edwards filed the police report in question when she received a copy of the report at the end of the investigation. Further, Plaintiff also testified that Mr. Edwards had made comments when he filed the police report, that he was bragging about it to people, and telling people that Plaintiff was going to be fired soon. (Plf.'s Ex. C, Plf. Depo I at 87:23-88:10.)

**Mars' Reply:** Mars disputes Plaintiff's Response that Defendant's SOUF No. 81 mischaracterizes Plaintiff's testimony.    Plaintiff's Response mischaracterizes Plaintiff's testimony.  Plaintiff was asked when she found out that Jacob Edwards made a report to the police, and in response, Plaintiff testified, "He told people at Mars about it before I even knew who did it. When I requested the information from the detective about who made the report, at the time, it was still being investigated so nothing had been released. But the detective gave me a copy of the report *at the end*, and it said Jacob Edwards had made the report." (Plaintiff's Exhibit C, at 87:7-18)(emphasis added).  Plaintiff was then asked, "do you remember how long it was between the time when you first found out that there was some--someone made a police report and that it was Jacob who made it?" (Plaintiff's Exhibit C, at 87:23-88:1).  Plaintiff responded, "He had made comments when he did it because - - I'm not 100 percent sure, but I'm pretty sure he did it from Mars. And he was bragging about it to people, that I was going to be fired soon - - and that he had made a police report against me. Again, *I don't know for sure because it wasn't told to me, and I*

*didn't have any proof of it at the time.*" (Plaintiff's Exhibit C, at 88:2-10)(emphasis added). Plaintiff may have *believed* that it was Mr. Edwards who filed the police, but as Plaintiff testified, she did not conclusively know that Mr. Edwards did in fact file the police report until she received a copy of the police report following her termination.   Therefore, Plaintiff's Response to Defendant's SOUF No. 81 is controverted, inaccurate, disproven, and does not create a genuine issue of material fact.

## Plaintiff's Termination

89.     After April Pfannenstiel was terminated, Idol Rashid and Niki Phillips received a copy of a one-page Non Criminal Incidents Report made to the Topeka Police Department, filed May 18, 2018. (Ex. A, Phillips Decl., at ¶5; Ex. G, Rashid Decl., at ¶17).

**RESPONSE:** Controverted. Benjamin Arteaga, Plaintiff's supervisor at the time of her termination, thinks that Ms. Pfannenstiel was still employed with Defendant at the time she sent him a picture of the police report bearing Mr. Edwards' name via text message. (Plaintiff's Exhibit D, January 7, 2020, Deposition of Benjamin Arteaga, Sr., at 116:2-24.)

**Mars' Reply:** Mars does not dispute Plaintiff's Response, however, Plaintiff's Response is irrelevant and does not controvert Defendant's SOUF No. 89.  Defendant's SOUF No. 89 is that Idol Rashid and Niki Phillips, the decision-makers behind Plaintiff's termination, did not receive the one-page Non Criminal Incidents Report made to the Topeka Police Department, filed May 18, 2018, until after Plaintiff was terminated.   Whether or not Mr. Arteaga believed Ms. Pfannenstiel was still employed with Mars at the time Plaintiff sent him a picture of the one-page Non Criminal Incidents Report, does not controvert this fact.  Therefore, although Mars does not dispute Plaintiff's Response to Defendant's SOUF No. 89, this response does not controvert the fact asserted at Defendant's SOUF No. 89, and does not create a genuine issue of material fact.

91.     When April Pfannenstiel submitted the Non Criminal Incidents Report to the Company, Idol Rashid and Niki Phillips saw that Jacob Edwards was the person who had filed the police report against Ms. Pfannenstiel. (Ex. A, Phillips Decl., at ¶5; Ex. G, Rashid Decl., at ¶17).

**RESPONSE:** Controverted to the extent it is meant to imply that Mr. Rashid and Ms. Phillips were first given information that Mr. Edwards might be implicated in the false police report against Plaintiff. Ms. Phillips admits that Plaintiff notified her that she believed Mr. Edwards was behind the false police report. (Plaintiff's Exhibit E, January 8, 2020, Deposition of Nichole Phillips at 104:3-5.)

**Mars' Reply:** Mars disputes Plaintiff's Response to Defendant's SOUF No. 91.  As stated in Defendant's SOUF No. 89, Idol Rashid and Niki Phillips, the decision-makers behind Plaintiff's termination, did not receive the one-page Non Criminal Incidents Report made to the Topeka Police Department, filed May 18, 2018, until after Plaintiff was terminated. (Exhibit A to Defendant's MSJ, at ¶5; Exhibit G to Defendant's MSJ, at ¶17).  Although Niki Phillips admitted that Plaintiff notified her that she *believed* Jacob Edwards filed the police report, Plaintiff testified that she did not conclusively know that Mr. Edwards did in fact file the police report until she received a copy of the police report following her termination.  It was not until after Plaintiff was terminated that Mr. Rashid and Ms. Phillips received confirmation that Mr. Edwards did file the police report.  Therefore, Plaintiff's Response to Defendant's SOUF No. 91 is controverted, inaccurate, disproven, and does not create a genuine issue of material fact.

93.     The reason for April Pfannenstiel's termination was for falsifying information and lying during a Company investigation, which is an integrity issue in violation of Mars Wrigley Confectionery policies. (Ex. G, Rashid Decl., at ¶19; Ex. I, Phillips Depo., at 103:2-104:2, 105:4-106:16, 106:21-107:4, 107:11-108:12, 111:2-112:5, 112:20-25).

14

**RESPONSE:** Controverted. Circumstantial evidence exists that such rationale for Plaintiff's termination is pretextual. For example, the temporal proximity between Plaintiff's conversations with Ms. Phillips on May 23, and May 24, 2018, and her termination on May 30, 2018, was mere days. (Plf.'s Ex. E, Phillips Depo. at 46:20-22, 93:16-21.) Moreover, assuming, *arguendo*, that Ms. Phillips actually had a conversation with Detective Davies as alleged, and that it went as she described, her own notes indicate that Detective Davies admitted to her that he, "cannot tell what the other detective said." (Plaintiff's Exhibit F, Nichole Phillips May 23, 2018, Investigation Notes.) This is a strong indication that she could not have reasonably believed that Plaintiff's statements that someone had told her that Mr. Edwards had made the police report were actually false. Additionally, Ms. Phillips was aware of Plaintiff's prior verified reports of sexual harassment, as well as her prior reports of retaliation by Jacob Edwards and Jordan Stilley, and her belief that Mr. Edwards' false police report was also retaliatory—specifically Plaintiff's belief that Mr. Edwards was engaging in this behavior because she "had gotten some of his friends fired"— prior to the decision to terminate Plaintiff's employment. (Plf.'s Ex. E, Phillips Depo. at 44:20-45:7, 72:11-18, 73:11-74:5, 96:23-97:14, 120:8-11; Plaintiff's Exhibit G., May 24, 2018, Email from Idol Rashid to Nichole Phillips.) In fact, Mr. Stilley admitted on or around September 28, 2017, that he was "yell[ing] and curs[ing] at [Plaintiff]" at least in part because he believed she "receive[d] special treatment for a lawsuit she '[held] over Mars'." (Plf.'s Ex. G., May 24, 2018, Rashid email.) Ms. Phillips also implies that she did not need to wait and see a copy of Mr. Edwards' false police report before terminating Plaintiff's employment because Plaintiff "was on leave for several days and did not produce it until after her separation," but admits that Plaintiff *could not* have produced a copy of the police report earlier than she did. (Plf.'s Ex. E, Phillips Depo. at 110:5-20.)

**Mars' Reply:** Mars disputes Plaintiff's Response to Defendant's SOUF No. 93.  First, Plaintiff's assertion that "[c]ircumstantial evidence exists that such rationale for Plaintiff's termination is pretextual" is an argument and a belief and not a fact that actually disputes Defendant's SOUF No. 93.  Next, Niki Phillips' conversation with Detective Davies did happen and was recorded by Ms. Phillips in her notes that were written contemporaneously with her telephone call with Detective Davies on May 23, 2018 and accurately reflect Ms. Phillips' knowledge.  These notes were attached as Exhibit A to the Declaration of Nichole Phillips, which was filed as Exhibit A to Defendant's MSJ.  This conversation between Ms. Phillips and Detective Davies is part of a record made by Ms. Phillips constituting a recorded recollection.  Detective Davies' statements to Ms. Phillips show that Ms. Phillips could have reasonably believed that Plaintiff's statements that someone had told her that Mr. Edwards had made the police report were actually false.  Detective Davies informed Ms. Phillips that he did not tell Plaintiff filed the police report.  Ms. Phillips admitted Plaintiff told her that she *believed* that it was Mr. Edwards who filed the police, but as Plaintiff testified, she did not conclusively know that Mr. Edwards did in fact file the police report until she received a copy of the police report following her termination. (Plaintiff's Exhibit C, at 87:7-88:10).

Additionally, although Plaintiff's assertions regarding Ms. Phillips' knowledge of Plaintiff's prior verified reports of sexual harassment and Plaintiff's prior reports of retaliation by Jacob Edwards and Jordan Stilley may be true, Mr. Edwards and Mr. Stilley were not and are not decision-makers for Mars.  As previously stated at Defendant's SOUF No. 19, which Plaintiff does not controvert, James Gustin and Travis Bussen were terminated after an investigation verified that Plaintiff's allegations of sexual harassment were credible.  And as previously stated at Defendant's SOUF No. 30, which Plaintiff does not controvert, Jordan Stilley was terminated for

his conduct towards Plaintiff.  Plaintiff's assertion that Jordan Stilley made an admission in an email in September 2017 is irrelevant and unreliable because Mr. Stilley was never deposed by Plaintiff in connection with this litigation.  Further, although Plaintiff's assertions regarding Ms. Phillips' knowledge of Plaintiff's allegation that Mr. Edwards made the police report in retaliation for getting some of his friends fired may be true, this allegation was not made as a complaint to Ms. Phillips, nor was this an allegation of Mr. Edwards sexually harassing Plaintiff.  Rather, Plaintiff shared this as part of a conversation with Ms. Phillips detailing the history of what had been happening at the Mars site. (Additional Excerpts from Deposition of Nichole Phillips, attached hereto as Exhibit B, at 71:23-72:10).  Even if this assertion is true, Mr. Edwards was not and is not a decision-maker for Mars and his actions were not retaliatory on behalf of Mars.

Finally, Plaintiff's assertion that Ms. Phillips "implied that she did not need to wait and see a copy of Mr. Edwards' false police report before terminating Plaintiff's employment…" is an argument and a belief and not a fact that actually disputes Defendant's SOUF No. 93 that the reason for April Pfannenstiel's termination was for falsifying information and lying during a Company investigation, which is an integrity issue in violation of Mars Wrigley Confectionery policies.  Therefore, Plaintiff's Response to Defendant's SOUF No. 93 is controverted, inaccurate, disproven, and does not create a genuine issue of material fact.

94.     Specifically, April Pfannenstiel was terminated for making:

a.      False statements regarding person who filed police report (Ex. I, Phillips Depo., at 103:2-104:2);

b.      False statements regarding why she had been arrested (Ex. I, Phillips Depo., at 106:21-107:4, 107:11-15, 111:2-112:5); and

c.      False statements to Niki Phillips regarding the substance of the police report

(Ex. I, Phillips Depo., at 105:4-106:16, 107:16-108:12).

**RESPONSE:** Controverted. At best, Defendant can only claim that Ms. Phillips *suspected* that Plaintiff's statements were false, especially since Plaintiff's assertion that Mr. Edwards was the one that had made the false police report against her turned out to be true. (Plf.'s Ex. E, Phillips Depo. at 104:3-8.) Even Plaintiff's statements that Ms. Phillips alleges were untrue, were at worst, subject to a different interpretation than information that Ms. Phillips had obtained elsewhere. For instance, Plaintiff *admitted* to Ms. Phillips that there had been a warrant for her arrest. (Plf.'s Ex. E, Phillips Depo. at 68:16-69:11.) Ms. Phillips also admitted that she required legal advice from Defendant's counsel to inform her interpretation of Plaintiff's explanation for the warrant. (Plf.'s Ex. E, Phillips Depo. at 107:5-10.) Despite that, she apparently assumed Plaintiff had the legal knowledge to accurately explain the reason for the warrant against her.

Circumstantial evidence exists that such rationale for Plaintiff's termination is pretextual. For example, the temporal proximity between Plaintiff's conversations with Ms. Phillips on May 23, and May 24, 2018, and her termination on May 30, 2018, was mere days. (Plf.'s Ex. E, Phillips Depo. at 46:20-22, 93:16-21.) Moreover, assuming, *arguendo*, that Ms. Phillips actually had a conversation with Detective Davies as alleged, and that it went as she described, her own notes indicate that Detective Davies admitted to her that he, "cannot tell what the other detective said." (Plf.'s Ex. F, Phillips Investigation Notes.) This is a strong indication that she could not have reasonably believed that Plaintiff's statements that someone had told her that Mr. Edwards had made the police report were actually false. Additionally, Ms. Phillips was aware of Plaintiff's prior verified reports of sexual harassment, as well as her prior reports of retaliation by Jacob Edwards and Jordan Stilley, and her belief that Mr. Edwards' false police report was also retaliatory—specifically Plaintiff's belief that Mr. Edwards was engaging in this behavior because she "had

18

gotten some of his friends fired"—prior to the decision to terminate Plaintiff's employment. (Plf.'s Ex. E, Phillips Depo. at 44:20-45:7, 72:11-18, 73:11-74:5, 96:23-97:14, 120:8-11; Plf.'s Ex. G., May 24, 2018, Rashid email.) In fact, Mr. Stilley admitted on or around September 28, 2017, that he was "yell[ing] and curs[ing] at [Plaintiff]" at least in part because he believed she "receive[d] special treatment for a lawsuit she '[held] over Mars'." (Plf.'s Ex. G., May 24, 2018, Rashid email.) Ms. Phillips also implies that she did not need to wait and see a copy of Mr. Edwards' false police report before terminating Plaintiff's employment because Plaintiff "was on leave for several days and did not produce it until after her separation," but admits that Plaintiff *could not* have produced a copy of the police report earlier than she did. (Plf.'s Ex. E, Phillips Depo. at 110:5-20.)

**Mars' Reply:**  Mars disputes Plaintiff's Response to Defendant's SOUF No. 94.  The facts asserted in Defendant's SOUF No. 94 are the reasons Plaintiff was terminated and were based on what Niki Phillips reasonably knew at the time Plaintiff was terminated.  The pertinent inquiry here is not whether the defendant's stated reasons for termination were wise, fair, or correct, but whether the defendant honestly believed in those reasons and acted in good faith.  *Lawson v. Potter*, 463 F. Supp. 2d 1270, 1283 (D. Kan. 2006).  The court's role is not to act as a "super personnel department" that second guesses employers' business judgments.  *Simms v. Oklahoma es rel. Department of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1330 (quoting *Verniero v. Air Force Academy Sch. Dist. No. 20*, 705 F.2d 388, 390 (10th Cir. 1983)).

In addition, Plaintiff's assertion that "[c]ircumstantial evidence exists that such rationale for Plaintiff's termination is pretextual" is an argument and a belief and not a fact that actually disputes Defendant's SOUF No. 94.  Niki Phillips' conversation with Detective Davies did happen and was recorded by Ms. Phillips in her notes that were written contemporaneously with her telephone call with Detective Davies on May 23, 2018 and accurately reflect Ms. Phillips'

19

knowledge.  These notes were attached as Exhibit A to the Declaration of Nichole Phillips, which was filed as Exhibit A to Defendant's MSJ.  This conversation between Ms. Phillips and Detective Davies is part of a record made by Ms. Phillips constituting a recorded recollection.  Detective Davies' statements to Ms. Phillips show that Ms. Phillips could have reasonably believed that Plaintiff's statements that someone had told her that Mr. Edwards had made the police report were actually false.  Detective Davies informed Ms. Phillips that he did not tell Plaintiff filed the police report.  Ms. Phillips admitted Plaintiff told her that she *believed* that it was Mr. Edwards who filed the police, but as Plaintiff testified, she did not conclusively know that Mr. Edwards did in fact file the police report until she received a copy of the police report following her termination. (Plaintiff's Exhibit C, at 87:7-88:10).

Additionally, although Plaintiff's assertions regarding Ms. Phillips' knowledge of Plaintiff's prior verified reports of sexual harassment and Plaintiff's prior reports of retaliation by Jacob Edwards and Jordan Stilley may be true, Mr. Edwards and Mr. Stilley were not and are not decision-makers for Mars.  As previously stated at Defendant's SOUF No. 19, which Plaintiff does not controvert, James Gustin and Travis Bussen were terminated after an investigation verified that Plaintiff's allegations of sexual harassment were credible.   And as previously stated at Defendant's SOUF No. 30, which Plaintiff does not controvert, Jordan Stilley was terminated for his conduct towards Plaintiff.  Plaintiff's assertion regarding that Jordan Stilley made an admission in an email in September 2017 is irrelevant and unreliable because Mr. Stilley was never deposed by Plaintiff in connection with this litigation.  Further, although Plaintiff's assertions regarding Ms. Phillips' knowledge of Plaintiff's allegation that Mr. Edwards made the police report in retaliation for getting some of his friends fired may be true, this was not made as a complaint to Ms. Phillips, nor was this an allegation of Mr. Edwards sexually harassing Plaintiff.   Rather,

20

Plaintiff shared this allegation as part of a conversation with Ms. Phillips detailing the history of what had been happening at the Mars site. (Exhibit B, Deposition of Nichole Phillips, at 71:23-72:10).  Even if this assertion is true, Mr. Edwards was not and is not a decision-maker for Mars and his actions were not retaliatory on behalf of Mars.

Finally, Plaintiff's assertion that Ms. Phillips "implied that she did not need to wait and see a copy of Mr. Edwards' false police report before terminating Plaintiff's employment…" is an argument and a belief and not a fact that actually disputes Defendant's SOUF No. 94 that the reasons for April Pfannenstiel's termination was for falsifying information and lying during a Company investigation, which is an integrity issue in violation of Mars Wrigley Confectionery policies.  Therefore, Plaintiff's Response to Defendant's SOUF No. 94 is controverted, inaccurate, disproven, and does not create a genuine issue of material fact.

## III.   MARS' RESPONSES TO PLAINTIFF'S ADDITIONAL STATEMENT OF UNCONTROVERTED FACTS

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1(b), Mars provides the following responses to Plaintiff's Additional Statement of Uncontroverted Facts in further support of its Motion for Summary Judgment:

1.     Ms. Phillips only became aware of Plaintiff in March or April of 2018. (Plf.'s Ex. E, Phillips Depo. at 31:1-6.)

**Mars' Response: Uncontroverted.**

2.     Ms. Phillips first became aware of Plaintiff with respect to a complaint made about her by Jacob Edwards that she glared at him one time because he asked to move teams. (Plf.'s Ex. E, Phillips Depo. at 31:15-32:5.)

**Mars' Response: Uncontroverted.**

3.      Ms. Phillips learned about Plaintiff's allegations of sexual harassment against James Gustin and Travis Bussen before Plaintiff's employment was terminated, but only as early as May 22, 2018, the date that law enforcement came to Defendant's Topeka, Kansas facility. (Plf.'s Ex. E, Phillips Depo. at 42:25-43:13, 44:20-45:7, 60:18-61:1.)

**Mars' Response: Uncontroverted.**

4.      Ms. Phillips only became aware of the details of the incident between Plaintiff and Jordan Stilley in September 2017 upon receiving the email from Idol Rashid outlining the incident on May 24, 2018. (Plf.'s Ex. E, Phillips Depo. at 73:11-18.)

**Mars' Response: Uncontroverted.**

5.      Plaintiff returned to work from FMLA leave on February 13, 2018. (Doc. #52, Pretrial Order at Stipulated Fact #20.)

**Mars' Response: Uncontroverted.**

6.      The very next day, Jacob Edwards sent a complaint to Idol Rashid indicating that he and other coworkers are upset because they found out an unnamed coworker (Plaintiff) had "been charged with several crimes dating back to 2017" and saying they didn't feel comfortable or safe because the company did not give them notice of the crimes, citing Case No. 2017-CR-00212 from Shawnee County Courts. (Plaintiff's Exhibit H, February 14, 2018, email from Jacob Edwards to Rashid Idol.)

**Mars' Response: Uncontroverted, but incomplete.  On October 6, 2017, the Topeka-Capital Journal reported that Plaintiff was booked into Shawnee County Jail in connection with aggravated assault with a deadly weapon on October 5, 2017. (Doc. 52, PTO, at p. 4, Stip. Fact No. 17).  Between October 4, 2017 and November 22, 2017, Plaintiff only worked a total of nine shifts, and from November 2, 2017 to November 10, 2017 and November 27,**

2017 to February 12, 2018, Plaintiff was out of work on FMLA medical leave. (Defendant's SOUF Nos. 39-41, all of which Plaintiff does not controvert).  At the time the Topeka-Capital Journal report was released, Plaintiff was on FMLA medical leave.  Because of the severity of the crimes Plaintiff was charged with, Mr. Edwards' medical condition flared up. (Plaintiff's Exhibit I, February 16, 2018, email from Jacob Edwards to Idol Rashid; Exhibit A, Deposition of Benjamin Arteaga, Sr., at 93:10-16).  Mr. Edwards submitted medical documentation stating that he did not feel safe working around Ms. Pfannenstiel and that he was requesting a medical accommodation to be moved off of Plaintiff's team. (Exhibit A, Deposition of Benjamin Arteaga, Sr., at 92:16-93:9).  The Americans with Disabilities Act ("ADA") "requires employers to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability,' unless the accommodations would impose an undue hardship." *Yinger v. Postal Presort, Inc.*, 693 F. App'x 768, 771-72 (10th Cir. 2017) (quoting 42 U.S.C. § 12112(a), (b)(5)(A)).  In accordance with the ADA, Mars gave Mr. Edwards the option to move teams, and as a result, he chose to switch to the blue team. (Plaintiff's Exhibit E, Excerpts from January 8, 2020, Deposition of Nichole Phillips, at 41:10-24; Additional Excerpts from Deposition of Shirley Ha, attached hereto as Exhibit E, at 59:5-60:23).

7.     Two days later, Jacob Edwards sent another email to Mr. Rashid following up on his supposed concerns regarding this same coworker. (Plaintiff's Exhibit I, February 16, 2018, email from Jacob Edwards to Idol Rashid.)

**Mars' Response: Uncontroverted, but incomplete.  On October 6, 2017, the Topeka-Capital Journal reported that Plaintiff was booked into Shawnee County Jail in connection with aggravated assault with a deadly weapon on October 5, 2017. (Doc. 52, PTO, at p. 4,**

Stip. Fact No. 17).  Between October 4, 2017 and November 22, 2017, Plaintiff only worked a total of nine shifts, and from November 2, 2017 to November 10, 2017 and November 27, 2017 to February 12, 2018, Plaintiff was out of work on FMLA medical leave.  (Defendant's SOUF Nos. 39-41, all of which Plaintiff does not controvert).  At the time the Topeka-Capital Journal report was released, Plaintiff was on FMLA medical leave.  Because of the severity of the crimes Plaintiff was charged with, Mr. Edwards' medical condition flared up. (Plaintiff's Exhibit I, February 16, 2018, email from Jacob Edwards to Idol Rashid; Exhibit A, Deposition of Benjamin Arteaga, Sr., at 93:10-16).  Mr. Edwards submitted medical documentation stating that he did not feel safe working around Ms. Pfannenstiel and that he was requesting a medical accommodation to be moved off of Plaintiff's team. (Exhibit A, Deposition of Benjamin Arteaga, Sr., at 92:16-93:9).  The Americans with Disabilities Act ("ADA") "requires employers to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability,' unless the accommodations would impose an undue hardship." *Yinger*, 693 F. App'x at 771-72 (quoting 42 U.S.C. § 12112(a), (b)(5)(A)).  In compliance with the ADA, Mars gave Mr. Edwards the option to move teams, and as a result, he chose to switch to the blue team. (Plaintiff's Exhibit E, Excerpts from January 8, 2020, Deposition of Nichole Phillips, at 41:10-24; Additional Excerpts from Deposition of Shirley Ha, attached hereto as Exhibit E, at 59:5-60:23).

8.     On March 1, 2018, Idol Rashid notified Christopher Krugman that "the assault with deadly weapons charged was dismissed so I will be reaching out to the complaining party then notifying April when she can return." (Plaintiff's Exhibit J, March 1, 2018, email from Idol Rashid to Christopher Krugman.)

**Mars' Response: Uncontroverted.**

24

9.    Shirley Ha, Value Stream Manager and supervisor for Defendant, testified that Plaintiff met with her to discuss workplace concerns some time after Plaintiff returned from leave for her carpal tunnel surgery in 2018, but before Mr. Edwards made his April 30, 2018, complaint. During this meeting, Plaintiff told Ms. Ha that she felt isolated from her team, and there were "still comments around, from her team, around [sic] she was out a lot on FMLA…" and that "…the commentary is that Jacob [Edwards] moved away because of her…" Ms. Ha further testified "… the team was obviously causing—they're just basically mentioning some of those comments to her, which didn't sit well with her." (Plaintiff's Exhibit K, January 7, 2020, Deposition of Shirley Ha at 61:9-62:17, 68:21-69:10 (noting Plaintiff met with Ms. Ha to discuss her concerns at some point before the April 30, 2018 complaint from Edwards).)

**Mars' Response: Uncontroverted.**

10.    Jacob Edwards had previously gone to Ms. Ha to complain about Plaintiff shortly after the September 14, 2017 meeting, at which time Mr. Edwards told Ms. Ha. "… Jordan [Stilley] was his friend and that he agrees with Jordan, that April has abused some form of policy, and that this has been going on for a while." Ms. Ha responded by telling Mr. Edwards she would look into it and speak to Mr. Arteaga to understand what was going on. (Plf.'s Ex. K, Ha Depo. at 49:11-50:12.)

**Mars' Response: Uncontroverted, but incomplete.  Specifically, after Jacob Edwards complained to Shirley Ha shortly after the September 14, 2017 meeting, Plaintiff remained employed for over eight (8) months before she was terminated. (See Defendant's SOUF No. 87, which Plaintiff does not controvert).**

11.    When Ms. Ha spoke with Mr. Arteaga about Mr. Edwards' concerns, Mr. Arteaga told Ms. Ha that Mr. Edwards was "really close" to Mr. Stilley, that Mr. Arteaga was aware of Mr.

Edwards concerns, and that Mr. Arteaga had already explained to Mr. Edwards and Mr. Stilley that the "reason why" Plaintiff might have been absent from work was "not something that he can discuss with them." (Plf.'s Ex. K, Ha Depo. at 50:13-21.)

**Mars' Response: Uncontroverted.**

12.     On April 30, 2018, Plaintiff returned from a leave of absence related to her workers compensation injury. (Doc. #52, Pretrial Order at Stipulated Fact #24.)

**Mars' Response: Uncontroverted.**

13.     On that very day, Mr. Edwards made an allegation that Plaintiff had given him a "death stare" and made a hurtful comment about changing teams, again claiming he didn't feel safe at work because of her. (Plaintiff's Exhibit L, April 30, 2018, email from Jacob Edwards to Clarence Chaney and Jonette Penton; Plf.'s Ex. E, Phillips Depo. at 33:18-25.)

**Mars' Response: Uncontroverted.**

14.     Ms. Phillips investigated Mr. Edwards' allegations of April 30, 2018. (Plf.'s Ex. E, Phillips Depo. at 35:23-37:2, 37:7-40:2.)

**Mars' Response: Uncontroverted.**

15.     The results of Ms. Phillips' investigation into Mr. Edwards' allegations were inconclusive, and, because of the conflicting witnesses, both Mr. Edwards and Plaintiff were simply told that they need to stay away from each other. (Plf.'s Ex. E, Phillips Depo. at 40:3-7, 104:20-105:3.)

**Mars' Response: Uncontroverted.**

16.     Ms. Phillips admitted that during the course of dealing with Mr. Edwards' April 30, 2018 complaint about Plaintiff, she became aware that Mr. Edwards had previously requested, and was granted, an "accommodation" to be moved from the same team as Plaintiff; Ms. Phillips

testified her understanding of why Mr. Edwards had requested not to work with Plaintiff was, in pertinent part, that "[h]e believed that she was a dangerous person and hung out with dangerous people." (Plf.'s Ex. E, Phillips Depo. at 41:10-42:6.)

**Mars' Response: Uncontroverted.**

17.     Jacob Edwards was not disciplined for making the police report against Plaintiff. (Plf.'s Ex. E, Phillips Depo. at 113:1-3.)

**Mars' Response: Uncontroverted.**

18.     Jacob Edwards and Plaintiff worked the same shift on the same team with the same supervisor (Plf.'s Ex. D, Arteaga Depo. at 69:17-70:5, 93:17-94:6.)

**Mars' Response: Uncontroverted.**

19.     Plaintiff took FMLA leave from November 2, through November 10, 2017, due to her generalized anxiety disorder. (Doc. #52, Pretrial Order at Stipulated Fact #19.)

**Mars' Response: Uncontroverted.**

20.     On November 8, 2017, while Plaintiff was out on FMLA leave, Benjamin Arteaga, Sr., drafted a "Final Written Warning" for Plaintiff with regard to her attendance for Idol Rashid's review, apparently in response to a conversation Mr. Rashid had had with Harry Smith. (Plaintiff's Exhibit M, November 8, 2017, email thread among Benjamin Arteaga, Harry Smith, and Idol Rashid.)

**Mars' Response: Uncontroverted, but incomplete.  On or around November 8, 2017, Benjamin Arteaga drafted a Final Written Warning for Plaintiff with regards to her attendance.  Plaintiff informed Mr. Arteaga that it was incorrect. (Additional Excerpts from Deposition of Plaintiff April Pfannenstiel, Volume I, attached hereto as Exhibit C, at 37:18-38:3).  Mr. Arteaga printed of a copy of Ms. Pfannenstiel's points from the timekeeping**

system, and together they went through her points. (Exhibit C, Deposition of Plaintiff April Pfannenstiel, Volume I, at 37:24-38:3).  After going through Plaintiff's points, Mr. Arteaga realized there were errors with her points. (Exhibit C, Deposition of Plaintiff April Pfannenstiel, Volume I, at 37:24-38:3).  Mr. Arteaga advised Ms. Pfannenstiel that he was unable to fix these errors, but that he was going to take this to Jonette Penton to get fixed because she was the one who reported Plaintiff's time off for FMLA. (Exhibit C, Deposition of Plaintiff April Pfannenstiel, Volume I, at 38:23-39:10).  Ms. Penton does not have the authority to assign points, however, she is involved with administering FMLA leave for associates and coding the associates' time entries in the Kronos system appropriately. (Additional Excerpts from Deposition of Jonette Penton, attached hereto as Exhibit D, at 26:3-17, 27:17-28:10, 33:10-16).  Associates are only allowed a certain number of points before Kronos sends an automatic warning. (Exhibit A, Deposition of Benjamin Arteaga, Sr., at 85:11-86:1; Exhibit C, Deposition of Plaintiff April Pfannenstiel, Volume I, at 39:16-40:11).  Ms. Penton then reviewed Plaintiff's FMLA paperwork and points. (Exhibit D, Deposition of Jonette Penton, at 36:14-39:11).

21.    Jonette Penton, the Topeka site's Nurse Case Manager, testified that she received requests from "management" regarding the status of drug tests following every work injury. (Plaintiff's Exhibit N, June 2, 2020, Deposition of Jonette Penton at 43:1-7.)

**Mars' Response: Uncontroverted, but incomplete.  During Ms. Penton's deposition, she testified that "the powers that be" were Benjamin Arteaga, Plaintiff's Line Manager, and Shirley Ha, Value Stream Manager. (Exhibit F to Defendant's MSJ, at 44:11-22).  At Defendant's SOUF No. 48, which Plaintiff did not controvert, Ms. Penton testified, "it was common for [her], as Regional Nurse Case Manager for Defendant's Topeka, Kansas facility,**

28

**to receive requests from management as to the status of drug tests." Ms. Penton also testified that Ms. Ha and Mr. Arteaga needed to know the results of Plaintiff's drug test for staffing purposes, specifically, when they could expect Plaintiff back. (Exhibit F to Defendant's MSJ, at 44:11-22). These facts were included in Defendant's SOUF at Nos. 46 and 47 and were uncontroverted by Plaintiff.**

22.     On April 24, 2018, Ms. Penton sent an email to Defendant's drug testing contractor, inquiring into Plaintiff's post-injury drug test results, stating, "Any updates on the arrival of this one. The powers that be are inquiring." (Doc. #52, Pretrial Order at Stipulated Fact #23; Plf.'s Ex. A, Penton/Coffee email thread.)

**Mars' Response: Uncontroverted, but incomplete.  During Ms. Penton's deposition, she testified that "the powers that be" were Benjamin Arteaga, Plaintiff's Line Manager, and Shirley Ha, Value Stream Manager. (Exhibit F to Defendant's MSJ, at 44:11-22).  At Defendant's SOUF No. 48, which Plaintiff did not controvert, Ms. Penton testified, "it was common for [her], as Regional Nurse Case Manager for Defendant's Topeka, Kansas facility, to receive requests from management as to the status of drug tests."  Ms. Penton also testified that Ms. Ha and Mr. Arteaga needed to know the results of Plaintiff's drug test for staffing purposes, specifically, when they could expect Plaintiff back. (Exhibit F to Defendant's MSJ, at 44:11-22).  These facts were included in Defendant's SOUF at Nos. 46 and 47 and were uncontroverted by Plaintiff.**

23.     On May 2, 2018, Ms. Penton sent an email to Defendant's workers compensation occupational health provider regarding the scheduling of treatment for Plaintiff after her work-related injury which included the statement, "[t]here are also performance based issues for this

associate." (Doc. #52, Pretrial Order at Stipulated Fact #25, Plf.'s Ex. B, May 2, 2018, Penton email.)

**Mars' Response: Uncontroverted, but incomplete.  Ms. Penton testified that she is not responsible for any kind of performance-related discipline. (Plaintiff's Exhibit N, at 46:20-47:3).  Ms. Penton further testified that the workers' compensation medical provider does not deal with any employee's performance-based issues. (Plaintiff's Exhibit N, at 47:9-48:12). Plaintiff's ASOUF No. 24, which Mars does not controvert, states, "Ms. Penton was responsible for discipline related to performance issues at the time she sent her May 2, 2018, email to Defendant's workers compensation occupational health provider, and admits that the medical provider would have no reason to deal with those issues."**

24.     Ms. Penton was not responsible for discipline related to performance issues at the time she sent her May 2, 2018, email to Defendant's workers compensation occupational health provider, and she admits that the medical provider would have no reason to deal with those issues. (Plf.'s Ex. N, Penton Depo. at 46:24-47:3, 48:8-11.)

**Mars' Response: Uncontroverted.**

25.     On May 23, 2018, at 10:10 a.m., Plaintiff sent a text message to Mr. Arteaga stating, "I am heading to the police station now to see if I can get a copy of the report that was made. I talked to the detective and he is going to guide me through the process of getting Jacob charged with false reporting. I told you I'm done with playing these little games that interfere with my daily life. It's not fair and I need him to leave me alone." (Plf.'s Ex. D, Arteaga Depo. at 106:24-107:6, 111:25-112:22; Plaintiff's Exhibit O, May 23, 2018 text message from Plaintiff to Benjamin Arteaga.)

**Mars' Response: Uncontroverted.**

26.    On May 29, 2020, the Topeka Police Department issued a Non Criminal Incidents Report regarding allegations made by Jacob Edwards against Plaintiff. (Plaintiff's Exhibit P, May 29, 2018, Topeka Police Department Non Criminal Incidents Report.)

**Mars' Response: Uncontroverted, but incomplete.  As stated in Defendant's SOUF No. 89, Idol Rashid and Niki Phillips, the decision-makers behind Plaintiff's termination, received a copy of a one-page Non Criminal Incidents Report made to the Topeka Police Department after Plaintiff was terminated. (Exhibit A to Defendant's MSJ, at ¶5; Exhibit G to Defendant's MSJ, at ¶17).**

27.    The report issued by the Topeka Police Department was written by a Detective Blood. (Plf.'s Ex. P, May 29, 2018, Topeka Police Report.)

**Mars' Response: Uncontroverted, but incomplete.  As stated in Defendant's SOUF No. 89, Idol Rashid and Niki Phillips, the decision-makers behind Plaintiff's termination, received a one-page Non Criminal Incidents Report made to the Topeka Police Department after Plaintiff was terminated. (Exhibit A to Defendant's MSJ, at ¶5; Exhibit G to Defendant's MSJ, at ¶17).  The one-page of the Non Criminal Incidents Report that Idol Rashid and Niki Phillips received does not state who wrote the report and does not include the name of Detective Blood.**

28.    The report issued by the Topeka Police Department indicates that Detective Blood interviewed Plaintiff regarding Mr. Edwards' complaints. (Plf.'s Ex. P, May 29, 2018, Topeka Police Report.)

**Mars' Response: Uncontroverted, but incomplete.  As stated in Defendant's SOUF No. 89, Idol Rashid and Niki Phillips, the decision-makers behind Plaintiff's termination, received a one-page Non Criminal Incidents Report made to the Topeka Police Department**

after Plaintiff was terminated. (Exhibit A to Defendant's MSJ, at ¶5; Exhibit G to Defendant's MSJ, at ¶17).  The one-page of the Non Criminal Incidents Report that Idol Rashid and Niki Phillips received does not state who wrote the report and does not include the name of Detective Blood.

29.    The report issued by the Topeka Police Department also references a Deputy S. Gilchrist. (Plf.'s Ex. P, May 29, 2018, Topeka Police Report.)

**Mars' Response: Uncontroverted.**

30.    The report issued by the Topeka Police Department indicates that Deputy Gilchrist took Mr. Edwards' complaint regarding Plaintiff. (Plf.'s Ex. P, May 29, 2018, Topeka Police Report.)

**Mars' Response: Uncontroverted.**

31.    The report issued by the Topeka Police Department indicates that Detective Blood made the determination that Mr. Edwards' complaints about Plaintiff did not merit concern. (Plf.'s Ex. P, May 29, 2018, Topeka Police Report.)

**Mars' Response: Uncontroverted, but incomplete.  As stated in Defendant's SOUF No. 89, Idol Rashid and Niki Phillips, the decision-makers behind Plaintiff's termination, received a one-page Non Criminal Incidents Report made to the Topeka Police Department after Plaintiff was terminated. (Exhibit A to Defendant's MSJ, at ¶5; Exhibit G to Defendant's MSJ, at ¶17).  The one-page of the Non Criminal Incidents Report that Idol Rashid and Niki Phillips received does not state who wrote the report and does not include the name of Detective Blood.  The one-page Non Criminal Incidents Report also does not state that a determination was made that Mr. Edwards' complaints about Plaintiff did not merit concern.**

32.     The report issued by the Topeka Police Department does not reference the involvement of a Detective Davies with the investigation. (Plf.'s Ex. P, May 29, 2018, Topeka Police Report.)

**Mars' Response: Uncontroverted, but incomplete.  As stated in Defendant's SOUF No. 89, Idol Rashid and Niki Phillips, the decision-makers behind Plaintiff's termination, received a one-page Non Criminal Incidents Report made to the Topeka Police Department after Plaintiff was terminated. (Exhibit A to Defendant's MSJ, at ¶5; Exhibit G to Defendant's MSJ, at ¶17).  The one-page Non Criminal Incidents Report is not the entire report, and the one-page Non Criminal Incidents Report is all Mr. Rashid and Ms. Phillips received after Ms. Pfannenstiel was terminated.  Additionally, Ms. Phillips testified that Detective Davies informed her that he never told Plaintiff who the police report came from because it came from another jurisdiction. (Exhibit I to Defendant's MSJ, at 77:17-78:10). This statement made by Detective Davies was recorded by Niki Phillips in her notes that were written contemporaneously with her telephone call with Detective Davies on May 23, 2018 and accurately reflect Ms. Phillips' knowledge.  These notes were attached as Exhibit A to the Declaration of Nichole Phillips, which was filed as Exhibit A to Defendant's MSJ.  This statement by Detective Davies is part of a record made by Ms. Phillips constituting a recorded recollection, which, pursuant to the Federal Rules of Evidence, Rule 803(5), is an exception to the rule against hearsay and is not excluded by the rule against hearsay.**

33.     On February 2, 2018—while Plaintiff was still on a continuous leave of absence for her carpal tunnel surgery—Ms. Ha complained to Mr. Rashid that Plaintiff purportedly "consistently failed to provide her paperwork in time," and asked Mr. Rashid "[i]s it really

acceptable to continue in this manner?" (Plaintiff's Exhibit Q, February 2-5, 2018, email thread between Shirley Ha to Idol Rashid).

**Mars' Response: Uncontroverted, but incomplete. Specifically, after Ms. Ha made these comments to Mr. Rashid, Plaintiff remained employed for over four (4), and nearly five (5), months before she was terminated. (See Defendant's SOUF No. 87, which Plaintiff does not controvert).**

34.     Mr. Rashid responded to Ms. Ha by stating Ms. Penton "followed the correct response of escalating [Plaintiff's] failures with the letter that was sent out and we will need to continue to monitor it with Legal's help." Mr. Rashid further stated, "[i]t's unfortunate that she is not abiding by the expectations n the process while we are providing her this benefit and I would not call it acceptable." (Plf.'s Ex. Q, February 2-5, 2018, Ha/Rashid email thread).

**Mars' Response: Uncontroverted, but incomplete. Specifically, after Mr. Rashid made these comments to Ms. Ha, Plaintiff remained employed for over four (4), and nearly five (5), months before she was terminated. (See Defendant's SOUF No. 87, which Plaintiff does not controvert).**

## IV.     ARGUMENT AND AUTHORITIES

### 1.     THE UNDISPUTED MATERIAL FACTS ESTABLISH THAT DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON EACH CLAIM.

#### A.     <u>Plaintiff Has Not Established Her *Prima Facie* Case for Title VII Retaliation, Either Through Direct or Circumstantial Evidence.</u>

Plaintiff erroneously argues that her comments to Mars about her belief that Jacob Edwards filed the police report constitute direct evidence of Title VII retaliation. Direct evidence, properly understood, refers to a narrow category of "evidence, which if believed, proves the existence of a

fact in issue *without inference or presumption*." *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987,

1000 n.8 (10th Cir. 2011) (quoting *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 854 (10th Cir. 2007)

(emphasis added).   The Tenth Circuit further explains direct evidence in this fashion: "'Strictly

speaking, the only 'direct evidence' that a decision was made 'because of' an impermissible factor

would be an admission by the decisionmaker such as 'I fired him because he was too old.'" *Twigg*,

659 F.3d at 1000 n.8 (quoting O*strowski v. Atl. Mut. Ins. Cos.*, 968 F.2d 171, 181 (2d Cir. 1992)

(quoting *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1185 (2d Cir. 1992)).

    In this case, the record is devoid of any explicit statement by Mars that its termination

decision was based on an impermissible, retaliatory factor.   To the contrary, Plaintiff attempts to

argue that her *own comment* alleging retaliation by another associate, Jacob Edwards, meets the

direct evidence requirement.   Doc. #59, pp. 34-35.   Given the lack of any overt retaliatory

statement by Mars, Plaintiff's argument still requires one to infer, presume, and leap to the

conclusion that her statements about Edwards' alleged retaliation are connected to her subsequent

termination.   Even more, Plaintiff undercuts her own direct evidence argument when she

contradictorily states her termination occurred specifically because, "Defendant's management

viewed Plaintiff as a complainer and were looking at a reason to get rid of her." Doc. #59, p. 50.

If Plaintiff had any direct evidence as to this stated basis, she would have presented such specific

facts in her brief.   They failed to do so, because there is no such evidence.   As Plaintiff's comments

do not constitute direct evidence, she is unable to create a genuine issue of material fact to defeat

summary judgment. *See Fischer v. Forestwood Co.*, 525 F.3d 972, 983 (10th Cir. 2008).

> **i.**     **Plaintiff's Additional Complaints Do Not Constitute Protected Activity.**

Plaintiff attempts to causally connect her termination to her complaint of sexual harassment that occurred fourteen months earlier.  In doing so, she argues that her subsequent complaints about Edwards and Stilley made some time prior to October 2017, and again in May 2018, both constitute protected activity.  Doc. #59, p. 39-40.  Plaintiff's attempts to characterize these subsequent reports as protected activity under Title VII must fail.

First, Plaintiff asserts that her statements to Manager Arteaga stating how Jacob Edwards and Jordan Stilley were making comments about Plaintiff's use of extra leave breaks should constitute protected activity.  SOUF ¶ 25; Doc. #59, 39.  However, her basis for such an argument contradicts legal precedent, which requires Plaintiff to oppose a potential Title VII violation or participate in a Title VII investigation, proceeding or hearing.  *See*, 42 U.S.C. 2000e-3(a); *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002).  In this incident, Plaintiff's complaint to Manager Arteaga was regarding her discomfort that other associates were making comments about her use of extra leave breaks.  SOUF ¶ 25, 26.  This complaint does not show that Plaintiff specifically opposed a Title VII violation.

In further support of her argument, Plaintiff references Edwards' comments that he did not feel safe around Plaintiff and, further, that he made a hurtful comment about changing teams.  ASOF ¶ 13; Doc. #59, p. 37-38.  Plaintiff argues that these comments were undoubtedly retaliatory, as Edwards admitted to being friends with Stilley in a conversation that occurred between Manager Ha and Edwards.  ASOF ¶ 11, 13.  However, Plaintiff ignores that Edwards' complaint about feeling unsafe around Plaintiff was prompted by an October 2017 article in the Topeka-Capital Journal that Plaintiff was booked into a Shawnee County Jail in connection with aggravated assault with a deadly weapon on October 5, 2017.  SOUF ¶ 34.   Edwards' email to Associate Relations Manager Rashid concerning Plaintiff's October 2017 criminal charges was dated February 14,

2018, the day after Plaintiff returned from FMLA leave, presumably because Edwards had not seen Plaintiff at the Topeka site.  Plaintiff had taken FMLA leave for part of October 2017 and only returned to work on or about February 13, 2018.  SOUF ¶ 31-33, 39-41; ASOF ¶ 5-6.  Edwards also requested a medical accommodation to be moved out of Plaintiff's section.  ASOF ¶ 6-7.  In support thereof, Edwards submitted medical documentation. ASOF ¶ 6-7.  Accordingly, Mars had a duty to accommodate Edwards in his request.[2]  *Yinger v. Postal Presort, Inc.*, 693 F. App'x 768, 771-72 (10th Cir. 2017) (quoting 42 U.S.C. § 12112(a), (b)(5)(A)).  Edwards' request to be removed from Plaintiff's team is more reflective of his own discomfort in light of Plaintiff's serious criminal charges, rather than a scheme to retaliate against Plaintiff.

Second, Plaintiff's own admissions indicate that her accusations against Edwards were not made in good faith.  Specifically, Plaintiff conceded, "[Edwards] had made comments when he did it [filed the police report] because - - I'm not 100 percent sure, but I'm pretty sure he did it from Mars.... Again, I don't know for sure because it wasn't told to me, and I didn't have any proof of it at the time."  SOUF ¶ 81.  In further support that Plaintiff's accusations were not made in good faith, Phillips had direct proof from the unbiased investigating detective who stated that the individual who filed the police report wanted to remain anonymous and, further, that he would not tell Plaintiff who filed the report.  SOUF ¶ 79-81.  Even more, the undisputed evidence shows that Phillips and Rashid did not receive a copy of the police report until *after* Plaintiff's termination, at which point it was first revealed that Edwards did file the police report.  SOUF ¶ 89.  Accordingly, Plaintiff cannot show that her accusations against Edwards was based upon a "good faith belief

---

[2] The Americans with Disabilities Act ("ADA") "requires employers to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability,' unless the accommodations would impose an undue hardship."  ASOF ¶ 6.

that Title VII [had] been violated." *Metzger v. City of Leawood*, 144 F. Supp. 2d 1225, 1231 (D. Kan. 2001) (court granted employer summary judgment, finding that plaintiff failed to create an inference of pretext with regard to defendant employers' claim that they terminated her for lying.).

> **ii.    Even If Each Report Constituted Protected Activity, There Is Insufficient Evidence of a Causal Connection to Plaintiff's Termination.**

Even if Mars concedes that Plaintiff's September 2017 and May 2018 reports constitute protected activity, which it does not, Plaintiff still cannot demonstrate the existence of a causal connection between each report and her subsequent termination.   In establishing a causal connection, a plaintiff "must show that [her] protected activity was the but-for cause of the alleged adverse employment action, and not merely a motivating factor." *Berkemeier v. Standard Bev. Corp.*, 171 F. Supp. 3d 1122, 1126 (D. Kan. 2016).   In this case, the evidence is insufficient to show that Plaintiff's March 2017 and subsequent reports even slightly motivated Mars' decision to terminate Plaintiff.   To the contrary, Plaintiff was terminated after Phillips' investigation revealed the falsity of several statements made by Plaintiff during the investigation into the police report allegations.  SOUF ¶ 68-74, 77, 94.

Moreover, intervening events preclude the presumption that Plaintiff's termination was causally connected thereto. *See, e.g.*, *Berkemeier*, 171 F. Supp. 3d at 1126 (finding the record lacked evidence that Plaintiff's complaints were connected to her termination, citing intervening events where Plaintiff was rewarded on the job as proof to the contrary).   First, in response to Plaintiff's March 2017 report of sexual harassment, Mars immediately conducted an investigation and terminated the individuals who made such inappropriate comments.  SOUF ¶ 16, 18, 19. Subsequent to March 2017, Plaintiff was encouraged to take approved paid non-FMLA medical

leave following the termination of James Gustin and Travis Bussen, as she was not yet eligible for FMLA leave.  SOUF ¶ 17, 24.  Third, Plaintiff was granted intermittent FMLA leave throughout September, October, and November 2017 for exacerbation of her anxiety.  SOUF ¶ 31, 32. 40. Fourth, Plaintiff was granted another FMLA leave from November 2017 through February 2018 due to carpal tunnel syndrome and related surgery.  SOUF ¶ 39, 41.  Fifth, Plaintiff was given an approved leave of absence after sustaining injuries due to a work-related fall.  SOUF ¶ 42, 50. Upon Plaintiff's return from each bout of leave, she resumed the same position.  SOUF ¶ 24, 39, 54.

The final intervening event occurred in May 2018, when a detective from the Topeka Police Department came to Mars' Topeka, Kansas facility and asked to speak with Plaintiff.  SOUF ¶ 57. Phillips, as the acting Associate Relations Manager for the site, launched an investigation to determine the reason why the detective wanted to speak with Plaintiff.  SOUF ¶ 66.  Through her investigation, it was revealed that Plaintiff made multiple false statements to Phillips, which was the non-retaliatory basis for her termination.  SOUF ¶ 94.  Specifically, Plaintiff was terminated for making false statements regarding the person who filed the police report.  SOUF ¶ 94(a).  In an attempt to distract from her own admission that she could not confirm who made the police report at the time she spoke with Phillips, Plaintiff now argues that Phillips' disbelief of Plaintiff's allegations was retaliatory because it was later discovered that Edwards did, in fact, file the police report. [3]  Doc. #59, p. X.  Even if this argument was proper, , which it is not, Plaintiff still made false statements about *why* she had been arrested and the allegations contained in the police report, both of which were wholly unrelated to Plaintiff's alleged protected activity.  SOUF ¶ 94(b)-(c).

---

[3] Mars received one-page of the two-page police report only *after* Plaintiff's termination, at which time Mars learned that Edwards filed the police report.  SOUF ¶ 26-28.

Plaintiff claims each complaint is "entitled to a presumption" that the termination of her employment was causally connected thereto, but fails to state any supporting case law to support such an assumption.  Moreover, Plaintiff has failed to set forth evidence that justifies an inference of retaliatory motive by Phillips, the primary decision-maker for Plaintiff's termination.

Again, without citing any relevant precedent, Plaintiff attempts to revive the temporal proximity of her March 2017 and September 2017 complaints to her termination.  Specifically, Plaintiff argues that because Phillips, the person who recommended her termination, first learned of these events in May 2018, these complaints became "new" to Phillips and influenced her decision-making.  Doc. #59, p. 40.   Plaintiff argues that the causal connection is established by the closeness in time between when Phillips first learned of Plaintiff's prior protected activity and Plaintiff's subsequent termination.  Doc. #59, p. 40.  Plaintiff has failed to provide authority for this supposition, and she cannot overcome the approximately 14 months and 8 months, respectively, that passed between these complaints and her termination.  For all of these reasons, dismissal of Plaintiff's Title VII retaliation claims is warranted.

### B.    Plaintiff Cannot Establish Her Prima Facie Case of FMLA Retaliation.

Plaintiff similarly fails in satisfying her *prima facie* case of FMLA retaliation, as she mischaracterizes undisputed facts in an attempt to connect her FMLA leave to her termination.  In doing so, Plaintiff highlights three facts that she alleges prove a causal connection.  First, Plaintiff claims that her complaint to Manager Ha about her feelings of isolation and her belief that other associates were making comments about her use of FMLA leave establishes Mars' retaliation against Plaintiff for using FMLA leave.  Doc. #59, p. 46.  This assertion ignores the undisputed fact that neither Edwards nor Ha were involved in the unrelated investigation and decision-making

leading to Plaintiff's termination.  SOUF ¶ 82-84, 86, 88.  The comments by teammates about Plaintiff have no bearing on whether Phillips or Rashid, acting as the ultimate decision-makers, terminated Plaintiff because of intentional FMLA retaliation.

For similar reasons, Plaintiff's allegation that Edwards complained to Arteaga and Ha in September 2017 that Plaintiff was abusing the leave policy is insufficient additional evidence to establish a causal connection.  Doc. #59, p. 46.  Even if Plaintiff cites Edwards' complaint to establish her manager's knowledge of Edwards' negative comments, the undisputed facts clearly show neither Arteaga nor Ha were the decisionmakers behind Plaintiff's termination that occurred more than six months later.  SOUF ¶ 92.  Moreover, Arteaga's response to Edwards' complaint was appropriate and objectively stated: the reason why Plaintiff was absent from work was not something that should be discussed with Edwards.  ASOF ¶ 11.

Plaintiff's third assertion that Ha and Rashid "expressed hostility" about Plaintiff's use of leave is a clear misrepresentation of the emails between Ha and Rashid.  Ha's email to Rashid was prompted by Nurse Case Manager Jonette Penton's email update to Ha, Arteaga, and Rashid regarding Plaintiff's continued failure to provide Mars with documentation of her medical treatments, as required during the FMLA process.  ASOF ¶ 33-34.  The statements which Plaintiff deems hostile are Ha's comment to Rashid, "April has consistently failed to provide her paperwork in time. Is it really acceptable to continue in this manner?" and Rashid's response to Ha, "Jonette has followed the correct response of escalating her failures with the letter that was sent out and we will need to continue to monitor it with Legal's help.  It's unfortunate that she is not abiding by the expectations in the process while we are providing her this benefit and I would not call it acceptable."  ASOF ¶ 33-34.  Plaintiff attempts to fashion her own failure to comply with the FMLA leave process, and her managers' appropriate follow-up on her non-compliance, as

evidence of Mars' retaliatory animus.   Moreover, Plaintiff remained employed with Mars for almost five more months before she was ultimately terminated.  ASOF ¶ 33-34.

Plaintiff further argues the Final Written Warning discussed by Arteaga and Rashid in November 2017 is evidence of their "retaliatory animus."  Doc. #59, p. 46.  However, Plaintiff overlooks several undisputed facts: (1) the Final Written Warning was prompted by an automatic report generated by Mars' objective, timekeeping system;[4] (2) Plaintiff and Arteaga reviewed Plaintiff's points together where Plaintiff alerted Arteaga that the points as recorded were incorrect; (3) as a result, Manager Arteaga asked Jonette Penton, the Nurse Case Manager,[5] to review and correct Plaintiff's timekeeping records.   ASOF ¶ 20.   Further disproving any link between the Warning and Plaintiff's termination, Plaintiff remained employed by Mars for another 203 days, or 6 months and 2 days.  SOUF ¶ 87.  For these reasons, Plaintiff's FMLA retaliation claim should be dismissed in its entirety.

### C.      There is No Factual Basis for Plaintiff's Wrongful Termination Claim.

Plaintiff's sole argument linking her worker's compensation claim to her termination is an email inquiry from Jonette Penton, the Nurse Case Manager, to Mars' drug testing provider.  Doc. #59, p. 48.  Plaintiff attempts to portray Penton's email inquiry as suspicious, referencing Penton's statement that "the powers that be" were inquiring.  *Id*.  Plaintiff fails to state Penton's prior testimony that "the powers that be" who were inquiring about Plaintiff's drug test results were Plaintiff's managers, Shirley Ha and Benjamin Arteaga.  SOUF ¶ 46, 47.  Their inquiry was based on their need to know Plaintiff's test results for staffing purposes; specifically, they wanted to

---

[4] Associates are only allowed a certain number of points before Kronos, the timekeeping system, sends an automatic warning to the manager.  ASOF ¶ 20.
[5] As the Nurse Case Manager, Penton is involved with administering FMLA leave for associates and coding the associates' time entries in the Kronos system appropriately.  ASOF ¶ 20.

know when they could expect Plaintiff's return to work. SOUF ¶ 47. Contrary to what Plaintiff

infers, this is what triggered Penton's email to the drug testing provider. SOUF ¶ 49. Moreover,

there is no merit to Plaintiff's theory that Penton's testimony contradicts the fact that Phillips,

Rashid, and Krugman were unaware of Plaintiff's worker's compensation claim. Doc. #59, p. 47.

Instead, the undisputed facts clearly establish that none of these individuals were told by Penton

about Plaintiff's worker's compensation claim. SOUF ¶ 85. The record is devoid of "clear and

convincing" evidence sufficient to establish a causal connection between Plaintiff's worker's

compensation claim and her later termination. *See Ortega v. IBP. Inc.*, 255 Kan. 513, 526, 874

P.2d 1188, 1196 (D. Kan. 1994). Accordingly, her claims should be dismissed.

### D.      **Plaintiff Has Failed to Present Any Evidence Whatsoever of Pretext and, Therefore, Summary Judgment is Warranted Regarding Plaintiff's Retaliation and Wrongful Termination Claims.**

Plaintiff contends that Mars unreasonably concluded Plaintiff's statements to Phillips about

her criminal charges and arrest on May 22, 2018, were false. Doc. #59, p. 41. Plaintiff further

contends that Mars premises its argument on inadmissible hearsay. *Id.* However, this argument

ignores Phillips' contemporaneously recorded notes from her telephone call with Detective Davies

on May 23, 2018, which constitute records of a regularly conducted activity.[6] Doc. #54-2, Exhibit

A.[7] Plaintiff did not question the method or circumstances of preparation to indicate that Phillips'

---

[6] FRE Rule 803 sets forth the requirements for hearsay exceptions under Rule 803(6): Records of a Regularly Conducted Activity are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness: "A record of an act, event, condition, opinion, or diagnosis if: (A) the record was made at or near the time by — or from information transmitted by — someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and (E) neither the opponent does not show that the source of information nor or the method or circumstances of preparation indicate a lack of trustworthiness.
[7] Plaintiff never questioned the method or circumstances of preparation to indicate that Phillips' journal notes lack trustworthiness.

journal notes lack trustworthiness.  Specifically, Phillips' notes clearly state the basis for Mars' honest belief that Plaintiff made false statements.  First, Phillips recorded that Detective Davies stated the police report was filed anonymously.  SOUF ¶ 79.  Second, Phillips' notes reflect that Plaintiff's May 2018 arrest was for a bench warrant issued against her for her failure to appear in court for a misdemeanor criminal damage to property charge.  SOUF ¶ 78.  These notes informed Phillips' good faith belief that Plaintiff's previous statements about her arrest and police report were false.  In further support, it is undisputed that Plaintiff was aware that she had a pending criminal damage to property charge.  SOUF ¶ 38.  Plaintiff failed to mention the pending criminal charge against her, instead claiming she was arrested because the detectives could not get a hold of her since she had changed her phone number.  SOUF ¶ 74.[8]

In her attempt to establish pretext, Plaintiff portrays Associate Relations Manager Phillips as a biased actor, who made the termination decision with retaliatory intent.  Plaintiff cites a cat's paw theory contending that Chris Krugman and Idol Rashid must also be held liable, because they relied on Phillips' findings without conducting their own investigation.  Doc. #59, pp. 43-44.  However, this argument entirely disregards the nature of Phillips' fact-finding.  Phillips relied on an unbiased, nonpartisan investigating detective that did not know Plaintiff or Plaintiff's employment history with Mars.  *See*, *e.g.*, *Hanson v. Colo. Judicial Dep't*, 564 F. App'x 916, 920-21 (10th Cir. 2014) (in establishing subordinate bias liability, "where an independent decision maker 'verifies the facts and does not rely on the biased source,' the plaintiff cannot use subordinate liability to establish causation").  Moreover, Plaintiff claims that because Phillips

---

[8] Plaintiff attempts to argue that Phillips was mistaken to assume Plaintiff had the "requisite legal knowledge" to explain why the bench warrant was issued against her.  Doc. #59, p. 41.  In support of her argument, Plaintiff presumes the purpose for Phillips' conversation with legal counsel where she has no sufficient basis to do so.  In any case, Plaintiff admitted to knowing (and having) a gun charge and a criminal damage to property charge against her, which is why the bench warrant was issued.  SOUF ¶ 74, 78.

became *aware* of the 2017 events involving Plaintiff, that this inherently means that Phillips herself acted with retaliatory intent and used pretextual reasons to terminate Plaintiff. Again, this theory belies the undisputed evidence, as Phillips' investigation notes reveal a "nonpartisan evaluation [that] cleanses the causal chain of any alleged bias." *Hanson*, 564 F. App'x at 920-21.

Plaintiff further attempts to establish pretext by arguing that Mars disparately treated Plaintiff in comparison to her fellow associate, Jacob Edwards. Doc. #59, p. 43. First, Plaintiff conflates the timeline of the undisputed facts as she attempts to show Mars' stated reasons for her termination were not honestly believed and made in good faith. *Lawson*, 463 F. Supp. 2d at 1283. Second, Plaintiff tries to compare Edwards' stated concerns about his safety to Plaintiff's false statements, which led to her termination. Doc. #59, p. 42-43. Plaintiff incorrectly argues that Phillips' reason for Plaintiff's termination was pretextual because "she did not assume Mr. Edwards had made false statements regarding Plaintiff and decide to terminate his employment." *Id.* This statement infers that Phillips assumed, without further evidence, that Plaintiff was making false statements—the evidence shows otherwise. Moreover, Phillips conducted an investigation into Edwards' complaints, of which the findings were inconclusive. ASOF ¶ 14, 15. On the other hand, Phillips received information from an unbiased, third-party detective to confirm that Plaintiff's statements were wholly inaccurate. SOUF ¶ 77-80. For these reasons, Plaintiff's allegations of disparate treatment fail to establish pretext.

The question is not whether Phillips, as a decisionmaker, "reasonably believed" that Plaintiff's statements regarding the police report were actually false, as Plaintiff states. Doc. #59, p. 42. Instead, the pertinent inquiry is "whether the defendant honestly believed in those reasons and acted in good faith." *Lawson*, 463 F. Supp. 2d at 1283. In lieu of any evidence, Plaintiff seeks to have the Court second-guess the non-retaliatory termination decision Mars made using the

information it had at the time.  As the Tenth Circuit has consistently held, it is not the court's role to retrospectively judge the wisdom, fairness, or correctness of an employers' termination decision. *See Lawson*, 463 F. Supp. 2d at 1283; *Simms*, 165 F.3d at 1330 (quoting *Verniero*, 705 F.2d at 390)).  Plaintiff has failed to prove Mars' actions were guided by anything other than a good faith and honest belief that Plaintiff lied during a Company investigation and, therefore, violated Mars' policies.  SOUF ¶ 93, 94.  Accordingly, each of Plaintiff's claims should be dismissed.

## V.    CONCLUSION

For the foregoing reasons, Mars respectfully requests that summary judgment be entered in its favor upon each of Plaintiff's claims and that this Court dismiss Plaintiff's claims with prejudice.

Date:   September 16, 2020          Respectfully Submitted,

/s/ *J. Phillip Gragson*
J. Phillip Gragson, #16103
Henson, Hutton, Mudrick, Gragson & Vogelsberg LLP
3649 SW Burlingame Road, Ste. 200
Topeka, KS  66111-2155
Telephone:  (785) 232-2200 x 223
Facsimile:   (785) 232-3344
Email:  jpgragson@hensonlawoffice.com

Thomas R. Davies, Esq., Pro Hac Vice
Laura Bailey Gallagher, Esq., Pro Hac Vice
Harmon & Davies, P.C.
2306 Columbia Ave.
Lancaster, PA  17603
Telephone: (717) 291-2236
Facsimile:  (717) 291-5739
tdavies@h-dlaw.com
lgallagher@h-dlaw.com

*Counsel for Defendant*
*Mars Wrigley Confectionery*

46

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing Defendant's Reply in Further Support of Its Motion for Summary Judgment was filed electronically via CM/ECF on this 16th day of September, 2020 and electronic notification was provided to:

Joshua P. Wunderlich, Esq.
Cornerstone Law Firm
8350 N. St. Clair Ave., Suite 225
Kansas City, MO  64151
jwunderlich@cornerstonefirm.com
*Attorney for Plaintiff*


/s/ J. Phillip Gragson
J. Phillip Gragson, #16103

47