## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **APRIL PFANNENSTIEL,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 19-02096-JAR** |
| **MARS WRIGLEY CONFECTIONARY US, LLC,** | |
| **Defendant.** | |

## MEMORANDUM AND ORDER

Plaintiff April Pfannenstiel brings this action against her former employer, Defendant Mars Wrigley Confectionary US, LLC ("Mars"), alleging retaliation under Title VII of the Civil Rights Act of 1964 and the Family and Medical Leave Act ("FMLA"), and retaliatory discharge under Kansas law. Before the Court is Mars's Motion for Summary Judgment (Doc. 53). The motion is fully briefed, and the Court is prepared to rule. For the reasons stated in more detail below, the Court denies in part and grants in part Mars's motion. Summary judgment is denied on Pfannenstiel's Title VII retaliation claim. Summary judgment is granted on Pfannenstiel's FMLA retaliation and retaliatory discharge claims.

## I.        Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[1] In applying this standard, the Court views the evidence and all reasonable inferences therefrom

---

[1] Fed. R. Civ. P. 56(a).

in the light most favorable to the nonmoving party.[2]  "There is no genuine [dispute] of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party."[3]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4]  A dispute of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[5]

The moving party initially must show the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law.[6]  In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial need not negate the nonmovant's claim; rather, the movant need simply point out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim.[7]

Once the movant has met the initial burden of showing the absence of a genuine dispute of material fact, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[8]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[9]  Rather, the nonmoving party must "set forth specific facts that would be

---

[2] *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010) (citing *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1210 (10th Cir. 2008)).

[3] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986)).

[4] *Wright ex rel. Tr. Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[5] *Adler*, 144 F.3d at 670 (citing *Anderson*, 477 U.S. at 248).

[6] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[7] *Adams v. Am. Guarantee & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[8] *Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[9] *Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[10]  The nonmovant must identify these specific facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[11]  A nonmovant "cannot create a genuine issue of material fact with unsupported, conclusory allegations."[12]  A genuine issue of material fact must be supported by "more than a mere scintilla of evidence."[13]  Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[14]

## II.     Factual Background

### A.     Evidentiary Objections

Before reciting the uncontroverted facts in this matter, the Court briefly addresses Pfannenstiel's objections to four of Mars's statements of fact.  Summary judgment evidence need not be "submitted 'in a form that would be admissible at trial.'"[15]  But "the content or substance of the evidence must be admissible."[16]  Under Fed. R. Civ. P. 56(c)(2), a party may object on this basis—that the material "cannot be presented in a form that would be admissible in evidence." As the Advisory Committee's notes to the 2010 Federal Rule amendments explain: "The burden

---

[10] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 670–71); *see Kannady*, 590 F.3d at 1169.

[11] *Adler*, 144 F.3d at 671.

[12] *Tapia v. City of Albuquerque*, 170 F. App'x 529, 533 (10th Cir. 2006) (citing *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004)).

[13] *Black v. Baker Oil Tools, Inc.*, 107 F.3d 1457, 1460 (10th Cir. 1997) (quoting *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1539 (10th Cir. 1993)).

[14] *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

[15] *Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016) (quoting *Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006)).

[16] *Id.* (quoting *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006)).

is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated."[17]

Pfannenstiel objects to Mars's Statements of Fact 77 through 80 on the basis that they contain inadmissible hearsay, meaning a statement that the declarant does not make while testifying at the current trial or hearing and that a party offers to prove the truth of the matter asserted.[18]  Hearsay is inadmissible except as provided by law,[19] and hearsay within hearsay is excluded unless each part of the combined statement conforms with an exclusion from or exception to the rule against hearsay.[20]

Mars's Statements of Fact 77 through 80 rely on the deposition testimony of Associate Relations Manager Nichole Phillips discussing statements made to her by Topeka, Kansas Police Detective Davies.  While Fed. R. Civ. P. 56(c)(1)(A) permits Mars to support its factual assertions at the summary judgment stage by citing to deposition testimony, the content or substance of the deposition testimony must be otherwise admissible.[21]

Here, Mars offers Detective Davies's statements not for the truth of the matter asserted but solely for their effect on Phillips, a proper nonhearsay use.  "If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay."[22]  A statement offered to show its effect on the

---

[17] Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment; *see also Brown*, 835 F.3d at 1232 ("The requirement is that the party submitting the evidence show that it will be possible to put the information, the substance or content of the evidence, into an admissible form." (quoting 11 James Wm. Moore et al., Moore's Federal Practice–Civil § 56.91 (3d ed. 2015))); *O'Connor v. Williams*, 640 F. App'x 747, 750 (10th Cir. 2016).

[18] Fed. R. Evid. 801(c).

[19] Fed. R. Evid. 802 ("Hearsay is inadmissible unless any of the following provides otherwise: a federal statute; these rules; or other rules prescribed by the Supreme Court.").

[20] Fed. R. Civ. P. 805.

[21] *See* 10A Charles Alan Wright et al., Federal Practice and Procedure § 2722, Westlaw (database updated Oct. 2020).

[22] Fed. R. Evid. 801(c) advisory committee's note.

listener is therefore not hearsay.[23]  Thus, the statements by Detective Davies contained in Phillips's deposition testimony are admissible for nonhearsay purposes.

### B.      Uncontroverted Facts

With the above rules of law and evidence in mind, the following material facts are either uncontroverted, stipulated to, or viewed in the light most favorable to Pfannenstiel.

Mars manufactures and distributes confectionary and snack food products, including M&Ms Peanut, M&Ms Caramel, Snickers, and Twix.  In May 2016, Mars hired Pfannenstiel as a Wrapper Operator for Snickers in the Filled Bar Department at its Topeka, Kansas facility.  The Filled Bar Department was divided into three teams that each worked different shifts.  Each team had a packaging side and a processing side.  Pfannenstiel worked on the packaging side.

### *March 2017 Sexual Harassment Complaint*

In March 2017, Pfannenstiel reported that two of her supervisors, Team Leads James Gustin and Travis Bussen, sexually harassed her.  Mars investigated her claims, found them credible, and terminated the employment of Gustin and Bussen.

Between March 14 and April 2, 2017, Pfannenstiel took paid medical leave offered by Mars.  While Pfannenstiel was on leave, Mars hired a new Team Lead, Benjamin Arteaga, Sr.  Pfannenstiel joined his team when she returned to work.

### *September 2017 Coworker Complaints*

In September 2017, Pfannenstiel and two of her coworkers, Jacob Edwards and Jordan Stilley, made complaints against each other to Arteaga.  Pfannenstiel complained that she did not feel comfortable working with Stilley or Edwards and that Edwards made comments about how

---

[23] *Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1434 (10th Cir. 1993).

Pfannenstiel was not safe to work with, while Edwards and Stilley complained that Pfannenstiel took extra breaks.

Arteaga held a meeting with Pfannenstiel, Edwards, and Stilley to discuss the complaints about Pfannenstiel's alleged extra breaks.  During the meeting, Stilley shouted and cursed at Pfannenstiel, accusing her of getting Gustin and Bussen fired.  Stilley said he was upset because he thought Pfannenstiel received special treatment because of "a lawsuit" she "holds over Mars."[24]  Because of his conduct at the meeting, Stilley was fired.

Shortly after the meeting, Edwards approached Value Stream Manager Shirley Ha to complain about Pfannenstiel.  Edwards told Ha that "Jordan [Stilley] was his friend and that he agree[d] with [Stilley], that [Pfannenstiel] ha[d] abused some form of policy, and that this ha[d] been going on for a while."[25]  Ha told Edwards she would look into it and speak with Arteaga to understand the situation.  When Ha spoke with Arteaga, he said that he was aware of Edwards's concerns and that Edwards was "really close" to Stilley.[26]  Arteaga also said that he had explained to Edwards and Stilley that Pfannenstiel's absences were "not something he [could] discuss with them."[27]

### FMLA Leave

In September 2017, Mars offered Pfannenstiel intermittent FMLA leave.  Shortly thereafter, Pfannenstiel began taking FMLA leave for anxiety, and between September 27 and October 3, 2017, Pfannenstiel took FMLA leave for her carpal tunnel syndrome.

---

[24] Doc. 59-7 at 3.

[25] Doc. 59-10 at 8.

[26] *Id.*

[27] *Id.*

Between October 4 and November 22, 2017, Pfannenstiel worked a total of nine shifts. Pfannenstiel was on FMLA medical leave from November 2 to November 10, 2017 for her generalized anxiety disorder, and again from November 27, 2017 to February 12, 2018 for carpal tunnel surgery on both hands.

On November 8, 2017, while Pfannenstiel was on FMLA leave, Arteaga drafted a "Final Written Warning" regarding her attendance for Associate Relations Manager Idol Rashid to review.  The warning was prompted by an automatic report generated by Mars's time-keeping system, under which employees are only allowed a certain number of points for absences before the system sends an automatic warning to the manager.  When Pfannenstiel received the Final Written Warning, she informed Arteaga that "it was incorrect" because it included points based on her FMLA leave.[28]  Pfannenstiel and Arteaga reviewed her attendance record together, and after confirming the error, Arteaga asked Regional Nurse Case Manager Jonette Penton, who is involved in administering FMLA leave for associates and coding time entries into the time-keeping system, to correct Pfannenstiel's records.

On February 2, 2018, while Pfannenstiel was on FMLA leave, Ha sent an email to Rashid stating: "[Pfannenstiel] has consistently failed to provide her [FMLA] paperwork in time.  Is it really acceptable to continue in this manner?"[29]  Rashid responded that "[Penton] followed the correct response of escalating [Pfannenstiel's] failures with the letter that was sent out and we will need to continue to monitor it with Legal's help."[30]  He also wrote, "It's unfortunate that she

---

[28] Doc. 63-4 at 5.

[29] Doc. 59-16 at 2.

[30] *Id.*

is not abiding by the expectations in the process while we are providing her this benefit and I would not call it acceptable."[31]

### *Edwards's February 2018 Complaints*

Pfannenstiel returned to work from FMLA leave on February 13, 2018. The next day, Edwards sent an email to Rashid, stating that he and other coworkers were upset because they found out that Pfannenstiel had "been charged with several crimes dating back to 2017," and that they did not feel comfortable or safe because Mars did not give them notice of the crimes.[32] Two days later, Edwards sent Rashid a follow-up email. Rashid later learned that the charges against Pfannenstiel had been dismissed. Because Edwards provided medical documentation stating he did not feel safe and requested that he be moved to a different team than Pfannenstiel as an accommodation, Mars permitted him to switch teams.

Pfannenstiel subsequently met with Ha to discuss her workplace concerns. During this meeting, Pfannenstiel told Ha that she felt isolated from her team, and there were "[s]till comments around, from her team, [that] she was out a lot on FMLA" leave, and that "the commentary is that [Edwards] moved away because of her."[33]

### *Work-Related Injury*

On April 21, 2018, Pfannenstiel sustained a work-related injury. She slipped on a hair net in the locker room and strained her back. Under Mars's policy, when an associate sustains a work-related injury and is sent to a physician for care, the associate must undergo a post-accident drug test. Pursuant to this policy, Pfannenstiel took a post-accident drug test. Pfannenstiel's drug sample was sent to Mars's drug testing contractor, Outcome, LLC.

---

[31] *Id.*

[32] Doc. 59-8 at 2.

[33] Doc. 59-10 at 9–10.

On April 23, 2018, Penton received an email from Outcome, LLC that indicated Pfannenstiel's drug sample "would most likely ship to the lab [that day] and be there [the next] morning."[34]  The next day, Penton responded: "Any updates on arrival of this one.  The powers that be are inquiring."[35]  Arteaga and Ha needed to know the drug test results for staffing purposes, so that they could anticipate when Pfannenstiel would return to work.  It is common for Penton to receive requests from management for the status of drug tests.

Pfannenstiel returned from an approved leave of absence due to her work-related injury on April 30, 2018.

In early May 2018, Penton sent an email to Mars's workers' compensation occupational health provider regarding the scheduling of treatment for Pfannenstiel's work-related injury.  In that email, Penton noted that "[t]here are also performance[-]based issues for this associate."[36]  But Penton was not responsible for performance-related discipline, nor was the workers' compensation occupational health provider.

In June 2018, Mars's workers' compensation insurance provider, Liberty Mutual, advised Penton that Pfannenstiel's last visit for medical treatment related to her work-related injury was May 23, 2018, and that it was closing her file because its attempts to reach her were unsuccessful.

### Changes in Associate Relations Managers

Between April 9 and May 25, 2018, Rashid was on paternity leave.  During that period, another Associate Relations Manager, Nichole Phillips, covered his responsibilities and duties at the Topeka facility.

---

[34] Doc. 59-1 at 2.

[35] *Id.*

[36] Doc. 59-2 at 2.

On April 30, the day Pfannenstiel returned to work from her leave of absence related to her injury, Edwards complained about Pfannenstiel giving him a "death stare" and making comments about changing teams.  Again, Edwards claimed he did not feel safe at work because of Pfannenstiel.  Because Rashid was on leave, Phillips investigated Edwards's allegations.  This was Phillips's first exposure to Pfannenstiel and to the dynamic between Pfannenstiel and Edwards.  After looking into the complaints, Phillips's investigation was inconclusive because of conflicting accounts from witnesses, so Phillips simply told Pfannenstiel and Edwards to stay away from each other.

In the course of dealing with Edwards's complaint, Phillips learned that Edwards had previously requested, and was granted, the accommodation that he be moved to a different team than Pfannenstiel.  Phillips testified that her understanding of why Edwards made this request was that "[h]e believed that she was a dangerous person and hung out with dangerous people."[37]

### May 2018 Police Report

On May 18, 2018, a police report was filed with the Topeka Police Department alleging that Pfannenstiel had talked about "wanting to kill people, being involved in drive-by shootings, and hanging out with a killer."[38]

On May 22, a detective from the Topeka Police Department came to Mars's Topeka, Kansas facility and asked to speak with Pfannenstiel, but Pfannenstiel was not there.  Detectives also went to Pfannenstiel's home and left a card.  Arteaga called Phillips to inform her that a detective was on site that wanted to question Pfannenstiel.  Phillips then called Pfannenstiel, who

---

[37] Doc. 59-5 at 17.

[38] Doc. 59-15 at 2.

confirmed that a detective wanted to question her.  Pfannenstiel said that she "wanted to take the night and connect the following day."[39]

That same morning, at around 10 a.m., Pfannenstiel sent the following text message to Arteaga: "Please call me when you can.  The detective called me back.  Said he needs me to come down to [the] police station about some accusations that had been made against me from a possible coworker."[40]  Pfannenstiel then sent him another text message: "I don't trust this and I know I'm probably going to end up in jail today.  I have a bad feeling and I haven't even done anything.  I guess a lot more was supposedly said.  The shooting up the place was just one of them."[41]  Later that day, Pfannenstiel voluntarily presented herself to law enforcement.  Unrelated to the May 18 police report, officers arrested Pfannenstiel for failing to appear for a hearing related to a prior misdemeanor charge of criminal damage to property.  She was released the same day.

On May 23, Phillips called Pfannenstiel.[42]  According to Phillips, Pfannenstiel said that local law enforcement contacted her "regarding a complaint that was made against her from – who they told her came from Jacob Edwards about her involvement with somebody who had just been charged with murder."[43]  In her deposition, Phillips testified:

---

[39] Doc. 54-10 at 8.

[40] Doc. 59-4 at 13.

[41] Doc. 54-6 at 15.

[42] Pfannenstiel attempts to controvert the date of this phone call.  She alleges that the call took place a few days later, citing her deposition testimony as support.  But Pfannenstiel previously stipulated to this fact in the Pretrial Order, and the Court therefore treats it as uncontroverted for summary judgment purposes.  *See Grabbe v. Quest Diagnostics Inc.*, No. 08-2281, 2010 WL 11627479, at *3 (D. Kan. May 14, 2010); *see also Jonker v. Melvin Simon & Assocs., Inc.*, No. 86-1654, 1989 WL 31402, at *4 (D. Kan. Mar. 1, 1989) (holding that a party's decision to stipulate to facts in the pretrial order is a decision to waive any challenges or defenses to that stipulated fact, because "[t]o allow defendants to still assert these issues would render meaningless the literal terms of their stipulation").

[43] Doc. 54-10 at 9.

> I could tell [Pfannenstiel] was upset, and . . . I kind of just let her
> go and rant, and so during that call she had kind of backed me up
> as far as informing me of some of the history of how she believes
> people don't like her on site, specifically Mr. Edwards, because
> she got some of his friends fired.  She said that . . . it was made
> aware to her by a detective that she was listed in a police report as
> someone who was going to shoot up Mars with Rahnel [Rayford]
> and that she had some type of link – Jacob had mentioned in the
> police report that she had some type of link to this person, and it
> just so happens that he killed somebody, and now I'm being
> questioned.[44]

Pfannenstiel explained that she knew Rayford because they were former coworker at Mars, and she previously sold him a car.  Pfannenstiel also informed Phillips that she had been arrested because she changed her phone number and, when detectives could not contact her, a bench warrant was issued for her arrest.

Pfannenstiel also communicated with Arteaga that morning.  At around 10 a.m., she sent him the following text message:

> I am heading to the police station now to see if I can get a copy of
> the report that was made.  I talked to the detective and he is going
> to guide me thru the process of getting [Edwards] charged with
> false reporting.  I told you I'm done with playing these little games
> that interfere with my daily life.  [I]t's not fair and I need him to
> leave me alone.[45]

Pfannenstiel was placed on paid leave pending Phillips's investigation into the allegations in the police report.

Phillips subsequently spoke with Detective Davies, the law enforcement officer that visited the Topeka facility on May 22.  According to Phillips, after she summarized her conversation with Pfannenstiel, Detective Davies said that "about 80 percent" of what

---

[44] *Id.* at 10–11.

[45] Doc. 59-14 at 2.

Pfannenstiel told Phillips was true.[46]  Detective Davies said that he did not tell Pfannenstiel, and could not tell Phillips, "who the police report came from, because it came in from another jurisdiction and that person wanted to remain anonymous,"[47] and added that he "[could] tell what the other detective said."[48]  Detective Davies also said that he told Pfannenstiel to contact him, but instead Pfannenstiel went to "Shawnee County to clear up a previous bench [warrant] that she had for failure to appear" in court for her misdemeanor criminal damage to property charge.[49]

Around this time, Phillips learned about Pfannenstiel's prior sexual harassment claims against Gustin and Bussen, and she received an email from Rashid on May 24, 2018 outlining the September 2017 incident involving Edwards and Stilley.

### Termination of Pfannenstiel's Employment

When Rashid returned from paternity leave, Phillips briefed Rashid on the situation and informed him that she believed Pfannenstiel made false statements based on her conversation with Detective Davies.  She recommended that Pfannenstiel's employment be terminated, and Rashid agreed.  Rashid and Phillips then discussed the recommendation with their manager, Senior Associate Relations Manager Christopher Krugman.

On May 30, 2018, Pfannenstiel's employment was terminated.

At the time of Pfannenstiel's termination and up to the point of discovery in this matter, Rashid and Phillips, the decisionmakers in the termination of Pfannenstiel's employment, as well as Krugman, were not aware that Pfannenstiel had an existing workers' compensation claim

---

[46] Doc. 54-10 at 14.

[47] *Id.* at 78.

[48] Doc. 54-2 at 3.

[49] Doc. 54-10 at 14.

against Mars, and Penton never told them about Pfannenstiel's work-related injury or her workers' compensation claim. Associate Relations Managers are not involved with workers' compensation claims.

Mars states that it terminated Pfannenstiel's employment because she made false statements during a company investigation, which is an integrity issue in violation of Mars's policies. In particular, Phillips found that Pfannenstiel lied about (1) the identity of the person who filed the police report; (2) the substance of the police report; and (3) the reason for her arrest. Phillips did not wait to receive a copy of the police report prior to terminating Pfannenstiel's employment.

The day after her termination, Pfannenstiel gave Phillips and Rashid a copy of a one-page "Non Criminal Incidents Report," issued on May 29, confirming that Edwards filed the police report.[50] The Non Criminal Incidents Report, prepared by Detective Blood, states that on May 18, "Mr. Jacob Andrew Edwards" reported "what he believed to be disturbing comments made by a co-worker, April Pfannenstiel . . . while they were both working at the Mars plant in Topeka Kansas. According to Edwards, Pfannenstiel had talked about wanting to kill people, being involved in drive-by shootings, and hanging out with a killer."[51] The Non Criminal Incidents Report also notes that Detective Blood interviewed Pfannenstiel, who explained that Edwards "is angry with her because of an ongoing issue she has had with sexual harassment involving two of their co-workers. The two have been . . . removed from their positions which upset Edwards, and Pfannenstiel believes this . . . has led to him making the statement to law enforcement."[52] The Non Criminal Incidents Report concludes that Edwards's allegations lacked merit: "I see no

---

[50] *See* Doc. 59-15.

[51] *Id.* at 2.

[52] *Id.* at 2–3.

evidence that would lead me to prolong this case.  Nothing Mr. Edwards said to me leads me to believe she poses a threat to him or anyone else.  This case will be closed at this time."[53]

    Mars never disciplined Edwards for filing the police report against Pfannenstiel.

## III.  Discussion

    Pfannenstiel brings three claims against Mars: (1) retaliation under Title VII; (2) retaliation under the FMLA; and (3) retaliatory discharge for filing a workers' compensation claim under Kansas law.  Mars moves for summary judgment on each claim against it, and the Court addresses each in turn.

### A.    Retaliation Under Title VII

    Title VII forbids employers from retaliating against an employee for opposing an employment practice made unlawful by Title VII.[54]  In the absence of direct evidence of retaliation, courts assess retaliation claims under the familiar *McDonnell Douglas Corp. v. Green*[55] burden-shifting framework.[56]  Under *McDonnell Douglas*, the plaintiff initially bears the burden to establish a prima facie case of retaliation.[57]  The plaintiff's burden of establishing a prima facie case is "not onerous."[58]  If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a facially nondiscriminatory reason for its actions.[59]  If the defendant articulates a legitimate nondiscriminatory reason, the burden shifts back to the plaintiff

---

[53] *Id.* at 3.

[54] 42 U.S.C. § 2000e-3(a); *Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1054 (10th Cir. 2009).

[55] 411 U.S. 792, 802–05 (1973).

[56] *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011).

[57] *McDonnell Douglas*, 411 U.S. at 802.

[58] *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981); *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013) (citing *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005)).

[59] *McDonnell Douglas*, 411 U.S. at 802.

to present evidence from which a jury might conclude that the defendant's proffered reason is pretextual, or "unworthy of belief."[60]

Mars argues on summary judgment that Pfannenstiel cannot establish a prima facie case of Title VII retaliation, and that even if she can, Mars has articulated a nonretaliatory reason for her termination and Pfannenstiel cannot demonstrate that this reason is pretext for retaliation. Pfannenstiel contends that genuine issues of material fact preclude summary judgment.

### 1.    Prima Facie Case

To establish a prima facie case of retaliation, a plaintiff must show that: (1) they engaged in protected opposition to an unlawful employment practice; (2) they suffered an adverse employment action contemporaneously with or subsequent to their protected opposition that a reasonable employee would have found materially adverse; and (3) a causal connection exists between the protected activity and the materially adverse action.[61]  Mars does not dispute that Pfannenstiel suffered a materially adverse action when Mars terminated her employment, but argues that two of three Pfannenstiel's three harassment complaints are not protected opposition and that Pfannenstiel cannot establish the requisite causal connection.

### a.    Protected Opposition

"Protected opposition can range from filing formal charges to voicing informal complaints to superiors."[62]  An employee need not show that the challenged conduct violates Title VII; the employee need only show a reasonable, good faith belief that the underlying employment practice was unlawful, even if no Title VII violation actually occurred.[63]  "Although

---

[60] *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1165 (10th Cir. 1998) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995)).

[61] *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006).

[62] *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004).

[63] *Id.* at 1015–16 (citing *Crumpacker v. Kan. Dep't of Human Res.*, 338 F.3d 1163, 1171 (10th Cir. 2003)).

16

no magic words are required," the employee must convey to the employer their concern about a Title VII violation.[64]

Mars concedes for purposes of summary judgment that Pfannenstiel engaged in protected opposition in March 2017, when she reported that Gustin and Bussen sexually harassed her. However, Mars argues that Pfannenstiel did not engage in protected opposition in September 2017, when she complained to Arteaga about Edwards and Stilley, or in May 2018, when she complained to Phillips that Edwards filed a false police report against her.  Pfannenstiel asserts that these complaints are both protected opposition sufficient to support the first element of her prima facie retaliation case because they constitute reasonable, "good faith reports of retaliatory harassment."[65]

Opposition to an employer's conduct is only protected if it opposes an employment practice made unlawful by Title VII.[66]  Title VII's anti-retaliation provision renders retaliation an unlawful employment practice.[67]  And, accordingly, a complaint about retaliation or retaliatory harassment for engaging in prior protected activity may itself constitute protected opposition to an unlawful employment practice.[68]  Mars does not contest that a complaint about retaliatory harassment may constitute a protected activity.  Rather, Mars contends that neither Pfannenstiel's

---

[64] *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008).

[65] Doc. 59 at 43–44.

[66] *Anderson v. Acad. Sch. Dist. 20*, 122 F. App'x 912, 916 (10th Cir. 2004).

[67] 42 U.S.C. § 2000e-3(a).  Retaliatory harassment is a theory of retaliation.  *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1264 (10th Cir. 1998).

[68] *See Clark v. Cache Valley Elec. Co.*, 573 F. App'x 693, 702 (10th Cir. 2014) (recognizing in dicta that a complaint about retaliation is protected activity only if the plaintiff shows a reasonable, good-faith belief that the retaliation constitutes an unlawful employment practice); *Furr v. Ridgewood Surgery & Endoscopy Ctr., LLC*, 192 F. Supp. 3d 1230, 1249 (D. Kan. 2016) (finding that an employee's complaint about a hostile work environment was protected opposition because the complaint "could be seen as a complaint about retaliation"); *accord Fields v. Locke Lord Bissell & Liddell LLP*, No. 07-2984, 2009 WL 2341981, at *16 (N.D. Ga. July 28, 2009) ("[A] complaint alleging 'retaliation' can be considered a protected activity under Title VII [if] the act of 'retaliation' was allegedly taken against her on the basis of some complaint alleging unlawful discrimination that is prohibited under Title VII."); .

September 2017 complaint nor her May 2018 complaint conveyed any concern that a Title VII violation occurred.

### September 2017 Complaint

The Court agrees that Pfannenstiel did not engage in protected opposition in September 2017.  Pfannenstiel complained to Arteaga that Edwards and Stilley made comments about how she was not safe to work with and took extra breaks.  Pfannenstiel expressed her frustration about their conduct, but Pfannenstiel never conveyed, formally or informally, any concerns that she was being harassed in retaliation for prior protected activity under Title VII.  A complaint that merely voices a personal grievance will not suffice.[69]  Thus, Pfannenstiel has not met her burden of showing she engaged in protected opposition when she complained about Edwards and Stilley in September 2017.

### May 2018 Complaint

Unlike in September 2017, Pfannenstiel sufficiently conveyed to Phillips in May 2018 that her complaint about Edwards opposed retaliatory harassment.  During a phone conversation about a police report filed against her, Pfannenstiel told Phillips that she believed Edwards filed the police report "because she got some of his friends fired."[70]  Phillips admits that she knew of the three employees whose terminations involved Pfannenstiel: Gustin and Bussen, who were both terminated after Pfannenstiel reported that they sexually harassed her, and Stilley, who was fired after he shouted and cursed at Pfannenstiel for causing the Gustin's and Bussen's terminations.  Pfannenstiel also offered a detailed account of Edwards's conduct toward her at work, which she perceived as retaliatory harassment.  Thus, Pfannenstiel gave Phillips adequate

---

[69] *Wirtz v. Kan. Farm Bureau Servs., Inc.*, 274 F. Supp. 2d 1198, 1212 (D. Kan. 2003).

[70] Doc. 54-10 at 10.

notice that her complaint opposed perceived harassment in retaliation for reporting sexual harassment—a protected activity.

In addition to engaging in activity that opposed the challenged conduct, Pfannenstiel must show that she had a reasonable, good-faith belief that Edwards's conduct constituted retaliatory harassment when she complained to Phillips.[71]  The "'reasonable good-faith belief' test has both subjective and objective components.  'A plaintiff must not only show that [s]he *subjectively* (that is, in good faith) believed that [her] employer was engaged in [an] unlawful employment practice[], but also that [her] belief was *objectively* reasonable in light of the facts and record presented.'"[72]  Mars contends for the first time in its reply brief that Pfannenstiel did not make her complaint in good faith because Pfannenstiel had no proof that Edwards filed the police report at the time, and Phillips and Rashid only received the Non Criminal Incidents Report confirming that Edwards filed the police report the day after they terminated Pfannenstiel's employment.  While courts generally "do not consider arguments raised for the first time in a reply brief,"[73] the Court would reject Mars's argument even if raised in its opening brief.

A reasonable jury could find that Pfannenstiel subjectively believed in good faith that Edwards filed the police report in retaliation for her prior sexual harassment complaints, even assuming she lacked proof of it.  Pfannenstiel sent a text message to Arteaga shortly after she learned about the police report, informing him that she spoke with a detective who told her that a

---

[71] *See Crumpacker v. Kansas Dep't of Human Res.*, 338 F.3d 1163, 1171 (10th Cir. 2003).

[72] *Clark*, 573 F. App'x at 701 (quoting *Little v. United Tech., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997)).

[73] *Lynch v. Barrett*, 703 F.3d 1153, 1160 n.2 (10th Cir. 2013); *see, e.g.*, *Parker v. Delmar Gardens of Lenexa, Inc.*, No. 16-CV-2169-JWL, 2017 WL 4284968, at *4 (D. Kan. Sept. 27, 2017) (declining to address the reasonableness of the plaintiff's belief that she reported conduct prohibited by Title VII because the defendant raised the issue for the first time in its reply brief).

possible coworker filed the police report and asked her to go to the police station.  The next day, she texted Arteaga that she spoke with a detective who would "guide [her] through the process of getting [Edwards] charged with false reporting."[74]  Pfannenstiel also explained in detail to both Phillips and Detective Blood, the detective who filed the Non Criminal Incidents Report, why she believed that Edwards filed the police report to retaliate against her for complaining about sexual harassment.  A reasonable jury could infer, particularly in light of Pfannenstiel's distress and reference to legal action, that she subjectively believed in good faith that Edwards filed the police report in retaliation for her earlier protected activity.

To determine whether Pfannenstiel's good-faith belief was objectively reasonable, the Court looks to the underlying substantive law.[75]  An actionable retaliatory harassment claim requires a showing that the conduct is "sufficiently severe or pervasive to constitute a 'materially adverse' action; that is, the conduct must be sufficiently severe or pervasive that it could well dissuade a reasonable worker from engaging in protected activity."[76]  The Court finds, and Mars does not dispute, that filing a police report that accuses a coworker of discussing a desire to murder, of being involved in drive-by shootings, and of hanging out with a murderer is conduct that, on its own, is sufficiently severe to dissuade a reasonable person from engaging in protected activity.[77]  Thus, a jury could conclude that Pfannenstiel's belief that she opposed retaliatory harassment when she told Phillips that she believed Edwards filed the police report against her "because she got some of his friends fired" was objectively reasonable.

---

[74] Doc. 59-14 at 2.

[75] *See Clark*, 573 F. App'x at 701 (citing *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270–71 (2001) (per curiam)).

[76] *Adcox v. Brennan*, No. 15-CV-9258-JWL, 2017 WL 2405326, at *7 (D. Kan. June 2, 2017).

[77] *See MacKenzie v. City & Cnty. of Denver*, 414 F.3d 1266, 1280 (10th Cir. 2005) ("[C]ourts should filter out offhand comments, and isolated incidents (unless extremely serious)."), *abrogated on other grounds by Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166 (10th Cir. 2018).

Viewed in the light most favorable to Pfannenstiel, a reasonable jury could find that she engaged in protected opposition not only in March 2017, when she reported sexual harassment, but also in May 2018, when she complained that Edwards filed a police report in retaliation for her reporting sexual harassment.  Pfannenstiel therefore meets her non-onerous burden of establishing the protected-opposition element of her prima facie case.

### b.    Causal Connection

Satisfying the causal-connection element of a prima facie case of retaliation requires "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action."[78]  But unless the adverse action "is *very closely* connected in time to the protected activity, the plaintiff must rely on additional evidence beyond mere temporal proximity to establish causation."[79]  While the Tenth Circuit has not drawn a bright-line rule on the temporal proximity required to establish causation, the court has explained that "if the adverse action occurs in a brief period up to one and a half months after the protected activity, temporal proximity alone will be sufficient to establish the requisite causal inference"; but "if the adverse action occurs three months out and beyond from the protected activity, then the action's timing alone will not be sufficient to establish the causation element."[80]

Mars argues that Pfannenstiel cannot establish a causal connection between her protected activity and her termination because Mars fired her on May 30, 2018, approximately fourteen months after her March 2017 sexual harassment complaint.  Mars is correct that Pfannenstiel's

---

[78] *Burrus v. United Tel. Co. of Kan., Inc.*, 683 F.2d 339, 343 (10th Cir. 1982) (citations omitted); *see also O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001).

[79] *Miller v. Auto Club of N.M., Inc.*, 420 F.3d 1098, 1121 (10th Cir. 2005) (quoting *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231 (10th Cir. 2004)), *abrogated in part on other grounds by Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53 (2006).

[80] *Conroy v. Vilsack*, 707 F.3d 1163, 1181–82 (10th Cir. 2013) (first citing *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999); and then citing *Meiners*, 359 F.3d at 1231).

firing is too temporally remote from her sexual harassment complaint to support an inference of causation.  But Pfannenstiel also engaged in protected activity on May 23, 2018, when she complained about the police report to Phillips.  The close temporal proximity between that complaint and her termination—merely seven days—is sufficient, on its own, to raise an inference of causation.

Thus, the Court finds that Pfannenstiel meets her de minimis prima facie burden and proceeds to consider the rest of the *McDonnell Douglas* test below.

### 2.      Legitimate, Non-Retaliatory Reason for Termination

Mars contends that Pfannenstiel was terminated for dishonesty in the course of a company investigation of the police report, which is an integrity issue in violation of Mars's policies.  Mars cites three false statements in particular, all of which Pfannenstiel made to Phillips during the May 23, 2018 call: (1) that Detective Davies informed her that Edwards filed the police report; (2) that Edwards reported that Pfannenstiel and Rayford hate Mars and planned to "shoot up the property";[81] and (3) that Pfannenstiel was arrested because she changed her phone number and detectives could not contact her to speak with her about the allegations in the police report.  This fulfills Mars's burden of articulating a legitimate, non-retaliatory reason for Pfannenstiel's termination.  The burden therefore shifts back to Pfannenstiel to show by a preponderance of the evidence that the non-retaliatory reason offered is pretextual.

### 3.      Pretext

A plaintiff may show pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons

---

[81] Doc. 54-10 at 22.

for its action that a reasonable factfinder could rationally find them unworthy of credence."[82]
Pretext can also be demonstrated by "direct evidence that the proffered rationale is false, or that
the plaintiff was treated differently from similarly-situated employees."[83]  "The critical question
regarding this aspect of the *McDonnell Douglas* rubric is whether 'a reasonable factfinder could
rationally find [the employer's rationale] unworthy of credence and hence infer that the employer
did not act for the asserted [non-retaliatory] reasons.'"[84]  The Court examines "the facts as they
appear *to the person making the decision*."[85]  Critically, the Court's role is not "to ask whether
the employer's decision was 'wise, fair or correct, but whether [it] honestly believed [the
legitimate, nondiscriminatory] reasons [it gave for its conduct] and acted in good faith on those
beliefs.'"[86]  In making this determination, the Court "must consider the evidence as a whole."[87]

Mars contends it fired Pfannenstiel for "making repeated false statements" in the course
of an investigation,[88] that is, during a phone call with Phillips about the police report.  Mars
argues that Phillips honestly believed Pfannenstiel lied to her based on a conversation with
Detective Davies.  While Phillips and Rashid were the decisionmakers in the termination of
Pfannenstiel's employment, it is undisputed that Rashid, previously on paternity leave, relied

---

[82] *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1203 (10th Cir. 2006).

[83] *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1196 (10th Cir. 2011) (citing *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007)).

[84] *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1234 (10th Cir. 2015) (alterations in original) (quoting *Crowe*, 649 F.3d at 1196).

[85] *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1166 (10th Cir. 2007) (en banc) (quoting *Watts v. City of Norman*, 270 F.3d 1288, 1295 (10th Cir. 2001)).

[86] *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017) (alterations in original) (quoting *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010)).

[87] *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1250 (10th Cir. 2002) (citing *Washington v. Davis*, 426 U.S. 229, 242 (1976)).

[88] Doc. 54 at 21.

entirely on Phillips's account in agreeing to terminate Pfannenstiel's employment.[89]  The Court

finds that Pfannenstiel submits enough evidence to establish a genuine issue of material fact that

Mars's articulated reason for her termination was pretextual.

First, Mars alleges that Pfannenstiel lied when she told Phillips that Detective Davies

informed her Edwards filed the police report.  According to Phillips, she believed Pfannenstiel

lied because Detective Davies said that he did not tell Pfannenstiel who filed the police report

and that the individual wanted to remain anonymous.  In the Statement of Uncontroverted Facts

submitted with its Motion for Summary Judgment, however, Mars does not claim Pfannenstiel

ever said that it was Detective Davies who told her that Edwards filed the report, and the record

would not support such an assertion.[90]  Phillips never stated in her deposition that Pfannenstiel

identified the detective she spoke with; rather, Phillips recounted that Pfannenstiel "said . . . it

was made aware to her by *a detective* that she was listed in a police report," and that "*the*

*detective* told her" Edwards filed the police report.[91]

The Court finds this significant because Phillips's own handwritten notes of her

conversation with Detective Davies explain that he "[could not] tell what the other detective

---

[89] There is some ambiguity in the record concerning whether Phillips and Rashid needed Krugman's affirmation to terminate Pfannenstiel's employment.  *See Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 715 (10th Cir. 2014) ("[I]f the supervisor's ability to make employment-related decisions is contingent on the independent affirmation of a higher-level manager or review committee, [the court must] focus on the motive of final decisionmaker.").  But it is undisputed by the parties that, although they consulted Krugman, Phillips and Rashid were the decisionmakers in the termination of Pfannenstiel's employment, and Court therefore treats them as such.  Accordingly, the Court does not address Pfannenstiel's argument in the alternative that Mars would be liable even if Phillips was not a decisionmaker under a "cat's paw" theory of liability.  *See EEOC v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 484 (10th Cir. 2006) (explaining that in the Title VII context, "'cat's paw' refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action" (citation omitted)).

[90] Rather, Mars's Statements of Uncontroverted Fact provide: "During Niki Phillips'[s] phone call with April Pfannenstiel, Ms. Pfannenstiel told Ms. Phillips that she had been contacted *by local law enforcement* regarding a complaint that was made against her by Jacob Edwards. . . .  April Pfannenstiel told Ms. Phillips that *the detective* told her that Jacob Edwards had made the police report."  Doc. 54 ¶¶ 69, 72 (emphasis added).

[91] Doc. 54-10 at 11 (emphasis added).

said."[92]  Phillips also admits that she did "[n]ot necessarily" think Pfannenstiel had even

discussed the police report with Detective Davies at that point.[93]  This evidence calls into

question whether Phillips honestly believed, based on Detective Davies's statement that he did

not tell Pfannenstiel who filed the police report, that Pfannenstiel's statement that "a detective"

told her Edwards filed the police report was false.

Second, Mars alleges that Pfannenstiel lied to Phillips about the substance of the police

report when she said it alleged that Pfannenstiel and Rayford "hate[] Mars and were going to

shoot up the property."[94]  Mars argues Phillips believed this was a lie because Detective Davies

said that the police report "had nothing to do with work.  There was no concern about

[Pfannenstiel] being on site.  It was about the people she hangs out with and the person

complaining just wanted [the] police to know."[95]  Phillips's explanation of why she believed that

the statement was false contains sufficient weaknesses and inconsistencies that a jury could

conclude she did not honestly hold that belief.

When asked during her deposition to confirm that Detective Davies said the police report

"had nothing to do with Mars," Phillips responded, "Correct."[96]  But she qualified that statement

with, "It was not work related.  Meaning nothing took place on site."[97]  Phillips subsequently

clarified that Detective Davies said the police report "had nothing to do with Mars" after she told

him she was concerned about the Topeka facility, and that she interpreted those words to mean

---

[92] Doc. 54-2 at 3.

[93] Doc. 54-10 at 15.

[94] *Id.* at 22.

[95] *Id.*

[96] *Id.* at 24.

[97] Id.

that "nothing occurred on site."[98]  In her call with Phillips, however, Pfannenstiel did not assert that anything had occurred at the Topeka facility or elsewhere.  Moreover, Phillips's handwritten notes of her conversation with Detective Davies show he confirmed that most of what Pfannenstiel told Phillips was true, and the notes do not list this claim by Pfannenstiel as one he said was false or otherwise could not confirm.  Thus, Phillips's deposition testimony explaining the context of Detective Davies's words and her subjective interpretation of those words, coupled with her handwritten notes, cast doubt on whether she honestly believed that Pfannenstiel's statement was false.

The summary judgment record draws into question whether Mars relied, honestly and in good faith, on Pfannenstiel's alleged false statements in terminating her employment.  The close temporal proximity between Pfannenstiel's phone call with Phillips and her termination could also contribute to a reasonable inference of pretext.[99]  Indeed, Phillips and Rashid did not even wait to receive a copy of the Non Criminal Incidents Report before terminating Pfannenstiel's employment.  If the factual disputes are construed in the light most favorable to Pfannenstiel, then Mars's assertion that Pfannenstiel's statements to Phillips during that one phone call formed the basis for her termination directly admits that Pfannenstiel's efforts to support her retaliatory harassment complaint were the but-for cause of her termination.[100]  In any event, a plaintiff

---

[98] *Id.* at 24–25.

[99] *See Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1172 (10th Cir. 2006) ("To raise a fact issue of pretext, [the plaintiff] must . . . present evidence of temporal proximity *plus* circumstantial evidence of retaliatory motive.").

[100] *See Reed v. Unified Sch. Dist. No. 233*, 299 F. Supp. 2d 1215, 1232 (D. Kan. 2004) (holding that evidence that a supervisor "in fact relied on [the] plaintiff's complaint of discrimination in deciding that he would not provide her with a recommendation . . . constitutes direct evidence of discrimination and renders any analysis of pretext unnecessary" (citing *Ramsey v. City & Cnty. of Denver*, 907 F.2d 1004, 1008 (10th Cir. 1990))).

facing summary judgment need "only establish that there is a genuine factual dispute with regard to the truth," and Pfannenstiel has made that requisite showing.[101]

To be sure, Pfannenstiel's two statements about the police report were not the sole statements Mars claims it relied on to fire Pfannenstiel; Mars also cites Pfannenstiel's statement that she was arrested because she changed her phone number and detectives could not reach her. But the Tenth Circuit has explained that "when the plaintiff casts substantial doubt on many of the employer's multiple reasons, the jury could reasonably find the employer lacks credibility . . . [and] need not believe the employer's remaining reasons."[102] And there may be cases where "multiple grounds offered by the defendant . . . are so intertwined, or the pretextual character of one of them so fishy and suspicious, that the plaintiff may [prevail]."[103]

Mars does not show that any one of the three statements would have been sufficient grounds for termination. Rather, Mars claims it terminated Pfannenstiel for "making repeated false statements during a Company investigation," and Mars relies on the three statements made during one phone call to justify its reason.[104] Thus, Mars's justifications are so intertwined that a reasonable jury could find that the pretextual character of Mars's two justifications casts doubt on all of them.

Pfannenstiel also submits evidence that Edwards, a similarly situated employee who did not engage in protected activity, was treated differently than her for arguably far more serious conduct. Pfannenstiel may show pretext with "evidence that [s]he was treated differently from other similarly-situated, nonprotected employees who violated work rules of comparable

---

[101] *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1126 (10th Cir. 2005).

[102] *Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 814 (10th Cir. 2000) (citation omitted).

[103] *Id.* (alteration in original) (quoting *Wilson v. AM Gen. Corp.*, 167 F.3d 1114, 1120 (7th Cir. 1999)).

[104] Doc. 54 at 21.

seriousness."[105]  "An employee is similarly situated to the plaintiff if the employee deals with the same supervisor and is subject to the 'same standards governing performance evaluation and discipline.'"[106]  "The infractions giving rise to the comparison need not involve exactly the same offenses; they need only be of comparable seriousness."[107]

Pfannenstiel points to two instances in which she alleges Edwards—who shared the same supervisor—was treated differently than her.  First, Pfannenstiel states that on April 30, 2018, Phillips investigated a complaint by Edwards claiming that Pfannenstiel gave him a death stare and made a hurtful comment about changing teams, and that he did not feel safe at work because of her.  Pfannenstiel argues that, despite receiving conflicting information from witnesses during the investigation of the complaint, Phillips did not assume Edwards lied about Pfannenstiel and terminate his employment; the two were merely told to stay away from each other.  Second, Pfannenstiel notes that Edwards was never terminated or otherwise subjected to any discipline for filing the police report, which the police found not to be credible.

Mars responds only to Pfannenstiel's assertion that she was treated differently than Edwards with respect to his April 30, 2018 complaint.  Mars does not dispute that the two employees are similarly situated but argues that they were not treated differently because the findings of Phillips's investigation of Edwards's complaint were inconclusive, whereas Phillips received information from an unbiased detective to confirm that Pfannenstiel's statements were false.  Mars also takes issue with Pfannenstiel's contention that Phillips merely assumed Pfannenstiel lied to her.

---

[105] *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 540 (10th Cir. 2014) (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000)).

[106] *Kendrick*, 220 F.3d at 1232 (quoting *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997)).

[107] *EEOC v. Flasher Co.*, 986 F.2d 1312, 1316 (10th Cir. 1992) (citing *McAlester v. United Air Lines*, 851 F.2d 1249, 1260 (10th Cir. 1988)).

Even if the Court agrees that Pfannenstiel's allegation of disparate treatment based on Phillips's handling of Edwards's April 30, 2018 complaint is insufficient to give rise to a showing of pretext, Pfannenstiel has presented other evidence indicating disparate treatment.  It is uncontroverted that Mars never terminated or disciplined Edwards for filing the police report, even after Phillips and Rashid received the Non Criminal Incidents Report confirming that Edwards filed the police report and concluding that his allegations had no merit.  In fact, it is unclear whether Mars even investigated Edwards after receiving the Non Criminal Incidents Report.  In other words, Edwards faced no repercussions for filing a police report that accused a coworker of wanting to engage in murder, of being involved in drive-by shootings, and of hanging out with a murderer—a serious offense that raises concerns about his integrity, particularly in light of his previous conduct toward Pfannenstiel.[108]

Mars provides no argument for why Pfannenstiel's disparate treatment compared to Edwards does not support Pfannenstiel's pretext argument.  The Court finds that Pfannenstiel has established a genuine and material factual issue as to whether she was punished more harshly than Edwards, a similarly situated employee who violated rules of comparable seriousness, and a reasonable jury could thus infer that Mars's articulated reason for Pfannenstiel's termination was pretext for unlawful retaliation.

For the reasons stated above, Pfannenstiel demonstrates a prima facie case of retaliation under Title VII, raising an inference of pretext, and presents evidence sufficient to allow a reasonable jury to find Mars's reason for her termination was pretextual.  Summary judgment is therefore denied on Pfannenstiel's claim of retaliation under Title VII.

---

[108] The summary judgment record is silent on Mars's policy on terminating employees on integrity grounds.

### B.      Retaliation Under the FMLA

The FMLA guarantees eligible employees the right to up to twelve weeks of unpaid leave for serious health conditions and reinstatement to their former position or an equivalent position upon return from that leave.[109]  The FMLA makes it unlawful for an employer to retaliate against an employee for exercising their right to FMLA leave.[110]  Like Title VII retaliation claims, retaliation claims under the FMLA are subject to the *McDonnell Douglas* burden-shifting analysis.[111]

Mars moves for summary judgment on Pfannenstiel's FMLA retaliation claim on the grounds that Pfannenstiel cannot establish a prima facie case of FMLA retaliation, and that even if she could, Mars has articulated a nonretaliatory reason for her termination that Pfannenstiel cannot demonstrate is pretextual.  Pfannenstiel contends that genuine issues of material fact preclude summary judgment.

To establish a prima facie case of retaliation under the FMLA, a plaintiff must show that: (1) they engaged in protected activity; (2) the employer took a materially adverse action; and (3) there is a causal connection between the protected activity and the adverse action.[112]  Mars concedes that Pfannenstiel meets the first two prongs of her prima facie case.  Pfannenstiel engaged in protected activity when she exercised her rights to FMLA leave, and she suffered a materially adverse employment action when Mars terminated her employment.  However, Mars argues that Pfannenstiel cannot establish a causal connection between the two.

---

[109] *See* 29 U.S.C. §§ 2612(a)(1), 2614(a).

[110] *See id.* § 2615(a).

[111] *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006).

[112] *Id.*

Pfannenstiel may demonstrate a causal connection between her use of FMLA leave and her subsequent termination "by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action."[113]  But, again, unless the protected activity and the adverse action are very closely connected in time, Pfannenstiel must put forward additional evidence beyond mere temporal proximity to establish causation.[114]  "A six-week period between protected activity and adverse action may be sufficient, standing alone, to show causation, but a three-month period, standing alone, is insufficient."[115]

Here, Pfannenstiel's final use of FMLA leave was on February 12, 2018, and Mars terminated her employment over three months later, on May 30, 2018.  Standing alone, then, temporal proximity between Pfannenstiel's use of FMLA leave and her termination is insufficient to establish a causal connection.  Pfannenstiel must rely on additional evidence that would support an inference of retaliatory motive.

Pfannenstiel argues that additional facts establish the requisite causal connection: (1) Pfannenstiel previously complained to Ha that she felt isolated and that her team, particularly Edwards, "made negative comments about her use of FMLA leave"; (2) Edwards complained to Arteaga and Ha that he believed Pfannenstiel "was possibly abusing the leave policy"; and (3) Ha engaged in an email exchange with Rashid about Pfannenstiel's use of FMLA leave.[116]

As an initial matter, while Edwards's comments and complaints about Pfannenstiel's use of FMLA leave may indicate animus, Pfannenstiel does not argue that Edwards—who did not hold a supervisory or managerial position—had any input or role in the decisionmaking process

---

[113] *Burrus v. United Tel. Co. of Kan., Inc.*, 683 F.2d 339, 343 (10th Cir. 1982).

[114] *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231 (10th Cir. 2004) (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)).

[115] *Id.* (citing *Anderson*, 181 F.3d at 1179).

[116] Doc. 59 at 46.

leading up to Pfannenstiel's termination.  Moreover, when Ha discussed Edwards's complaint with Arteaga in late 2017, Arteaga said that he explained to Edwards that Pfannenstiel's medical leave was "not something he [could] discuss with [him]."[117]  The Court cannot find that evidence of Edwards's animus about Pfannenstiel's use of FMLA leave permits an inference of retaliatory motive, nor do the circumstances surrounding Ha's and Arteaga's handling of the situation.

Pfannenstiel also points to an email exchange between Ha and Rashid in February 2018 that she argues "expressed hostility about [her] use of leave and purported delays in providing paperwork.[118]  Pfannenstiel does not identify any statement in either Ha's or Rashid's email to support her assertion that they showed hostility about her use of FMLA leave, and the Court can find none.  While the emails certainly express frustration about her failure to submit paperwork on time, Pfannenstiel does not dispute that she submitted her paperwork late, nor does she contend that the letter she received from Penton concerning the delays referenced in the emails was improper.  This email exchange does not support an inference of retaliatory motive.

Finally, Pfannenstiel asserts that Rashid, along with Arteaga, expressed retaliatory animus by preparing a "Final Written Warning" for Pfannenstiel based on her attendance in November 2017, while she was on FMLA leave.  In that same sentence, however, Pfannenstiel admits that the write-up was not retaliatory—presumably because Arteaga only issued the warning after the company time-keeping system sent an automatic warning about her attendance.[119]  When Pfannenstiel and Arteaga subsequently reviewed her attendance record together, Arteaga agreed that the warning was issued in error and asked Penton to correct Pfannenstiel's records.  These circumstances do not justify an inference of retaliatory motive.

---

[117] Doc. 59-10 at 8.

[118] Doc. 59 at 46.

[119] Pfannenstiel does not assert that the Final Written Warning constitutes an adverse employment action.

Because Pfannenstiel has not put forward additional evidence beyond mere temporal proximity to demonstrate a causal connection between her use of FMLA leave and her termination, she has not established a prima facie case of FMLA retaliation.  Summary judgment is therefore granted on this claim.

## C.      Retaliatory Discharge Under Kansas Law

Kansas law prohibits employers from firing an employee for filing a workers' compensation claim or for being absent because of work-related injuries.[120]  Retaliatory discharge claims under Kansas law are analyzed under the *McDonnell Douglas* burden-shifting framework.[121]  Under Kansas law, the plaintiff bears the burden of establishing a retaliatory discharge claim "by a preponderance of the evidence, but the evidence must be clear and convincing in nature."[122]

The elements of a prima facie case of retaliatory discharge under Kansas law are: (1) the employee filed a claim for workers' compensation benefits or sustained a work-related injury for which the employee could assert a future claim for such benefits; (2) the employer had knowledge of the employee's compensation claim or the fact that the employee sustained a work-related injury for which they could file a future claim for benefits; (3) the employer

---

[120] *Ortega v. IBP, Inc.*, 874 P.2d 1188, 1191 (Kan. 1994).

[121] *Rebarchek v. Farmers Co-op. Elevator & Mercantile Ass'n*, 35 P.3d 892, 898–99 (Kan. 2001).

[122] *Ortega*, 874 P.2d at 1198.  The Kansas Supreme Court, however, has also held that a plaintiff "need not meet the clear and convincing standard at the summary judgment stage of the proceedings."  *Rebarchek*, 35 P.3d at 898.  With respect to the applicable standard of proof in federal court, the District of Kansas has explained that a plaintiff need not "establish the elements of [their] prima facie case by clear and convincing evidence.  The clear and convincing evidence standard only applies once the burden shifts back to [the] [p]laintiff to demonstrate that the employer's proffered reasons for termination are pretextual."  *Eckman v. Superior Indus. Int'l, Inc.*, No. 05-2318-DJW, 2007 WL 1959199, at *6 (D. Kan. July 2, 2007) (footnotes omitted) (citing *Foster v. AlliedSignal, Inc.*, 293 F.3d 1187, 1195 (10th Cir. 2002)), *aff'd*, 271 F. App'x 782 (10th Cir. 2008).

terminated the employee's employment; and (4) a causal connection exists between the protected activity or injury and the termination.[123]

Pfannenstiel meets the first and third elements of her prima facie case of retaliatory discharge under Kansas law.  Pfannenstiel filed a workers' compensation claim, and her employment was subsequently terminated.  However, Mars disputes that any of those involved in Pfannenstiel's termination had the requisite knowledge and denies any causal connection.

"To establish a causal connection, a plaintiff must establish that the individual or individuals who actually undertook the alleged retaliatory acts were aware or should have been aware of [the] plaintiff's participation in the protected activity."[124]  Pfannenstiel must therefore show that, "at the time of her discharge, the decision-makers who terminated her employment were aware or should have been aware that the absences for which she was discharged were the result of a work-related injury" or that she filed workers' compensation claim.[125]  In this case, it is uncontroverted that the decisionmakers who terminated Pfannenstiel's employment had no knowledge about Pfannenstiel's workers' compensation claim.

Pfannenstiel asserts that Penton's email to Mars's drug-testing contractor stating that "the powers that be" wanted to know the results of her drug tests creates a genuine issue of material fact as to whether the decisionmakers knew about her work-related injury, particularly in light of Penton's deposition testimony indicating that she was referring to management.[126]  However, that "the powers that be" in this case were Arteaga and Ha, who asked for the drug test results for staffing purposes—a common request.  Neither Arteaga nor Ha participated or had any input in

---

[123] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[124] *Foster v. Alliedsignal, Inc.*, 293 F.3d 1187, 1193 (10th Cir. 2002).

[125] *Bones*, 366 F.3d at 876 (citing *Foster*, 293 F.3d at 1193).

[126] Doc. 59-1 at 2.

the decision to terminate Pfannenstiel's employment,[127] and Penton testified that she never told

any of the decisionmakers about Pfannenstiel's work-related injury.

Moreover, Rashid was on paternity leave when Pfannenstiel sustained her work-related

injury and took a short leave of absence related to the injury.  Phillips, who covered Rashid's

duties and responsibilities, testified that she was never "made aware at any time" that

Pfannenstiel suffered a work-related injury.[128]  Pfannenstiel does not contend that she informed

any of the decisionmakers that she was absent from work because of a work-related injury.

While the Court "cannot make credibility determinations and must leave fact-finding to the

jury,"[129] there is simply nothing in the summary judgment record to suggest that any of the

decisionmakers knew or should have known about Pfannenstiel's work-related injury when they

terminated her employment.

Accordingly, Pfannenstiel has not met her burden of showing that the decisionmakers

knew or should have known of her work-related injury or her workers' compensation claim.

Summary judgment is granted on Pfannenstiel's retaliatory discharge claim under Kansas law.

**IT IS THEREFORE ORDERED BY THE COURT** that Mars Wrigley Confectionary

US, LLC's Motion for Summary Judgment (Doc. 53) is **granted in part and denied in part**.

Summary judgment is denied on Pfannenstiel's Title VII retaliation claim.  Summary judgment

is granted on Pfannenstiel's FMLA retaliation and retaliatory discharge claims.

**IT IS SO ORDERED.**

---

[127] *Cf. Kimbrell v. Amsted Rail Co.*, No. 13-CV-2227, 2014 WL 1910077, at *4 (D. Kan. May 13, 2014) (holding that, while the decisionmaker "undisputedly had no knowledge of plaintiff's injury," the evidence supported an inference that the decisionmaker "made the decision with full participation" of at least one person with knowledge of the plaintiff's injury).

[128] Doc. 54-10 at 5.

[129] *Wilkins v. Packerware Corp.*, No. 04-4024-KGS, 2005 WL 1528670, at *7 (D. Kan. June 22, 2005).

Dated: January 29, 2021

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE